Shannon Seibert (CBN 240317)
seibert@ssjblaw.com
Joe Bautista (CBN 255708)
joebau@ssjblaw.com
**SEIBERT & BAUTISTA**
22 Battery Street, Ste. 888
San Francisco, CA  94111
Tel:  415.954.9455
Fax: 415.494.8115

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DESOTO CAB COMPANY, INC., d/b/a FLYWHEEL TAXI, <br><br>        Plaintiff, <br> vs. <br><br> UBER TECHNOLOGIES, INC., a Delaware corporation; UBER USA, LLC, a Delaware limited liability company; RASIER, LLC, a Delaware limited liability company; RASIER-CA, LLC, a Delaware limited liability company; and DOES 1 through 100, inclusive, <br><br>        Defendants. | CASE NO.: 3:16-cv-06385 <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff DESOTO CAB COMPANY, INC., d/b/a FLYWHEEL TAXI, complains against Defendants, and each of them, demands a trial by jury of all issues and for all causes of action for which it is entitled, and hereby alleges on information and belief as follows.

## INTRODUCTION

1.     This is an action that stems from the anticompetitive and illegal conduct of Uber, which promotes itself as a "disrupter" of the transportation industry through its use of "innovative" practices. In reality, Uber has done little more than implement a business strategy that openly flouts the law while shifting many of the costs and nearly all of the risks of providing ride-hail services from itself to its drivers and passengers while forcing a race to the bottom through predatory pricing tactics – where, propped up by billions of dollars in venture capital funding, Uber will remain until its illegal strategy has forced all other competitors from the market.

## PARTIES

2.     Plaintiff DESOTO CAB COMPANY, INC., d/b/a FLYWHEEL TAXI ("FLYWHEEL TAXI") is a California corporation. FLYWHEEL TAXI is a San Francisco taxicab company that maintains its headquarters and principal place of business in the City and County of San Francisco, California.

3.     Defendant UBER TECHNOLOGIES, INC. is a Delaware corporation. UBER TECHNOLOGIES, INC. maintains its headquarters and principal place of business in the City and County of San Francisco, California.

4.     Defendant UBER USA, LLC is a Delaware limited liability company. UBER USA maintains its headquarters and principal place of business in the City and County of San Francisco, California.

5.     Defendant RASIER, LLC is a Delaware limited liability company. RASIER, LLC maintains its headquarters and principal place of business in the City and County of San Francisco, California.

6.     Defendant RASIER-CA, LLC is a Delaware limited liability company. RASIER-CA, LLC maintains its headquarters and principal place of business in the City and County of San Francisco, California.

7.      Defendants UBER TECHNOLOGIES, INC., UBER USA, LLC, RASIER, LLC, and RASIER-CA, LLC are collectively referred to herein as "UBER" or "Defendants."

8.      FLYWHEEL TAXI is unaware of the identity of those Defendants sued as DOES 1 through 100, inclusive, and they are therefore sued under those fictitious names. FLYWHEEL TAXI is informed and believes, and thereon alleges, that it is entitled to the relief requested in this complaint from these Doe defendants and will seek leave of this Court to amend this complaint to reflect these defendants' true names and identities when ascertained.

9.      FLYWHEEL TAXI is informed and believes and thereon alleges that each of the defendants named herein was the agent, alter ego, employee or representative of each of the remaining defendants and in doing the things mentioned herein, was acting in the course and scope of such relationship. FLYWHEEL TAXI further alleges that in doing the acts or omissions complained of herein, Defendants, and each of them, acted or omitted to act in concert as agents of and/or on behalf of the other defendants named herein.

## VENUE AND JURISDICTION

10.      Jurisdiction is conferred upon this Court by 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331 and 1337.

11.      Supplemental jurisdiction over the California state law claims alleged herein is invoked pursuant to 28 U.S.C. § 1367. The claims that arise under state law are so related to claims within the original jurisdiction of this Court that they form a part of the same case and controversy under Article III of the United States Constitution.

12.      Venue is proper in this district pursuant to 15 U.S.C. §§ 22 and 26 and 28 U.S.C. § 1391 because Defendants transact business and maintain their principal corporate offices in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the violation of the antitrust laws alleged herein was and is carried on within this district, and the acts complained of have had, and will have, substantial anticompetitive effects in this district.

////

////

////

## INCORPORATION OF ALLEGATIONS

13.     All of the allegations in this Complaint are hereby incorporated into each cause of action to the extent necessary or useful to clarify and complete each stated cause of action, to avoid repetition and redundancy.

## TRADE AND COMMERCE

14.     Defendants market and sell ride-hail ground transportation services through the internet and smartphone applications within the flow and using means of interstate commerce.

## RELEVANT MARKET

15.     The product market relevant to the antitrust, unfair practices, and unfair competition causes of action is ride-hail ground transportation service provided in private vehicles that are not licensed as "TCP" or "PSC" and that originate in the City and County of San Francisco. The geographic market is the City and County of San Francisco, including San Francisco International Airport. This market is referred to herein as the "San Francisco Ride-Hail Market."

16.     Defendants currently control approximately 70 percent of the San Francisco Ride-Hail Market.

## FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION

### Ground Transportation in San Francisco

17.     In San Francisco, three types of private for-hire ground transportation existed prior to July 2012: Passenger stage corporations ("PSCs"), which are shuttles driven by commercially licensed drivers; charter-party carriers ("TCPs"), which are limousines and luxury sedans driven by commercially licensed drivers; and taxicabs, which are driven by specially permitted drivers.

18.     PSCs and TCPs are licensed and regulated by the California Public Utilities Commission ("CPUC"). PSCs provide shuttle transportation service to the general public on fixed routes or through scheduled service. TCPs are hired on a prearranged basis through a TCP-permitted company for the exclusive use of an individual or group. There is no limit on the number of PSCs or TCPs that may operate in the City of San Francisco, and no limit is set on the fees that PSCs or TCPs may charge to passengers.

////

19.     Taxicabs are permitted and regulated by the San Francisco Municipal Transportation Agency ("SFMTA"). Working within the confines of the regulations established by the SFMTA and the San Francisco Transportation Code, the taxicab industry provides ride-hail ground transportation services originating in the City and County of San Francisco through smartphone applications, telephone dispatch, and street hails.

20.     FLYWHEEL TAXI is a taxicab company that has been operating in the San Francisco Ride-Hail Market since the 1930s.

21.     Prior to July 2012, UBER offered transportation services in San Francisco by commercially licensed drivers in TCP-licensed vehicles.

22.     On July 4, 2012, UBER entered the San Francisco Ride-Hail Market with the launch of "UberX," which offered transportation in non-TCP-licensed vehicles. With the launch of UberX, UBER entered into direct competition with taxicab companies, including FLYWHEEL TAXI, for drivers and consumers of ride-hail transportation services in San Francisco.

23.     UBER expanded its presence in the San Francisco Ride-Hail Market on May 12, 2014 with the launch of "UberXL."

24.     From July 2012 through the present date, the taxicab industry has experienced an approximately 65 percent decline in ridership and has lost more than 30 percent of its drivers as a result of UBER's illegal actions as explained below.

25.     As a result of the decline in ridership and loss of drivers caused by UBER's illegal actions as explained below, FLYWHEEL TAXI has suffered substantial monetary losses between July 2012 and the present date.

### UBER's History in San Francisco

26.     UBER began operations in San Francisco in approximately June 2010 as "UberCab." UberCab provided ride-hail transportation service in full-size luxury vehicles. The luxury vehicles were TCP-licensed and driven by commercially licensed drivers. UBER conceived of its luxury vehicle service as one that would be used as a status symbol for people who wanted to be "ballers" in San Francisco.

////

27.     In October 2010, UberCab was ordered to cease and desist operations by local and state agencies due, in part, to the agencies' findings that UBER was using limousines, town cars, and other luxury vehicles to provide taxi services in violation of San Francisco's Transportation Code and California law.

28.     UBER responded by dropping the name "Cab" from the company name and continuing to provide luxury car services known as "UberBlack." UBER charged a base rate of $8.00 plus $4.90 per mile and $1.25 per idle minute for UberBlack service.

29.     On July 4, 2012, UBER launched "UberX" in San Francisco. UBER promoted its UberX service as its lower cost alternative to UberBlack. UberX prices were initially set higher than those charged by taxicabs but lower than UberBlack.

30.     On July 4, 2012, UBER also launched "UberSUV" in San Francisco as a premium service for larger groups. UberSUV services are provided by commercially licensed drivers in TCP-licensed luxury vehicles. UberSUV rates are higher than those charged for UberBlack due to the additional passenger capacity offered by UberSUV vehicles.

31.     On October 17, 2012, UBER launched UberTaxi, which allows users to request a licensed taxicab through UBER's smartphone application. UBER charged the taximeter rates, plus a $1.00 booking fee and added an automatic 20 percent gratuity to the total fare.

32.     On May 12, 2014, UBER launched "UberXL," which was promoted as its "Low-Cost SUV Option." UberXL drivers are not commercially licensed, and UberXL vehicles are not TCP-licensed. UberXL is approximately 50 percent less expensive than UberSUV.

**UBER's Business Model**

33.     UBER formed in 2009 with seed funding of approximately $200,000. Since then, UBER has raised more than $15 billion in private venture capital funding.

34.     UBER's revenue is generated by taking a percentage of the money paid by passengers for rides booked through the UBER smartphone application. The amount charged to the passenger for each ride is determined by a GPS-based system that, just like a meter in a taxicab, measures the time and distance traveled during each trip.

////

35.     At the conclusion of each trip, the passenger's credit card is charged by UBER. UBER withholds its percentage as commission and deposits the remainder into each driver's bank account on a weekly basis. The standard percentage currently taken by UBER is 25 percent of the total amount charged to the passenger, though the amount may vary from 0 percent to 30 percent.

36.     In October 2011, UBER implemented a new policy called "surge pricing," which results in an automatic price increase during times of actual or anticipated increases in demand. Surge pricing has resulted in passengers being charged up to eight (8) times the advertised fare during times of natural and national emergencies and has led to numerous accusations of price gouging.

37.     From the time of its founding until July 2012, UBER's service was promoted as a luxury service, and its business model was centered on the premise that passengers were willing to pay more for an Uber than for a taxi because UBER offered higher quality transportation services.

38.     Beginning in July 2012, UBER shifted its focus from providing luxury TCP-licensed transportation service and entered the San Francisco Ride-Hail Market with UberX.

39.     UBER drivers must provide their own personal vehicles and personal liability insurance to be approved to drive for UBER. UBER requires that driver applicants submit a picture of their vehicle – which must be an UBER-approved make and model, must carry at least four passengers, must not be more than 10 to 15 years old, and must not have any scratches or dents in the body – as well as proof of personal insurance on the vehicle at the time of application.

40.     By requiring drivers to maintain personal insurance, UBER pushes many of the liability risks inherent in providing ride-hail transportation to UBER drivers. The risk is also transferred to UBER passengers and third-parties such as pedestrians, who may be left without any or sufficient recourse if they are injured as a result of an UBER driver's actions due to the absence of an adequate insurance policy to provide coverage.

41.     Additional costs associated with driving a vehicle include maintenance, cleaning, and depreciation of the vehicle. Depending on the amount of time and number of miles driven, the cost of maintenance, cleaning, and service of the vehicle can range from $500 per month to more than $1,500 per month.

////

42.     Additional costs include data usage rates for streaming music UBER offers to passengers through the driver's personal cell phone, $10 a week for use of UBER's iPhone containing the UBER application, toll charges incurred when transporting UBER passengers, and tickets and citations issued for operating UBER as an unauthorized taxi service.

43.     Beginning in November 2013, UBER implemented a plan to push additional costs to drivers while ensuring drivers would be unable to stop driving for UBER through the "Vehicle Solutions Program." Through the program, UBER "connects drivers with any kind of credit history to the best financing options available" from subprime lenders in order to purchase an UBER-approved vehicle. At least one of UBER's "partner" lenders is currently under federal investigation for its auto lending and underwriting practices.

44.     To enroll in the Vehicle Solutions Program, the driver makes an initial cash deposit of approximately $2,000. The driver's car payments are then automatically deducted from his or her weekly earnings before UBER deposits them in the driver's bank account. At interest rates as high as 25 percent, UberX drivers pay between $700 and $1,000.00 per month until the loan is paid in full, resulting in drivers often paying nearly double the sticker price of the car. The program works, according to UBER CEO Travis Kalanick, to ensure that UberX drivers continue driving for UBER.

45.     Beginning in July 2015, UBER added a new program, Xchange Leasing, through which UBER offers subprime automobile leases to UBER drivers with poor credit. UBER markets Xchange Leasing as offering "low" car payments that are deducted from the driver's weekly earnings and a leasing program that is "flexible." In reality, the subprime rates charged to UBER drivers with poor credit are two to three times the amount charged by car dealerships and include hidden fees and cancellation penalties.

46.     Despite a business model that unabashedly shifts the risks of doing business to its drivers and lures drivers to a modern-day form of indentured servitude, UBER has yet to turn a profit. Propped up by billions of dollars in venture capital, UBER has lost and continues to lose hundreds of millions of dollars each year due to its predatory pricing practices.

////

////

**Beyond "Disruption" – UBER's Anticompetitive Conduct**

47.     In 2010 and 2011, UBER advertised the prices for its luxury-vehicle transportation service as the premium charged for a better service than that offered by the taxicab industry. In a lengthy 2011 blog post, UBER explained: "We *do* cost more than a cab. But we *offer* more than a cab: reliability, user support, and of course style and comfort … Uber may cost more, but … Uber's benefits far outweigh the extra costs." (emphasis in original UBER website posting.) At the time, UBER charged a base rate of $8.00 plus $4.90 per mile and $1.25 per idle minute for UberBlack luxury vehicles.

48.     In July 2012, UBER launched UberX in San Francisco at prices higher than taxicab rates but lower than UberBlack rates. UBER promoted UberX as its lower cost alternative to UberBlack. In July 2012, UberX cost $5.00 for the base rate, $3.25 per mile, and $.75 for each idle minute in San Francisco.

49.     As demand for UberX increased between July 2012 and June 2013, UBER increased the base rate for UberX services in San Francisco to $5.75, the per-mile rate to $3.75, and the per-minute rate to $.85.

50.     In June 2013, UBER drastically lowered the price of its UberX service in San Francisco and incorrectly announced that "effective today, **uberX prices are 10 percent lower than taxi prices**." (emphasis in original UBER website posting.) UBER promoted UberX as the "new UberX" that offered "cheaper-than-taxi pricing."

51.     In reality, the June 2013 price cut brought UberX prices into parity with the taxicab industry's 2013 prices: $3.50 for the base fare, $2.75 for each additional mile, and $.55 for each minute of waiting or traffic delay time.

52.     UBER lost money on each and every UberX ride provided in the San Francisco Ride-Hail Market after reducing prices in June 2013.

53.     Six months later, in January 2014, UBER "temporarily" slashed UberX prices in San Francisco by an additional 20 percent explaining that "we're going all-in on being the cheapest ride in town" and claiming to offer fares 26 percent cheaper than taxicabs.

////

54.     The new rates charged for UberX after the January 2014 price cuts were $3.00 for the base fare, $1.50 per mile, and $.30 per idle minute.

55.     At the same time it lowered UberX rates in January 2014, UBER reduced its commission on each UberX ride by 75 percent (from 20 percent to 5 percent) to subsidize the income lost by UberX drivers due to the price cuts.

56.     UBER lost money on each and every UberX ride under the pricing structure implemented in January 2014.

57.     In April 2014, UBER restored its commission on UberX rides to 20 percent but did not return UberX prices to pre-January levels, leading the drivers to suffer a 15 percent reduction in income compared to three months earlier. Though it claimed the January 2014 price cuts would be "temporary," UberX prices never returned to pre-January 2014 levels.

58.     In May 2014, UBER launched UberXL, which it advertised as its "low-cost SUV option." UberXL prices were: $5.00 for the base fare, $2.15 per mile, and $.45 per idle minute. UBER lost money on each and every UberXL ride under the pricing structure implemented in May 2014.

59.     In June 2014, UBER further reduced UberX prices by 25 percent. UBER emailed its San Francisco users and advertised through its San Francisco blog: "We just dropped uberX fares by 25 percent, making it 45 percent cheaper than a taxi. In San Francisco … and everywhere else in the Bay Area, uberX is the most affordable ride on the road."

////

////

////

////

////

////

////

////

////

60.     To ensure the public would not miss the drastic, if overrepresented, undercutting of the prices charged by the taxicab industry, UBER included the following graphic:

## HOW THESE PRICES COMPARE







61.     UBER subsidized the June 2014 round of price cuts by paying its drivers more than UBER charged passengers under the new pricing program. Though UberX passengers paid only 75 percent of the January 2014 rates due to the 25 percent price-reduction, UBER continued to pay UberX drivers 80 percent of the January 2014 rates – meaning UBER paid the entire amount collected from the passenger *plus* an additional 5 percent for each UberX ride.

62.     When UBER stopped subsidizing UberX drivers' income in the San Francisco Ride-Hail Market in September 2014, drivers lost an additional 25 percent of their income due to the price cuts.

63.    The June 2014 price cuts lowered UberX prices to $2.20 for the base fare, $1.30 per mile, and $.26 per idle minute. UBER lost money on each and every UberX ride under the pricing structure implemented in June 2014.

64.    UBER further reduced prices of UberX in January 2016 to $2 for the base fare, $1.15 per mile, and $.22 per idle minute. UBER has experienced and continues to experience a loss on each and every UberX ride under the pricing structure implemented in January 2016.

65.    In January 2016, UBER reduced UberXL prices to: $3 for the base fare, $2 per mile, and $.30 per idle minute. UBER has experienced and continues to experience a loss on each and every UberXL ride provided in the San Francisco Ride-Hail Market.

66.    In August 2016, UBER instituted a program called Uber Plus. In San Francisco, Uber Plus passengers pay $30 per month in return for 40 UberX rides per month at the flat rate of $8 per ride, resulting in a total fare of $8.75 for each UberX ride provided by UBER.

67.    UBER subsidizes the difference between the flat rate charged to passengers and the normal rates earned by drivers by paying drivers more than UBER receives from the passengers, resulting in additional losses for UBER for each and every ride taken.

68.    Beginning in at least January 2014 and continuing through the present date, UBER has lost and continues to lose money on each and every UberX and UberXL ride provided in the San Francisco Ride-Hail Market.

69.    Throughout this time, UBER has also artificially increased prices of taxicabs through its UberTaxi application, which allows a user to hail a taxicab but only at rates higher than those allowed by the SFMTA. Despite UBER's assertion that the service was offered to provide customers more "choice," the service has improperly inflated taxicab fares.

70.    UBER has been able to maintain below-cost pricing for its UberX and UberXL services in the San Francisco Ride-Hail Market due to vast reserves of capital invested with the expectation of reaping extraordinary future returns.

71.    In adopting this approach, UBER has veered from free market principles and artificially deflated fares of UberX and UberXL to prices below cost in an effort to drive competitors

of UberX and UberXL from the market in the hope of recouping its losses once UBER's competition has been destroyed.

72.     UBER's intent to monopolize the San Francisco Ride-Hail Market and injure competitors has been made clear through the statements of its CEO Travis Kalanick and UBER's advertising highlighting its unilateral price war in the San Francisco Ride-Hail Market.

73.     UberX is advertised as "everyday cars for everyday use" that are "better, faster, and cheaper than a taxi," and UBER's San Francisco website advertises that its "fares are usually cheaper than a taxi." UBER's San Francisco webpage links to the SFMTA website, where San Francisco taxicab rates are published so consumers can compare UberX and UberXL prices to San Francisco taxicab prices.

74.     UBER CEO Travis Kalanick has repeatedly stated in public speeches that UBER intends to "destroy" all of its competitors and has made clear that UBER is doing so through below-cost pricing of UberX and UberXL services.

75.     Propped up by billions of dollars in venture capital that allow it to operate at enormous losses due to below-cost pricing, UBER has captured more than 70 percent of the San Francisco Ride-Hail Market. Left unchecked, UBER is likely to succeed in establishing complete domination of the market by forcing out all competitors through its predatory pricing practices. Once its competitors have been removed, UBER, free of the constraints of competition, will be free to implement unfettered price increases for its services, and consumers will be left with no choice but to pay the prices – however exorbitant – demanded by UBER.

### UBER's Wrongful, Illegal & Unfair Practices

#### *UBER's Misrepresentations to Drivers*

##### *False Statements about Uber Drivers' Hourly Income*

76.     In June 2013, UBER represented to current and prospective UberX drivers that they would earn more money per hour as a result of UBER's June 2013 price reduction for UberX services.

////

////

77.     In January 2014, UBER represented to current and prospective UberX drivers that they would earn more money per hour as a result of UBER's January 2014 price reduction for UberX services.

78.     In June 2014, UBER represented to current and prospective UberX drivers that they would earn more money per hour as a result of UBER's June 2014 price reduction for UberX services.

79.     In reality, UberX drivers earned less money on a per-hour basis despite performing more work after each of UBER's price cuts than they earned before each of UBER's price cuts.

80.     In reliance on UBER's misrepresentations, thousands of former and potential San Francisco taxicab drivers have quit or foregone driving taxicabs and assumed monthly car payments with the expectation of earning increased amounts of income on a per-hour basis. Having incurred the costs and long-term financial commitments required to become an UberX driver, the drivers are left with no choice but to continue driving for UBER despite a decreasing rate of return.

*False Statements about Uber Drivers' Annual Income*

81.     Beginning in May 2014 and continuing through the present date, UBER has represented to current and potential UberX drivers that half of UberX drivers in the San Francisco Ride-Hail Market earn more than $74,000 per year driving for UBER.

82.     In reality, more than half of full-time UberX drivers in the San Francisco Ride-Hail Market make less than approximately $35,000 in gross earnings per year and incur costs exceeding approximately $15,000 per year.

83.     In reliance on UBER's representations, thousands of former and potential San Francisco taxicab drivers have quit or foregone driving taxicabs and assumed monthly car payments with the expectation of earning approximately $74,000 per year driving an UberX vehicle. Having incurred the costs and long-term financial commitments required to become an UberX driver, drivers are left with no choice but to continue driving for UBER despite the paltry annual income actually earned.

////

////

*False Statements about Uber Drivers' Proportional Income*

84.     Beginning in June 2013 and continuing through the present date, UBER has represented to current and potential UberX and UberXL drivers in San Francisco that they would earn 80 percent of all fares collected from their passengers and that UBER would provide free smartphones to them.

85.     In reality, UBER began deducting $10.00 per week from drivers' earnings in September 2014 for the use of its smartphone and began confiscating a $1.00 "safe rides" fee that was previously paid to UberX and UberXL drivers. As a result, UberX and UberXL drivers receive far less than 80 percent of the total fares collected from their passengers.

86.     In reliance on UBER's misrepresentations, thousands of former and potential San Francisco taxicab drivers have quit or foregone driving taxicabs and assumed monthly car payments with the expectation of earning 80 percent of all fares collected from their passengers. Having incurred the costs and long-term financial commitments required to become an UberX or UberXL driver, drivers are left with no choice but to continue driving for UBER despite the reduced proportional income actually earned.

*False Statements about Taxicab Drivers' Income*

87.     UBER represents to current and potential UberX and UberXL drivers that taxicab drivers live below the poverty line and are required to spend $3,500 per month to lease their taxicab.

88.     In reality, full-time taxicab drivers in the San Francisco Ride-Hail Market made approximately $6,000.00 per month in gross earnings before UBER began engaging in anticompetitive conduct and paid approximately $1,900.00 per month to lease the vehicles.

89.     Relying on UBER's misrepresentations, thousands of potential San Francisco taxicab drivers assumed the financial responsibilities, risks, and commitments associated with driving for UBER rather than choosing to drive a taxicab.

90.     In reliance on UBER's misrepresentations, thousands of potential San Francisco taxicab drivers have foregone driving taxicabs and assumed monthly car payments with the expectation of making more money driving for UBER than would be made driving a taxicab. Having incurred the costs and long-term financial commitments required to become an UberX or UberXL

driver, drivers are left with no choice but to continue driving for UBER despite the paltry annual income actually earned.

### *UBER's Misrepresentations to the Public*

#### *False Statements about UberX Prices Relative to Taxi Prices*

91.     In June 2013, UBER falsely stated to the public that UberX prices were "10 percent lower than taxi prices." In reality, UberX prices were not lower than taxicab vehicle prices but were exactly equal to taxicab prices in the San Francisco Ride-Hail Market after UBER's June 2013 price cuts.

92.     In January 2014, UBER falsely stated to the public that UberX prices were 26 percent lower than taxi prices. In reality, UberX prices were 15 percent lower than taxicab prices in the San Francisco Ride-Hail Market after UBER's January 2014 price cuts.

93.     In June 2014, UBER falsely stated to the public that it dropped UberX prices by 25 percent and that the price reduction made UberX prices 45 percent lower than taxi prices. In reality, UberX prices were decreased by 18 percent, making them 38 percent lower than taxicab prices in the San Francisco Ride-Hail Market after UBER's June 2014 price cuts.

94.     Throughout this time and continuing through the present date, purchasers of ride-hail services in San Francisco have relied on and have been deceived by UBER's representations regarding UberX prices relative to San Francisco taxicab prices when selecting UberX instead of UBER's taxicab competitors.

#### *False Statements about Surge Pricing*

95.     Beginning in June 2013 and continuing through December 2013, UBER advertised UberX prices in San Francisco as $3.50 for the base fare, $2.75 per additional mile, and $.55 per idle minute.

96.     Beginning in January 2014 and continuing through June 2014, UBER advertised UberX prices in San Francisco as $3.00 for the base fare, $1.50 per additional mile, and $.30 per idle minute.

////

////

97.     Beginning in July 2014 and continuing through December 2015, UBER advertised UberX prices in San Francisco as $2.20 for the base fare, $1.30 per additional mile, and $.26 per idle minute.

98.     Beginning in January 2016 and continuing through the present date, UBER advertised UberX prices in San Francisco as $2.00 for the base fare, $1.15 per additional mile, and $.22 per idle minute.

99.     In reality, beginning in June 2013 and continuing through the present date, UBER has charged UberX customers "surge" rates at amounts not included in the advertised rates. UBER's "surge" pricing results in passengers being charged up to eight (8) times the rates advertised by UBER.

100.     Beginning in June 2013 and continuing through the present date, purchasers of ride-hail services in San Francisco have relied on and have been deceived by the advertised rates when selecting UberX instead of UBER's competitors.

### False Statements about Tipping & Total Fares Charged to Passengers

101.     Beginning in at least November 2011 and continuing through April 2016, UBER consistently and repeatedly falsely stated that the fare charged to the customer through the UBER smartphone application for UberX and UberXL services "includes the tip."

102.     In reality, the fare charged to passengers never included a tip and UBER did not provide the driver with a tip despite the fact that tipping is a common and expected practice in the San Francisco ride-hail industry.

103.     Continuing through at least June 2016, purchasers of ride-hail services have relied on and have been deceived by UBER's misrepresentations when comparing the prices of UberX and UberXL to those of UBER's taxicab competitors.

### False Statements about Vehicle Locations & Response Times

104.     Through its smartphone application, UBER provides a visual depiction of nearby UberX and UberXL vehicles currently available to accept requests from passengers. The application also provides an estimate of the time it will take for a driver to reach the passenger when the passenger requests a ride. From June 2012 and continuing through the present date, UBER advertised

this function as real-time tracking of UberX vehicles available for hire. From May 2014 and continuing through the present date, UBER advertised this function as real-time tracking of UberXL vehicles available for hire.

105.     In reality, the UBER application did not and does not accurately represent the UberX and UberXL vehicles available to pick up passengers. The application overstates the number and understates the proximity of available vehicles. When an order is placed through the application, the application significantly underestimates the time it will take for an UberX or UberXL driver to reach the passenger, leading to longer wait times than represented.

106.     Throughout this time and continuing through the present date, purchasers of ride-hail services in San Francisco have relied on and have been deceived by UBER's false statements regarding the number and proximity of available vehicles and estimated wait times when selecting an UberX or UberXL vehicle over those of UBER's taxicab competitors.

*False Statements about Safety*

107.     Beginning in at least June 2013 and continuing through April 2016, UBER falsely stated that it conducted "rigorous" background checks on UBER drivers that "set a new standard" to ensure the safety of passengers. UBER represented its drivers "provide[d] the safest ride on the road" and were "the gold standard" of safety practices.

108.     In reality, UBER's background checks were and are inferior to those required for taxicab drivers, who are required to submit to fingerprinting and LiveScan, which searches a national database of records. UBER's deficient background check process has allowed registered sex offenders, identity thieves, and a convicted murderer drive for UberX and led to numerous assaults and injuries of UberX passengers.

109.     Throughout this time and continuing through the present date, purchasers of ride-hail services in San Francisco have been deceived by and have relied on UBER's misrepresentations regarding safety when choosing UberX and UberXL services over those of UBER's taxicab competitors.

////

////

### *UBER's Illegal & Unfair Conduct*

#### *UBER's Violations of Federal Law*

110.     The Americans with Disabilities Act prohibits private for-hire transportation companies from discriminating against any individual with a disability and requires that private for-hire transportation companies provide readily accessible vehicles for individuals with disabilities, train personnel to provide proficient service to disabled individuals, assist with the stowing of mobility devices, and allow service animals to accompany people with disabilities. In contravention of federal law and continuing from UBER's inception through the present date, UBER has discriminated against individuals with disabilities by providing services only through smart-phone applications that require credit card payment, thereby excluding from UBER services all disabled individuals of limited financial means, and has further refused to provide readily accessible vehicles for disabled individuals, refused to train personnel to provide proficient service to disabled individuals, refused to assist with the stowing of mobility devices, and, until April 2016, refused to allow service animals to accompany disabled individuals.

#### *UBER's Violations of California State Law*

111.     The Unruh Civil Rights Act prohibits business establishments from discriminating on the basis of race and requires that all businesses in California provide full and equal accommodations, advantages, facilities, privileges and services without regard to race. In contravention of state law and continuing from UBER's inception through the present date, UBER has discriminated against non-white passengers by refusing, and allowing its agents to refuse, to offer non-white passengers free and full access to UBER vehicles.

112.     From September 2013 through July 2015, UBER was required to maintain commercial insurance that provided a minimum of $1 million per incident in liability coverage. In contravention of California law, UBER forced its drivers to maintain their own insurance policies to provide primary coverage while offering a "contingent" policy that did not provide full coverage at all times the vehicle was in use.

113.     California regulatory authorities require that for-hire vehicles be registered as commercial vehicles. UBER refuses to allow drivers to register UberX and UberXL vehicles as

commercial vehicles and has deactivated the UBER accounts of UberX and UberXL drivers who registered their vehicles as commercial vehicles in defiance of UBER's instruction. By mandating that UberX and UberXL vehicles be registered as personal rather than commercial vehicles, UBER is operating, and requires that its drivers operate, in direct violation of California law.

114.    UBER is required by California regulatory authorities and statute to ensure that all drivers are safely operating UberX and UberX vehicles by establishing a driver training program. UBER has failed and refused to establish or provide a driver training program for UberX and UberXL drivers. Instead, UBER offers a 16-minute YouTube video that demonstrates how to operate the UBER smartphone application and refers potential drivers to an optional $65.00 course offered by a third party.

### *UBER's Violations of San Francisco Municipal Law*

115.    San Francisco municipal law requires that private vehicles providing ride-hail services in the City and County of San Francisco must comply with the SFMTA's rules regarding taxicab vehicles contained in sections 300 and 1100 of the San Francisco Transportation Code. Beginning in July 2012 and continuing through the present date, UBER has refused and continues to refuse to abide by San Francisco municipal law regulating taxicab vehicles.

116.    San Francisco's municipal law requires private vehicles providing ride-hail services in the City and County of San Francisco must comply with the regulations adopted by San Francisco International Airport. San Francisco International Airport requires all vehicles providing ride-hail services to register with and be permitted by the airport. Beginning in at least July 2012 and continuing through October 2014, UBER failed and refused to register its vehicles or apply for permits with the San Francisco International Airport.

117.    San Francisco's Transportation Code requires private vehicles providing ride-hail services in the City and County of San Francisco to provide liability insurance of no less than $1 million per incident that covers property damages as well as personal injury for the driver, passengers, and third parties caused any time the vehicle is in use. In contravention of San Francisco municipal law, beginning in July 2012 and continuing through the present date, UBER refused and continues to provide liability insurance of at least $1 million to protect drivers, passengers, and third

parties from injuries caused by a driver of an UberX or UberXL vehicle at all times the vehicle is in use.

118.     San Francisco's Transportation Code requires private vehicles providing ride-hail services in the City and County of San Francisco to participate in the city's Paratransit program and remain in compliance with the regulations of the SFMTA's Paratransit program. In contravention of San Francisco municipal law beginning in at least July 2012 and continuing through the present date, UBER has refused and continues to refuse to participate in the Paratransit program and is not and has not been in compliance with the regulations of the Paratransit program.

119.     San Francisco's Transportation Code prohibits private vehicles providing ride-hail services in the City and County of San Francisco from charging passengers more than SFMTA-approved "meter rates," which cap the amount a taxicab may charge a passenger for the base fare, distance driven, and wait time. Beginning in at least July 2012 and continuing through the present date, UBER has charged passengers in excess of SFMTA-approved rates through a practice referred to by UBER as "surge pricing."

120.     San Francisco's Transportation Code requires all private vehicles providing ride-hail services in the City and County of San Francisco to be associated with a medallion issued by the SFMTA. Beginning in at least July 2012 and continuing through the present date, UBER has refused and failed to associate any of its UberX or UberXL vehicles with a city-issued medallion.

121.     San Francisco's Transportation Code caps the amount ride-hail services in the City and County of San Francisco may charge drivers for daily lease fees. Beginning in July 2015 and continuing through the present date, UBER has charged drivers far in excess of the maximum daily lease fee that may is authorized under the Transportation Code.

122.     San Francisco's Transportation Code requires private vehicles providing ride-hail services in the City and County of San Francisco to be equipped with a two-way communication device, paratransit debit card processing system, high speed printer, decals indicating the taxicab company name, and a light attached to the vehicle indicating the vehicle is a taxicab. Beginning in July 2012 and continuing through the present date, UBER has failed and continues to fail to equip its vehicles with a two-way communication device, paratransit debit card processing system, high speed

printer, decals indicating UBER's company name, and a light attached to each vehicle in its fleet indicating the vehicle is a taxicab.

123.    San Francisco's Transportation Code requires ride-hail companies to provide a telephone dispatch service and advertise a phone number that can be called by passengers to request transportation. In contravention of San Francisco municipal law, beginning in at least July 2012 and continuing through the present date, UBER has failed and continues to fail to provide a telephone dispatch service or advertise a phone number that can be called by passengers to request transportation.

124.    UBER has employed these unfair and illegal methods to obtain an unfair advantage over FLYWHEEL TAXI and the ride-hail industry as a whole, leaving FLYWHEEL TAXI and the ride-hail industry unable to fairly compete for customers in the San Francisco market.

### FIRST CAUSE OF ACTION
**MONOPOLIZATION**
**(SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)**
**(Against all Defendants)**

125.    The purpose of this country's antitrust laws is to preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

126.    The Sherman Antitrust Act prohibits the acquisition or maintenance of monopoly power within any part of interstate or foreign trade or commerce where such power harms competition and injures consumers.

127.    The San Francisco Ride-Hail Market is a valid antitrust market.

128.    Through the actions described in paragraphs 47 to 75, UBER has willfully acquired and maintained monopoly power in the San Francisco Ride-Hail Market. UBER's anticompetitive conduct has harmed competition in the San Francisco Ride-Hail Market and has caused and will cause injury to consumers in the San Francisco Ride-Hail Market by allowing UBER to charge supracompetitive prices for ride-hail services after its competition is eliminated.

////

129.     UBER's anticompetitive conduct is in violation of the Sherman Antitrust Act, and the injuries caused by UBER's anticompetitive conduct are the type intended to be prevented by the Act.

130.     There is no appropriate or legitimate business justification for UBER's anticompetitive conduct.

131.     As a direct and proximate result of UBER's anticompetitive conduct, FLYWHEEL TAXI has suffered and continues to suffer damages in an amount to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

**SECOND CAUSE OF ACTION**
**ATTEMPTED MONOPOLIZATION**
**(SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)**
**(Against all Defendants)**

132.     The purpose of this country's antitrust laws is to preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

133.     The Sherman Antitrust Act prohibits anticompetitive conduct carried out for the purpose of achieving monopoly power in any part of interstate or foreign trade or commerce.

134.     The San Francisco Ride-Hail Market is a valid antitrust market.

135.     Through the actions described in paragraphs 47 to 75, UBER has engaged in exclusionary conduct through below-cost pricing carried out with the specific intent of achieving monopoly power in the San Francisco Ride-Hail Market and of obstructing, restraining and excluding competition.

136.     There is a dangerous probability that UBER will achieve its goal of obtaining monopoly power in the San Francisco Ride-Hail Market if it continues to engage in the conduct described herein because UBER has sufficient market power to and actually does exclude its competitors through the use of below-cost pricing.

137.     There is a dangerous probability that UBER will recoup the losses it has incurred due to below-cost pricing by charging supracompetitive prices once it has achieved its goal of excluding

and driving out competitors from the San Francisco Ride-Hail Market because significant barriers to entry into the Ride-Hail Market exist.

138.    There is no appropriate or legitimate business justification for UBER's anticompetitive conduct.

139.    The anticompetitive conduct described herein is in violation of the Sherman Antitrust Act, and the injuries caused by UBER's anticompetitive conduct are the type intended to be prevented by the Sherman Antitrust Act.

140.    As a direct and proximate result of UBER's attempt to achieve monopoly power through anticompetitive conduct, FLYWHEEL TAXI has suffered and continues to suffer damages in an amount to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

### THIRD CAUSE OF ACTION
### UNFAIR PRACTICES ACT – SALES BELOW COST
**(Bus. & Prof. Code § 17043)**
**(Against all Defendants)**

141.    Pursuant to section 17043 of the California Business and Professions Code, it is unlawful for a business to sell any article or product at less than the cost thereof, or to give away any article or product, for the purpose of injuring competitors or destroying competition.

142.    Transportation service is an "article or product" pursuant to Business and Professions Code section 17024.

143.    From June 2013 through December 2013, UBER charged $3.50 for the base fare, $2.75 for each additional mile, and $.55 for each idle minute for UberX services in San Francisco.

144.    From January 2014 through June 2014, UBER charged $3.00 base fare, $1.50 per mile, and $.30 per idle minute for UberX services in San Francisco.

145.    From July 2014 through December 2015, UBER charged $2.20 for the base fare, $1.30 per mile, and $.26 per idle minute for UberX services in San Francisco.

146.    From January 2016 and continuing through the present date, UBER charged and has continued to charge $2.00 for the base fare, $1.15 per mile, and $.22 per idle minute for UberX services in San Francisco.

147.    From May 2014 through December 2015, UBER charged $5.00 for the base fare, $2.15 per mile, and $.45 per idle minute for UberXL services in San Francisco.

148.    From January 2016 and continuing through the present date, UBER charged and has continued to charge $3.00 for the base fare, $2.00 per mile, and $.30 per idle minute for UberXL services in San Francisco.

149.    From June 2013 through the present date, UBER has sold each UberX service at a cost below UBER's cost in providing the service.

150.    From May 2014 through the present date, UBER has sold each UberXL service at a cost below UBER's cost in providing the service.

151.    UBER engaged and continues to engage in this activity for the express purpose of injuring competitors and destroying competition.

152.    As a direct and proximate result of the purposeful actions taken by UBER as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages in an amount to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

### FOURTH CAUSE OF ACTION
### UNFAIR PRACTICES ACT – LOSS LEADER PRACTICES
#### (Bus. & Prof. Code § 17044)
#### (Against all Defendants)

153.    Pursuant to section 17044 of California's Business and Professions Code, a business may not offer to sell or sell a service at a price that is below the cost of providing the service for the purpose of injuring competitors or destroying competition when the effect of the loss-leader is to divert trade from or otherwise injure competitors.

154.    Transportation service is an "article or product" pursuant to Business and Professions Code section 17024.

155.    From June 2013 through December 2013, UBER charged $3.50 for the base fare, $2.75 for each additional mile, and $.55 for each idle minute for UberX services in San Francisco.

156.    From January 2014 through June 2014, UBER charged $3.00 base fare, $1.50 per mile, and $.30 per idle minute for UberX services in San Francisco.

157.    From July 2014 through December 2015, UBER charged $2.20 for the base fare, $1.30 per mile, and $.26 per idle minute for UberX services in San Francisco.

158.    From January 2016 and continuing through the present date, UBER charged and has continued to charge $2.00 for the base fare, $1.15 per mile, and $.22 per idle minute for UberX services in San Francisco.

159.    From May 2014 through December 2015, UBER charged $5.00 for the base fare, $2.15 per mile, and $.45 per idle minute for UberXL services in San Francisco.

160.    From January 2016 and continuing through the present date, UBER charged and has continued to charge $3.00 for the base fare, $2.00 per mile, and $.30 per idle minute for UberXL services in San Francisco.

161.    Beginning in June 2013 and continuing through the present date, UBER has offered to sell and has sold UberX services at a cost below UBER's cost in providing the service.

162.    From May 2014 through the present date, UBER has offered to sell and sold UberXL services at a cost below UBER's cost in providing the service.

163.    UBER's offers to sell and sale of UberX services below-cost had a tendency or capacity to mislead or deceive purchasers and potential purchasers of UberX services by misrepresenting the percentage by which UberX prices were reduced and the difference between UberX and taxicab prices beginning in June 2013 and continuing to the present date.

164.    UBER's offers to sell and sale of UberXL services below-cost had a tendency or capacity to mislead or deceive purchasers and potential purchasers of UberXL services by misrepresenting the percentage by which UberXL prices were reduced and the difference between UberXL and taxicab prices beginning in May 2014 and continuing to the present date.

165.    UBER's offers to sell and the sale of UberX and UberXL services at below-cost prices diverted business from or otherwise injured UBER's competitors.

166.    As a direct and proximate result of the purposeful actions taken by UBER as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages in an amount to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

**FIFTH CAUSE OF ACTION**
**LANHAM ACT**
**(15 U.S.C. § 1125(a))**
**(Against all Defendants)**

167.    Pursuant to the Lanham Act, it is illegal to make false statements of fact in a commercial advertisement about one's own or a competitor's products or services.

168.    UBER is in commercial competition with FLYWHEEL TAXI.

169.    UBER made false statements of fact regarding UberX drivers' income as described in paragraphs 76 to 86.

170.    UBER made false statements of fact regarding taxicab drivers' income as described in paragraphs 87 to 90.

171.    UBER made false statements of fact regarding UberX prices relative to taxi prices as described in paragraphs 91 to 94.

172.    UBER made false statements of fact regarding UberX prices as described in paragraphs 95 to 103.

173.    UBER made false statements of fact regarding UberX vehicle locations and passenger wait times as described in paragraphs 104 to 106.

174.    UBER made false statements of fact regarding passenger safety as described in paragraphs 107 to 109.

175.    UBER's false statements have the tendency to deceive a substantial segment of UBER's audience, which is composed of consumers of ride-hail services in San Francisco.

176.    UBER's false statements actually deceived and continue to deceive a substantial segment of UBER's audience, which is composed of consumers of ride-hail ground transportation services in San Francisco.

177.    The deception caused by each of UBER's false statements is likely to influence and has influenced the purchasing decisions of consumers of ride-hail services in San Francisco and drivers providing ride-hail services in San Francisco.

////

////

178.    UBER made each of the false statements of fact over the internet through its websites (e.g., newsroom.uber.com, www.uber.com/cities/san-francisco), which affect and are a part of interstate commerce.

179.    Each and every one of UBER's false statements of fact is commercial speech, was made for the purpose of influencing customers to purchase UBER's services, and was disseminated sufficiently to consumers of ride-hail services in San Francisco to constitute advertising or promotion.

180.    As a result of UBER's false statements of fact as described herein, FLYWHEEL TAXI has been and is likely to be injured through diversion of sales to UBER and by a lessening of goodwill in amounts to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

**SIXTH CAUSE OF ACTION**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**
**(Against all Defendants)**

181.    It is unlawful for an individual or business to intentionally interfere with an economic relationship between two third parties when the relationship was likely to result in an economic benefit to one or both of the parties.

182.    FLYWHEEL TAXI had established economic relationships with numerous taxicab drivers, each of which was substantially likely to result in future economic benefit to FLYWHEEL TAXI.

183.    UBER knew of FLYWHEEL TAXI's economic relationships with the taxicab drivers.

184.    UBER did not have a direct, significant, or legitimate interest in FLYWHEEL TAXI's relationship with the taxicab drivers.

185.    Beginning in at least November 2014 and continuing through the present date, UBER has engaged in wrongful conduct through below-cost pricing of its UberX and UberXL services as described in paragraphs 47 to 75.

186.    Beginning in at least November 2014 and continuing through the present date, UBER has engaged in wrongful conduct by making misrepresentations to current and potential UberX and UberXL drivers as described in paragraphs 76 to 90.

////

187.    Beginning in at least November 2014 and continuing through the present date, UBER has engaged in wrongful conduct by making misrepresentations to the public regarding UberX and UberXL services as described in paragraphs 91 to 109.

188.    Beginning in at least November 2014 and continuing through the present date, UBER has engaged in wrongful conduct by violating numerous federal, state, and local laws that regulate private ride-hail services as described in paragraphs 110 to 124.

189.    UBER's wrongful conduct was designed to disrupt the economic relationships between FLYWHEEL TAXI and the taxi drivers.

190.    UBER's wrongful conduct was carried out with the substantial certainty that the economic relationships between FLYWHEEL TAXI and the taxicab drivers would be disrupted.

191.    UBER's wrongful conduct has disrupted and continues to disrupt the relationships between FLYWHEEL TAXI and the taxicab drivers.

192.    As a direct and proximate result of UBER's intentional and wrongful acts as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages in an amount to be proven at trial.

193.    UBER acted with malice, oppression, and fraud when UBER intentionally and in conscious disregard of FLYWHEEL TAXI's rights, engaged in predatory pricing practices, made misrepresentations to the San Francisco public and current and potential drivers, and flouted federal, state, and local laws regulating the ride-hail industry. UBER's interference with FLYWHEEL TAXI's economic relationships was intentional, willful, and calculated to cause damages to FLYWHEEL TAXI's lawful business. The conduct of UBER was perpetrated with actual malice and ill will toward FLYWHEEL TAXI and the taxi industry as a whole, and with the intentional and improper purpose of causing damage, thereby entitling FLYWHEEL TAXI to punitive damages in an amount to be proven and determined at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

////

////

////

## SEVENTH CAUSE OF ACTION
### UNFAIR COMPETITION LAW – ILLEGAL & UNFAIR PRACTICES
#### (Bus. & Prof. Code § 17200, *et seq.*)
#### (Against all Defendants)

194.     Pursuant to the Unfair Competition Law (Bus. & Prof. Code § 17200 *et seq.*), it is unlawful for an entity to engage in unfair or illegal business activities.

195.     Beginning in June 2013 and continuing through the present date, UBER has committed acts of unfair competition, as defined by section 17200, et seq. of the California Business and Professions Code.

196.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described above, has committed and continues to commit acts of unfair competition by engaging in the regular and customary practice of below-cost pricing of UberX and UberXL services in violation of the Sherman Antitrust Act (15 U.S.C. § 2) and California's Unfair Practices Act (Bus. & Prof. Code § 17000, *et seq.*).

197.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described above, has committed and continues to commit acts of unfair competition by engaging in the regular and customary practice, of charging "surge" prices despite advertising a base rate of $2.00, $1.15 per mile, and $.22 per minute for UberX in violation of the Lanham Act (15 U.S.C. § 1125).

198.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described above, has committed and continues to commit acts of unfair competition by engaging in the regular and customary practice of charging "surge" prices despite advertising a base rate of $3.00, $2.00 per mile, and $.30 per minute for UberXL services in violation of the Lanham Act (15 U.S.C. § 1125).

199.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described above, has committed and continues to commit acts of unfair competition by engaging in the regular and customary practice of falsely advertising the price of UberX and UberXL services relative to those of the taxicab industry in violation of the Lanham Act (15 U.S.C. § 1125).

////

200.     FLYWHEEL TAXI has suffered injury in fact and will continue to suffer injury as a result of Defendants' unfair acts of competition as described herein.

201.     The unlawful conduct described herein is continuing and will continue unless and until UBER is enjoined from engaging in such unfair and illegal conduct.

202.     FLYWHEEL is entitled to injunctive relief enjoining Defendants from engaging in conduct that constitutes unfair or illegal conduct in violation of California's Business and Professions Code.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, FLYWHEEL TAXI prays for judgment on all causes of action against all Defendants as follows:

**AS TO THE FIRST CAUSE OF ACTION**

1.     For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from four years before the filing of the complaint to the date of trial, pursuant to 15 U.S.C. § 15;

2.     For additional damages in an amount equal to three times Plaintiff's compensatory damages pursuant to 15 U.S.C. § 15;

3.     For immediate and permanent injunctive relief pursuant to 15 U.S.C. § 26 requiring Defendants to cease all predatory practices including offering for sale and selling UberX and UberXL services at below-cost prices; and

4.     For attorneys' fees and costs of suit pursuant to 15 U.S.C. § 15.

**AS TO THE SECOND CAUSE OF ACTION**

1.     For compensatory damages in an amount according to proof at the time of trial for all harm suffered by Plaintiff from four years before the filing of the complaint to the date of trial pursuant to 15 U.S.C. § 15;

2.     For additional damages in an amount equal to three times Plaintiff's compensatory damages pursuant to 15 U.S.C. § 15;

////

3.      For immediate and permanent injunctive relief pursuant to 15 U.S.C. § 26 requiring Defendants to cease all predatory practices including offering for sale and selling UberX and UberXL services at below-cost prices; and

4.      For attorneys' fees and costs of suit pursuant to 15 U.S.C. § 15.

**AS TO THE THIRD CAUSE OF ACTION**

1.      For compensatory damages in an amount according to proof at the time of trial for all harm suffered by Plaintiff from three years before filing of the complaint to the date of trial pursuant to California Business and Professions Code § 17070;

2.      For additional damages in an amount equal to three times Plaintiff's damages suffered from one year prior to filing of the complaint to the date of trial pursuant to California Business and Professions Code § 17082;

3.      For immediate and permanent injunctive relief pursuant to California Business and Professions Code § 17070 and  §§ 17078 – 17081 enjoining Defendants from offering to sell and selling UberX and UberXL services at below-cost prices where the purpose of such pricing practices is to injure competitors and destroy competition; and

4.      For attorneys' fees and costs of suit pursuant to California Business and Professions Code § 17082.

**AS TO THE FOURTH CAUSE OF ACTION**

1.      For compensatory damages in an amount according to proof at the time of trial for all past and future harm suffered by Plaintiff from three years before filing of the complaint through a date to be determined pursuant to California Business and Professions Code § 17070;

2.      For additional damages in an amount equal to three times Plaintiff's damages suffered from one year prior to filing of the complaint to the date of trial pursuant to California Business and Professions Code § 17082;

3.      For immediate and permanent injunctive relief pursuant to California Business and Professions Code § 17070 and §§ 17078 – 17081 enjoining Defendants from offering to sell and selling UberX and UberXL services as loss-leaders where the purpose of such pricing practices is to injure competitors and destroy competition; and

4.      For attorneys' fees and costs of suit pursuant to California Business and Professions Code § 17082.

**AS TO THE FIFTH CAUSE OF ACTION**

1.      For compensatory damages in an amount according to proof at the time of trial for all damages suffered by Plaintiff, pursuant to 15 U.S.C. § 1117;

2.      For additional damages in an amount equal to three times Plaintiff's compensatory damages, pursuant to 15 U.S.C. § 1117;

3.      For equitable relief in the form of disgorgement of profits and any additional amounts the Court finds to be just, pursuant to 15 U.S.C. § 1117;

4.      For an accounting of profits Defendants have made as a result of their false and misleading statements as alleged herein, pursuant to 15 U.S.C. § 1117;

5.      For immediate and permanent injunctive relief, pursuant to 15 U.S.C. § 1116, enjoining Defendants from making false statements of fact regarding UberX prices, UberX prices relative to taxi prices, and passenger safety;

6.      For immediate and permanent injunctive relief, pursuant to 15 U.S.C. § 1116, enjoining Defendants from making false statements of fact regarding UberX and UberXL drivers' annual, hourly, and proportional income and from falsely advertising the income earned and expenses incurred by San Francisco taxicab drivers; and

7.      For attorneys' fees and costs of suit due to the exceptional nature of this case pursuant to 15 U.S.C. § 1117.

**AS TO THE SIXTH CAUSE OF ACTION**

1.      For compensatory damages in an amount according to proof at the time of trial for all past and future harm suffered by Plaintiff from two years before filing of the complaint through a date to be determined pursuant to California Code of Civil Procedure § 335.1; and

2.       For punitive damages pursuant to California Civil Code § 3294(a) in an amount sufficient to punish and deter Defendants from engaging in wrongful conduct as alleged herein.

**AS TO THE SEVENTH CAUSE OF ACTION**

1.      For disgorgement of all profits illegally obtained by Defendants through the wrongful

acts described above;

2.      For permanent injunctive relief pursuant to Business & Professions Code § 17203 enjoining Defendants from selling UberX and UberXL services below-cost;

3.      For permanent injunctive relief pursuant to Business & Professions Code § 17203 enjoining Defendants from charging "surge" prices while advertising lower rates;

4.      For permanent injunctive relief pursuant to Business & Professions Code § 17203 requiring Defendants to comply with the Americans with Disabilities Act; and

5.      For permanent injunctive relief pursuant to Business & Professions Code § 17203 requiring Defendants to comply with California's Unruh Civil Rights Act.

**AS TO ALL CAUSES OF ACTION**

1.      For all additional forms of relief to which Plaintiff is entitled pursuant to statute or that justice and equity demand be awarded;

2.      For pre- and post-judgment interest at the maximum legal rate pursuant to statute;

3.      For costs of suit incurred herein; and

4.      For such other and further relief as this Court may deem fair and just.

Dated: November 2, 2016                    SEIBERT & BAUTISTA


                                       ____/s/ Joe Bautista_____
                                       Shannon Seibert
                                       Joe Bautista
                                       Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a jury trial on all issues so triable.

Dated: November 2, 2016                    SEIBERT & BAUTISTA


                                       ____/s/ Joe Bautista_____
                                       Shannon Seibert
                                       Joe Bautista
                                       Attorneys for Plaintiff