1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5    DESOTO CAB COMPANY, INC.,                Case No. 16-cv-06385-JSW

6                    Plaintiff,

7         v.                                  ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANTS'
8    UBER TECHNOLOGIES, INC., et al.,         MOTION TO DISMISS

9                    Defendants.              Re: Dkt. No. 22

10

11         Now before the Court is the motion to dismiss filed by Defendants Uber Technologies,

12   Inc., Uber USA, LLC, RASIER, LLC, and RASIER-CA, LLC (collectively, "Defendants" or

13   "Uber").  The Court has considered the parties' papers, relevant legal authority, and the record in

14   this case, and it HEREBY GRANTS IN PART and DENIES IN PART Defendants' motion to

15   dismiss, but affords Plaintiff leave to amend.

16                                     **BACKGROUND**

17         Prior to July 2012, there were three types of private, for-hire ground transportation in San

18   Francisco: (i) passenger stage corporations ("PSCs"), which are shuttles driven by commercially-

19   licensed drivers; (ii) charter-party carriers ("TCPs"), which are limousines and luxury sedans

20   driven by commercially-licensed drivers; and (iii) taxicabs or taxis, which are driven by specially-

21   permitted drivers.  (Dkt. No. 1 (Complaint) ¶ 17.)  PSCs provide shuttle transportation service to

22   the general public on fixed routes or otherwise scheduled service.  (*Id.* ¶ 18.)  Customers hire

23   TCPs on a prearranged basis through a TCP-permitted company for the exclusive use of an

24   individual or group.  (*Id.*)  The California Public Utilities Commission ("CPUC") regulates and

25   licenses PSCs and TCPs.  (*Id.*)  There is no cap on the number of PSCs or TCPs that may operate

26   in San Francisco and no cap on fees that PSCs or TCPs may charge passengers.  (*Id.*)

27         The San Francisco Municipal Transportation Agency ("SFMTA") regulates and permits

28   taxis.  (*Id.* ¶ 19.)  The taxi industry provides ride-hail ground transportation services originating in

the City and County of San Francisco through smartphone applications, telephone dispatch, and street hails.  (*Id.*)  The SFMTA sets fare rates for taxis.  (*Id.* ¶ 69.)

## I.    Uber's Business Model.

Plaintiff DeSoto Cab Company, Inc. d/b/a Flywheel Taxi ("Flywheel") is a San Francisco-based taxicab company that has been operating in the San Francisco "ride-hail" market since the 1930s.  (*Id.* ¶¶ 2, 20.)

Uber currently operates in the San Francisco "ride-hail" market by allowing users/customers to use a smartphone application to request rides.  (*Id.* ¶ 22.)  Uber formed in 2009 with approximately $200,000 in seed funding.  (*Id.* ¶ 33.)  Since that time, Uber has raised more than $15 billion in private venture capital funding.  (*Id.*)  Uber has yet to turn a profit.  (*Id.* ¶ 46.)  Flywheel alleges that Uber's internal business policies, driver incentives, and its purportedly predatory pricing behavior in the market is designed to eliminate competition and result in an eventual monopoly.  (*Id.* ¶¶ 46, 71, 72, 75.)

Uber generates revenue by taking a percentage of the money passengers pay for rides booked through the Uber smartphone application.  (*Id.* ¶ 34.)  At the end of each trip, Uber charges the passenger's credit card based on the time and distance of the trip, withholds its percentage as a commission, and deposits the remainder into each driver's bank account on a weekly basis.  (*Id.* ¶¶ 34, 35.)  As of the time of the writing of the Complaint, Uber's standard commission was twenty-five percent, but historically the commission has ranged from zero to thirty percent.  (*Id.* ¶ 35.)  In October 2011, Uber introduced "surge pricing," a system where ride price increases during increased demand.  (*Id.* ¶ 36.)

Uber drivers provide their own personal vehicles (that comport with Uber's make-and-model requirements) and pay for their own personal liability insurance.  (*Id.* ¶ 39.)  Other costs that Uber drivers assume are maintenance, cleaning, and vehicle depreciation, as well as data usage for streaming music, ten dollars a week for use of an Uber iPhone containing the Uber application, toll charges, and tickets and citations.  (*Id.* ¶¶ 41, 42.)

## II.    Uber Services and Pricing.

In the summer of 2010, Uber began operations as "UberCab," a service that dispatched

TCP-licensed vehicles and commercially-licensed drivers.  (*Id.* ¶ 26.)  Sometime thereafter, Uber dropped the "Cab" from the company moniker and began providing its services as "UberBlack." (*Id.* ¶ 28.)  On July 4, 2012, Uber introduced a service called "UberX," which Uber marketed as a lower cost alternative to UberBlack.  (*Id.* ¶¶ 22, 29.)  UberX dispatched transportation in the form of non-TCP-licensed vehicles and directly competed with taxi companies.  (*Id.*)  UberX rates were initially higher than taxi rates, but lower than UberBlack rates.  (*Id.* ¶ 29.)

The same day that Uber rolled out UberX, it introduced UberSUV.  (*Id.* ¶ 30.)  UberSUV services were provided by commercially-licensed drivers in TCP-licensed luxury vehicles.  (*Id.*) UberSUV rates were higher than UberBlack rates.  (*Id.*)  On October 17, 2012, Uber introduced UberTaxi, which allowed customers to request a traditional taxi through the Uber smartphone application.  (*Id.* ¶ 31.)  Uber charged taxi rates for this service, plus a nominal booking fee and a twenty percent gratuity.  (*Id.*)

Finally, on May 12, 2014, Uber introduced "UberXL."  (*Id.* ¶ 32.)  UberXL drivers were not commercially-licensed, and UberXL vehicles were not TCP-licensed.  (*Id.*)  UberXL's rates were about half as expensive as UberSUV.  (*Id.*)

Flywheel's predatory pricing allegations center upon UberX (non-TCP-licensed vehicles) and UberXL (non-commercially-licensed drivers and non-TCP-licensed vehicles) services. Flywheel alleges that Uber, beginning in June of 2013, began lowering its prices at semi-regular intervals, periodically making false claims about its prices relative to taxi prices, and ultimately lowering its prices so much that Uber lost money on each ride and was forced to subsidize driver income due to depressed fares.

Between July of 2012 (when UberX was launched) and June 2013, Uber increased the base rate, per-mile rate, and per-minute-idle-time rate for UberX services in San Francisco.  (*Id.* ¶¶ 48, 49.)  Then, in June of 2013, Uber significantly lowered its UberX rates.  (*Id.* ¶ 51.)  Though Uber advertised these new prices as "10 percent lower than taxi prices" and promoted UberX as offering "cheaper-than-taxi" pricing, UberX's June 2013 prices were similar to contemporary taxi rates. (*Id.* ¶¶ 50, 51.)

In January of 2014, Uber cut UberX rates again and claimed its fares were twenty-six

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   percent cheaper than taxi fares.  (*Id.* ¶¶ 53, 54.)  At the same time, Uber reduced its own

2   commission on UberX rides by seventy-five percent (from twenty percent to five percent), which

3   (at least partially) offset the drivers' income losses from the reduced fares.  (*Id.* ¶ 55.)

4          In April of 2014, Uber restored its commission to twenty percent.  (*Id.* ¶ 57.)  Uber claimed

5   the January 2014 rate cuts were temporary, but, as of the writing of the Complaint, UberX prices

6   had not returned to pre-January 2014 levels.  (*Id.*)  In June of 2014, Uber reduced UberX rates

7   again.  (*Id.* ¶¶ 59, 63.)  Uber emailed its San Francisco users that these new fares were "45 percent

8   cheaper than a taxi" and that UberX was "the most affordable ride on the road."  (*Id.*)

9          Uber subsidized UberX drivers' incomes to offset this latest price cut, paying drivers more

10  than Uber was charging passengers.  (*Id.* ¶ 61.)  In January of 2016, UberX lowered its prices yet

11  again.  (*Id.* ¶ 64.)  After this latest cut, UberX's rates were approximately a third of what they had

12  been in June of 2013.  Flywheel alleges UberX lost money on every UberX ride after June 2013.

13  (*Id.* ¶ 52, 56, 64.)  Likewise, Flywheel alleges that Uber lost money on each UberXL ride from

14  May 2014 onward.  (*Id.* ¶¶ 58, 65.)

15         In August of 2016, Uber instituted "Uber Plus."  (*Id.* ¶ 66.)  Uber Plus passengers in San

16  Francisco pay thirty dollars per month in return for forty UberX rides per month.  (*Id.*)  Uber

17  subsidized drivers' earnings on this flat rate, so that drivers receive the income they would on a

18  normally-priced ride.  (*Id.* ¶ 67.)  Flywheel alleges that UberTaxi allows users to hail taxis at rates

19  higher than the prevailing SFMTA-regulated taxi rate.  (*Id.* ¶ 69.)  Flywheel further alleges that

20  UberTaxi "improperly inflated" taxi fares, further enabling Uber to undercut taxi pricing.  (*Id.*)

21         Flywheel alleges that Uber's below-cost pricing for UberX, UberXL, and Uber Plus,

22  subsidized by venture capital, is designed to drive taxi companies out of business.  (*Id.* ¶¶ 71, 75.)

23  Once taxi companies have been pushed out of the market, Flywheel alleges, Uber will recoup its

24  losses by raising prices.  (*Id.*)

25         Flywheel alleges that Uber's intent to monopolize is clear from the company's pricing

26  behavior, advertising strategy, and the CEO's statements that he wishes to "destroy" competition

27  using below-cost pricing.  (*Id.* ¶¶ 72-74.)  Flywheel alleges that Uber has captured more than

28  seventy percent of what it calls the San Francisco Ride-Hail Market (ride-hail ground

4

1   transportation service provided by private vehicles not licensed as "TCP" or "PSC," providing

2   service in the City and County of San Francisco and the San Francisco International Airport).  (*Id.*

3   ¶¶ 15, 75.)  Flywheel also alleges that from July of 2012 through the writing of the Complaint, taxi

4   companies have experienced a sixty-five percent drop in ridership.  (*Id.* ¶ 24.)

5   **III.    Uber Drivers.**

6          Flywheel contends that Uber made multiple misrepresentations to its prospective and

7   current UberX and UberXL drivers.  Flywheel avers that, at each UberX price-cutting juncture

8   (June 2013, January 2014, and June 2014), Uber represented to current and prospective UberX

9   drivers that they would earn more money per hour due to Uber's price cuts.  (*Id.* ¶¶ 76-78.)

10  Flywheel alleges, however, that, despite working more, UberX drivers earned less each time Uber

11  cut fares.  (*Id.* ¶ 79.)

12         Flywheel also alleges that, beginning in May of 2014 and up through the present date,

13  Uber misrepresented statistics regarding median driver earnings to current and prospective UberX

14  drivers.  (*Id.* ¶¶ 81, 82.)  Flywheel further alleges that Uber misrepresented to current and potential

15  UberX and UberXL drivers that they would keep eighty percent of their collected fares and that

16  Uber would provide free smartphones.  (*Id.* ¶¶ 84, 85.)  Flywheel also alleges that Uber made

17  misrepresentations to UberX and UberXL drivers about taxi drivers' income and costs.  (*Id.* ¶¶ 87,

18  88.)  Flywheel contends these misrepresentations lured drivers into working as UberX and

19  UberXL drivers and away from driving taxis.  (*Id.* ¶¶ 80, 83, 86, 89, 90.)

20         Flywheel alleges that Uber's vehicle-access programs trap its drivers into relationships

21  with Uber.  In November of 2013, Uber introduced the "Vehicles Solutions Program," a program

22  that offered financing from subprime lenders to Uber drivers to facilitate the purchase of an Uber-

23  approved vehicle.  (*Id.* ¶ 43.)  The Vehicle Solutions Program requires an initial cash deposit of

24  approximately $2,000, and, once a driver is enrolled, Uber automatically deducts the driver's car

25  payments from his or her weekly earnings until the loan is paid.  (*Id.* ¶ 44.)

26         In July of 2015, Uber introduced "Xchange Leasing."  (*Id.* ¶ 45.)  Under this program,

27  Uber offers subprime automobile leases to Uber drivers with low credit scores.  (*Id.*)  As with the

28  Vehicle Solutions Program, Uber deducts lease payments from enrolled drivers' weekly earnings.

United States District Court
Northern District of California

(*Id.*)  Flywheel has alleged that Uber's aim in offering both of these programs is to make it difficult for Uber drivers to stop driving for Uber.  (*Id.* ¶¶ 44, 45.)  Flywheel also contends that these programs have effectively deterred Uber drivers from working as taxi drivers.  (*Id.* ¶¶ 80, 83, 86, 89, 90.)

Flywheel contends that from July of 2012 through the writing of the Complaint, taxi companies have lost more than thirty percent of their drivers.  (*Id.* ¶ 24.)

**IV.     The Public.**

Flywheel claims that Uber made multiple misrepresentations to prospective and current customers.  Flywheel alleges that in June of 2013, January of 2014, and June of 2014, Uber made false representations to the public regarding UberX prices relative to the cost of taxi prices. (*Id.* ¶¶ 91-94.)  Flywheel contends that, from June of 2013 through the writing of the Complaint, Uber occasionally charged UberX customers "surge" prices above advertised UberX prices.  (*Id.* ¶¶ 95-100.)  Flywheel further alleges that, beginning in November of 2011 and continuing through April of 2016, Uber misrepresented that fares charged through the smartphone application for UberX and UberXL services included tips.  (*Id.* ¶¶ 101, 102.)

Flywheel further contends that Uber misrepresented the accuracy and reliability of its application feature that allows passengers to track UberX and UberXL vehicles.  (*Id.* ¶¶ 104, 105.) Flywheel alleges that Uber misrepresented the quality of the background checks it conducted on its drivers relative to the background checks taxi companies conduct of taxi drivers.  (*Id.* ¶¶ 107, 108.)

**V.      Violations of Federal, California, and Municipal Laws and Regulations.**

Finally, Flywheel contends that Uber's policies and practices violate a host of federal, California, and municipal laws and regulations.   Flywheel alleges that UBER discriminates against individuals with disabilities and non-white passengers by failing to comply with federal and California regulations.  (*Id.* ¶¶ 110, 111.)  Flywheel alleges that UBER violates California law by requiring drivers to maintain their own insurance policies, preventing drivers from registering UberX and UberXL vehicles as commercial vehicles, and failing to provide a driver training program for UberX and UberXL drivers.  (*Id.* ¶¶ 112-114.)  Flywheel alleges that Uber violates

United States District Court
Northern District of California

6

1  San Francisco municipal laws by failing to comply with laws regulating taxis, refusing to register

2  applicable vehicles with San Francisco International Airport, failing to carry appropriate liability

3  insurance, refusing to participate in the Paratransit program, charging more than SFMTA-

4  approved meter rates during surge pricing, and charging drivers more than the daily lease fee

5  authorized by the Transportation Code, among other things.  (*Id.* ¶¶ 115-124.)

6      Flywheel brings seven causes of action against Uber: (i) monopolization and (ii) attempted

7  monopolization under the Sherman Antitrust Act, (iii) violations of California's unfair practices

8  act for sales below cost and (iv) loss leader practices, (v) violation of the federal Lanham Act, (vi)

9  intentional interference with prospective economic advantage, and (vii) violation of California's

10  unfair competition law.

**ANALYSIS**

## I.      Appropriate Legal Standard.

13      A complaint must contain a "short and plain statement of the claim showing that the

14  pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[D]etailed factual allegations are not

15  required" to survive a motion to dismiss if the complaint contains sufficient factual allegations to

16  "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

17  (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Labels and conclusions[] and a

18  formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 50 U.S. at 555.

19      When evaluating a Rule 12(b)(6) motion to dismiss, a district court accepts as true all

20  material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff.

21  *Faulkner v. ADT Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).  A district court should grant

22  leave to amend unless the court determines the pleading could not "possibly be cured by the

23  allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

## II.     Sherman Act.

25      Protecting competition, not individual competitors, is at the heart of antitrust regulation.

26  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).  Accordingly, antitrust laws target

27  only behavior that tends to reduce (or actually reduces) competition.  *Atl. Richfield Co. v. USA*

28  *Petroleum Co.*, 495 U.S. 328, 344 (1990); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104,

United States District Court
Northern District of California

United States District Court
Northern District of California

1  109-10 (1986) ("[I]t is inimical to the antitrust laws to award damages for losses stemming from

2  continued competition." (citation and quotation omitted)).

3       To successfully plead monopolization under the Sherman Act, a plaintiff must allege: (i) a

4  market participant has monopoly power in the relevant market and (ii) is willfully acquiring or

5  maintaining monopoly power. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480-

6  81 (1992).  "[G]rowth or development as a consequence of a superior product, business acumen,

7  or historic accident" is not prohibited behavior.  *Id.* at 1481.  A private plaintiff must also plead

8  the defendant's anticompetitive behavior has injured it.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51

9  F.3d 1421, 1433 (9th Cir. 1995).

10       To successfully plead *attempted* monopolization under the Sherman Act, a private plaintiff

11  must allege: (i) predatory or anticompetitive conduct (ii) pursued with the specific intent to control

12  prices or destroy competition; (iii) a dangerous probability the defendant will achieve a monopoly

13  or monopoly power; and (iv) injury stemming from the complained-of anticompetitive behavior.

14  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) (citations

15  omitted).

16       Uber argues that Flywheel's monopolization and attempted monopolization claims are

17  deficient for the same reasons.

18       **A.       Flywheel Sufficiently Alleges Relevant Market.**

19       Uber first argues that Flywheel has incorrectly defined the appropriate product market.[1]

20       In order to state a valid claim for monopolization or attempted monopolization, a plaintiff

21  must allege that a "relevant market" exists and that the defendant has power within that market.

22  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).[2]  The sufficiency of

23  allegations concerning the "relevant market" is a factual, rather than legal, question; therefore, a

24  Sherman Act claim survives a Rule 12(b)(6) motion to dismiss unless the alleged market suffers

25

26  [1] Uber does not argue that Flywheel's definition of the geographic market is deficient.

27  [2] This element of an antitrust claim need not be pled with specificity.  *See Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996) (complaint "need only allege

28  sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws") (citation and quotation omitted).

1    from a fatal legal defect. *Id.* at 1045; *see High Tech. Careers v. San Jose Mercury News*, 996 F.2d

2    987, 990 (9th Cir. 1993) (market definition depends on "a factual inquiry into the 'commercial

3    realities' faced by consumers") (citation omitted).

4          To avoid a fatal legal defect, the relevant market must be a "product market," rather than a

5    market whose boundaries are delineated by consumers. *Id.* (citations omitted).  A market must

6    also encompass all economic substitutes for the product at issue. *Id.*  The relevant market must

7    include the group of service providers "who have [the] actual or potential ability to deprive each

8    other of significant levels of business." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d

9    1369, 1374 (9th Cir. 1989).

10         A degree of fungibility demarcates the outer boundaries of a product market: the court

11   must look to whether the market, as the plaintiff defined it, includes all reasonably interchangeable

12   products and whether there is cross-elasticity of demand between the product and its substitutes.

13   *Olin Corp. v. FTC*, 986 F.2d 1295, 1298-99 (9th Cir. 1993) (citation omitted).  Practically, cross-

14   elasticity means that if the price of one good increases, demand for the purportedly equivalent

15   good will increase, as consumers substitute the equivalent good for their initial, now relatively

16   expensive, choice: "[i]f consumers view the products as substitutes, the products are part of the

17   same market." *Rebel Oil Co.*, 51 F.3d at 1435.

18         Defining the appropriate product market is unquestionably one of the thorniest questions of

19   anti-trust law.  Flywheel defines the relevant product market as "ride-hail ground transportation

20   service provided in private vehicles that are not licensed as 'TCP' or 'PSC.'"  (Complaint ¶ 15.)[3]

21   Uber contends this definition is improperly narrow, first, because it excludes TCPs and PSCs and,

22   second, because it excludes public transportation, bicycling, private automobiles, car-sharing,

23   pedicabs, and walking.  The Court disagrees.

24         Flywheel's chosen product market includes ride-hail transportation but explicitly excludes

25   two types of other for-hire modes of transportation: PSCs and TCPs.  Based on the Complaint,

26

27   ─────────────────
     [3] Flywheel also alleges that Uber controls approximately seventy percent of this market.  (*Id.* ¶
28   16.)

United States District Court
Northern District of California

1    PSC and TCP services are not reasonably interchangeable with ride-hail transportation.[4]

2         PSCs provide shuttle transportation service on "fixed routes" or through "scheduled

3    service," and TCPs are hired on a "prearranged basis" for the "exclusive use of an individual or a

4    group."  (Complaint ¶ 18.)  If ride-hailing services that UberX or UberXL offered became too

5    expensive, consumers would turn (and have turned) to other, *more similar* services, either to

6    "traditional" taxi services or services such as Lyft.  A shuttle (sharing the majority of a journey

7    with other passengers, with a shared proximate or actual destination that departs at assigned times)

8    or a luxury vehicle (a prearranged booking with the supplemental features of optics and comfort)

9    are not logical substitutes for ride-hailing services on-demand.  These services lack the

10   fundamental characteristics of a ride-hail service, which are non-premium accommodations

11   (ordinary vehicles) and customizable pick-up and drop off points.  Using common sense, and

12   drawing inferences from the Complaint in Flywheel's favor, it is apparent that there is little cross-

13   elasticity of demand between ride-hail services and services excluded from Flywheel's definition

14   of the relevant product market; shuttles and luxury vehicles do not have the ability to deprive ride-

15   hail services of "significant levels of business."[5]

16        Flywheel's chosen product market also excludes other discrete modes of transportation

17   Uber contends should be included.  Some of Uber's selected examples (such as Chariot) are more

18   similar to TCPs and PSCs than to ride-hailing services and, therefore, are properly excluded from

19   the relevant product market for the same reasons discussed immediately above.  Uber's other

20   examples (bike sharing, pedicabs, walking, personal vehicle use) are also properly excluded from

21   the defined product market.

22

23   _____

24   [4] According to the Complaint, UberX and UberXL exist in the marketplace as direct competitors
     to taxis—not as direct competitors to commercially licensed transportation services.  (*Id.* ¶¶ 22,
     23, 37, 38, 50, 59, 60.)

25
     [5] The Court disagrees with Uber's argument that the allegations in the Complaint are
26   contradictory.  (*See* Complaint ¶ 17.)  The Complaint only describes three broad categories of
     private, for-hire transportation in San Francisco in the pre-2012 economy.  The Complaint does
27   not suggest that these three "types" of transportation were fungible or "reasonably
     interchangeable."  Rather, the Complaint suggests that the three "types" of transportation served
28   distinct market needs.  (*See id.* ¶¶ 18-19.)

United States District Court
Northern District of California

1  Consumers engage in multiple considerations when evaluating whether to substitute a

2  bicycle, pedicab, public transportation, a personal vehicle, or their own two feet for a ride-hail

3  service: efficiency of arrival at one's destination, exposure to the elements, cost and location of

4  temporary storage (parking garages, risk of bicycle theft), the need to arrive at one's destination in

5  a state of order, and novelty.  In contrast, when considering which ride-hail service to utilize, a

6  consumer will largely be focused on cost and reliability.  *Paladin Assocs., Inc. v. Montana Power*

7  *Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003) ("For antitrust purposes, a market is composed of

8  products that have reasonable interchangeability for the purposes for which they are produced—

9  price, use[,] and qualities considered.") (citation and quotations omitted).  Bicycles, pedicabs,

10  walking, and personal vehicle use are not capable of depriving ride-hailing services of "significant

11  levels of business."[6]

12  As alleged, the relevant product market suffers no facial legal defect.  Even if it did, the

13  relevant product market meets the requirements for a submarket.  *See Brown Shoe*, 370 U.S. at

14  325 ("well-defined submarkets may exist which, in themselves, constitute product markets for

15  antitrust purposes.").[7]

16  **B.   Flywheel Does Not Sufficiently Allege Barriers to Entry.**

17  Having determined Flywheel adequately alleges a relevant market, the Court must next

18  determine whether Flywheel has sufficiently alleged Uber's power to "control prices or exclude

19

20  [6] The cases Uber cites in order to argue these methods of transportation are "interchangeable" are

21  distinguishable.  Two of these cases occur in the context of constitutional challenges to municipal
   ordinances, not in the context of analyzing a "relevant market" under the Sherman Act.  *See Ill.*

22  *Transp. Trade Assn. v. City of Chicago*, 839 F.3d 594 (7th Cir. 2016); *Joe Sanfelippo Cabs, Inc. v.*
   *City of Milwaukee*, 839 F.3d 613 (7th Cir. 2016).  In a third case, *Lala v. Frampton*, No. 07-cv-

23  2144-MSK-CBS, 2008 WL 4059874, at *4 (D. Colo. Aug. 28, 2008), the plaintiff provided only a
   perfunctory and "conclusory" market definition, and the complaint "did not plead facts that would

24  explain why [alternate] services should not be considered part of the relevant market."  Those
   deficits are not present here.

25

26  [7] In order to establish a submarket, a plaintiff must be able to show that the submarket is
   economically distinct from the general product market.  *Newcal Indus.*, 513 F.3d at 1045.

27  "[I]ndustry or public recognition of the submarket as a separate economic entity, the product's
   peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices,
   sensitivity to price changes, and specialized vendors" all are "practical indicia" of an economically

28  distinct submarket.  *Brown Shoe,* 370 U.S. at 325.

United States District Court
Northern District of California

1    competition*." United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  In evaluating whether

2    an entity has monopoly power, "it is not market share that counts, but [an entity's] ability to

3    *maintain* market share." *United States v. Syufy Enter.*, 903 F.2d 659, 666 (9th Cir. 1990)

4    (emphasis in original).  A plaintiff must, therefore, show that new competitors are "barred from

5    entering the market and show that existing competitors lack the capacity to expand their output to

6    challenge the predator's high price." *Rebel Oil Co.*, 51 F.3d at 1439 (citation omitted).  If such

7    barriers do not exist, nothing prevents a newcomer (or an existing competitor) from effectively

8    challenging an emerging monopoly, thereby undercutting the would-be monopolist's ability to

9    domineer the market and hinder competition.  *See Syufy Enter.*, 903 F.2d at 664 (without barriers

10   to entry, defendant with 100% share of market lacks market power: "any attempt to raise prices

11   above competitive level will lure into the market new competitors . . .").

12           Here, the parties' primary disagreement on this subject is whether barriers to entry exist.

13   Flywheel argues that Uber's $15 billion venture capital war chest constitutes a barrier to entry and

14   that Uber's own history[8] illustrates the difficulty of breaking into the relevant market.  Uber

15   counters that its capital backing does not constitute a barrier to entry.  Uber has the better

16   argument.

17           A barrier to entry is either an "additional" long-run cost that incumbent firms did not incur,

18   but "must" be incurred by new entrants, or a factor or factors in the market that deter entry "while

19   permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*,

20   6 F.3d 1422, 1427-28 (9th Cir. 1993) (need for financing not barrier to entry because no evidence

21   more difficult for new entrants to obtain financing) (citation omitted).  Barriers to entry may

22   include: (i) legal license requirements, (ii) control of an essential or superior resource, (iii)

23   entrenched buyer preferences for established brands, (iv) capital market evaluations imposing

24   higher capital costs on new entrants, and, occasionally, (v) economies of scale.  *Rebel Oil Co.*, 51

25   F.3d at 1439 (citation omitted).  The fact that entering a market requires a large capital investment,

26

27   _____

28   [8] According to the Complaint, Uber was founded in 2009 with $200,000 in "initial seed money," but started UberX and UberXL in 2012 and 2014, respectively.  (Complaint ¶ 33.)

1    without more, does not constitute a barrier to entry: "a new [market] entrant is disadvantaged only

2    to the extent that he must pay *more* to attract those funds *than would an established firm*."  Areeda

3    & Hovenkamp, *Antitrust Law* ¶ 409e at 303 (1992 Supp.) (emphasis added).

4          In *Los Angeles Land*, the plaintiff (a bowling center developer) argued that lenders'

5    hesitancy to finance bowling equipment purchases constituted a barrier to entry because the

6    difficulty of borrowing money to start a bowling alley made it difficult for would-be competitors

7    to enter the market.  903 F.3d at 1427-28.  In an opinion reversing a hefty trial judgment, the Ninth

8    Circuit disagreed, opining there was no evidence that lenders who *were* willing to finance bowling

9    equipment imposed higher financing costs on new market participants than on firms already

10   established.  *Id.*  This, the Ninth Circuit concluded, signified that difficulty obtaining financing,

11   without more, was not a barrier to entry.

12         Uber's large venture capital backing is similarly not a barrier to entry.[9]  First, the

13   Complaint lacks allegations that enable the Court to infer that competitors are precluded from

14   entering the market *unless* they obtain similar capital backing.  *See DocMagic, Inc. v. Ellie Mae,*

15   *Inc.*, 745 F. Supp. 2d 1119, 1137 (N.D. Cal. 2010) (barriers to entry sufficiently pled where

16   difficult for customers to switch providers); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d

17   1028, 1035 (C.D. Cal. 2007) (barriers to entry sufficiently pled where competitors' licensing

18   strategy created additional capital costs for new market entrants).[10]

19         Further, Flywheel argues that Uber's taking several years to break into the relevant market

20   underscores the difficulty of breaking into it.  Flywheel's argument, however, presupposes that

21

22   ───────────────────
     [9] Flywheel cites to *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980) for

23   the proposition that an allegation of a specific market share is sufficient to withstand a motion to
     dismiss.  There, the Ninth Circuit stated that it *could not say* that allegations of a sixty-five percent

24   market share (that was increasing) *could not* "under any market conditions" provide a basis for
     inferring the requisite market power.  *Id.* at 925.  This statement, of course, is not the same as

25   declaring that an allegation of a certain threshold of market share is sufficient to plead
     monopolization.  *Hunt-Wesson*, moreover, makes no mention of potential barriers to entry or the

26   importance of such analysis, which innumerable, more recent cases have suggested is crucial.  For
     these reasons, *Hunt-Wesson* is distinguishable.

27   [10] Given venture capital's known proclivity for funding subsequent iterations of a successful
     business model, Uber's market success (as alleged in the Complaint) very likely makes it easier,

28   not harder, for newcomers to the relevant product market to procure capital backing.

United States District Court
Northern District of California

1    Uber's intention from the beginning (in 2009) was to break into the ride-hail market, but that it

2    was unable to do so.  Flywheel's allegations contradict this: Flywheel alleges that Uber initially

3    marketed itself as a purveyor of luxury and luxury-adjacent ground transport.  (*See, e.g.*,

4    Complaint ¶¶ 17, 21.)  There are no allegations that allow the Court to infer that Uber intended,

5    but was unable, to compete in the relevant market before 2012.

6        The Complaint does not contain allegations sufficient to allow the Court to infer that the

7    relevant market "requires onerous front-end investments" that might deter competition from all but

8    the "hardiest and most financially secure investors;" is dependent upon a "scare commodity;" or is

9    rife with "exclusive contracts or distribution arrangements designed to lock out potential

10   competitors."  *Syufy Enterp.*, 903 F.2d at 667.  "[E]fficient, aggressive competition," which

11   Flywheel *does* allege, is not in itself a structural barrier to entry.  *Id.*

12                    **C.      Flywheel Alleges Below-Cost Pricing, But Not "Dangerous**

13                              **Probability" of Recoupment.**

14       The parties next disagree over whether Flywheel has sufficiently alleged Uber's behavior

15   constitutes predatory pricing.  Price reductions that constitute a "legitimate, competitive response"

16   to market conditions are, of course, "entirely proper."  *William Inglis & Sons Baking Co. v. ITT*

17   *Cont'l Baking Co.*, 668 F.2d 1014, 1031 (9th Cir. 1981).  In fact, lowering prices to attract sales is

18   the "essence" of healthy competition.  *Solyndra Residual Tr. v. Suntech Power Holdings Co., Ltd.*,

19   62 F. Supp. 3d 1027, 1041 (N.D. Cal. 2014) (citation omitted).  Accordingly, the circumstances

20   under which a plaintiff may bring a predatory pricing claim are limited.  To state such a claim

21   under the Sherman Act, a plaintiff must allege that (i) the complained-of prices are below an

22   appropriate measure of defendant's costs and (ii) there is a "dangerous probability" the defendant

23   will recoup its losses for below-cost pricing by raising prices after the defendant achieves

24   monopoly power.  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222,

25   224 (1993) (citations omitted).

26       Uber argues, first, that Flywheel has not adequately alleged below-cost pricing and,

27   second, that Flywheel has not sufficiently alleged a dangerous probability of recouping losses

28   because Flywheel does not sufficiently allege barriers to entry.  Flywheel argues that its

United States District Court
Northern District of California

United States District Court
Northern District of California

1    allegations that Uber lost money on each and every UberX and UberXL ride (in certain described

2    timeframes) are sufficient.

3         As a preliminary matter, there appears to be some disagreement within the Ninth Circuit as

4    to the appropriate measure of cost for predatory pricing claims.  *See, e.g., Cascade Health Sols. v.*

5    *PeaceHealth*, 515 F.3d 883, 909–10 (9th Cir. 2008) (the appropriate measure of cost is an "open

6    question" in the Ninth Circuit); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1030–

7    31 (D. Or. 2015) ("Neither the Supreme Court nor this Circuit has concluded what is the

8    appropriate measure of cost in a predatory pricing case.  However, it is generally agreed that the

9    relation between the cost of producing a product and the price charged for it is the criterion for

10   determining whether the price is predatory." (citation and quotation omitted)); *William Inglis*, 668

11   F.2d at 1062 n.1 (recognizing acceptability of average variable cost as metric: "marginal cost is

12   often impossible to determine").  Thankfully, the Court need not resolve this ambiguity.

13        In addition to alleging UberX and UberXL prices and relating those prices to taxi prices,

14   Flywheel has alleged Uber "lost money on each and every" UberX and UberXL ride in the

15   identified time frames.  At the pleading stage, this level of detail is sufficient.  *Compare Solyndra*,

16   62 F. Supp. 3d at 1043 ("At [motion to dismiss stage], Plaintiff's allegation that Defendants priced

17   their product below cost is sufficient to avoid dismissal."), *with Eastman v. Quest Diagnostics*

18   *Inc.*, 108 F. Supp. 3d 827, 835 (N.D. Cal. 2015) (dismissing predatory pricing Sherman Act claim

19   where plaintiffs alleged only that defendant charged "monopoly prices" or "above-competitive

20   prices" but did not allege defendant's prices or how those prices compared to competitors' prices).

21        Courts in the Ninth Circuit routinely hold that levels of detail similar to that provided in

22   the Complaint sufficiently allege below-cost pricing.  *See, e.g., Momento, Inc. v. Seccion Amarilla*

23   *USA*, No. 09-cv-1223-SBA, 2009 WL 10696217, at *5 (N.D. Cal. Sept. 17, 2009) (allegations

24   sufficient where plaintiff pled only that competitor sold product substantially below cost and

25   identified the specific cost of the product, but not the market price); *Jensen Enters. Inc. v.*

26   *Oldcastle, Inc.*, No. 06-cv-00247 SI, 2006 WL 2583681, at *7 (N.D. Cal. Sept. 7, 2006) (below-

27   cost pricing sufficiently alleged where plaintiff alleged only that defendant charged

28   "uneconomically low" prices); *Origami Owl LLC v. Mayo*, No. 15-cv-00110-PHX-DGC, 2015

WL 4747101, at *5–6 (D. Ariz. Aug. 7, 2015) (below-cost pricing sufficiently alleged where plaintiff alleged eighty percent reduction from wholesale pricing).  The Court has located, and Uber has provided, no case that stands for the proposition that allegations of below-cost pricing must be more detailed than what Flywheel has provided.  *See Momento*, 2009 WL 10696217, at *1 (motions to dismiss disfavored in fact-intensive antitrust cases).[11]

However, Flywheel has not sufficiently alleged a dangerous probability of recoupment because, as discussed above, it has not sufficiently alleged that barriers to entry will prevent competitors from entering the market.  *See In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1470 n.20 (C.D. Cal. 1988) ("Predatory pricing can only be effective when there are significant barriers to entry which enable a monopolist to recoup short term losses through monopoly profits reaped after exclusion of a competitor from the market.")

For the reasons discussed above, Flywheel's Sherman Acts claims are dismissed.

### III.    California Unfair Practice Act.

Uber next argues that Flywheel failed to plead its California Unfair Practices Act ("UPA") claims.  Under the UPA, it is unlawful to sell any article or product at below-cost "for the purpose of injuring competitors or destroying competition."  Cal. Bus. & Prof. Code §§ 17043, 17044; *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 171-72 (Cal. 1999).

California Business and Professions Code section 17024 carves out two exemptions to the UPA.  The UPA does not apply:

> (1) To any service, article or product for which rates *are established* under the jurisdiction of the Public Utilities Commission of this State and sold or furnished by any public utility corporation, or installation and repair services rendered in connection with any services, articles or products.
> (2) To any service, article or product sold or furnished by a publicly owned public utility and upon which the rates *would have been established under the jurisdiction* of the Public Utilities Commission

---

[11] The Court is not persuaded that Flywheel's surge pricing allegations undermine or contradict its allegations regarding below-cost pricing.  Drawing all reasonable inferences from the Complaint, for example, it is reasonable to conclude that incidents of surge pricing occurred less frequently than incidents of below-cost pricing and in such margins and multiples as to only partially offset below-cost pricing.  As such, it is entirely possible that the additional income generated by surge pricing was insufficient to overtake the losses incurred by the below-cost pricing.

United States District Court
Northern District of California

1

2

> of this State if such service, article or product had been sold or furnished by a public utility corporation, or installation and repair services rendered in connection with any services, articles or products.

3     Cal. Bus. & Prof. Code § 17024 (emphasis added).

4          Despite the plain language of section 17024(1), California courts have determined that the

5     section 17024(1) exception also applies where the CPUC has the jurisdiction to establish a utility's

6     rates.  *Hladek v. City of Merced*, 69 Cal. App. 3d 585 (Cal. Ct. App. 1977); (Dkt. No. 61).  The

7     section (1) exception, therefore, applies if Uber is a public utility.  Flywheel is judicially estopped

8     from arguing that Uber is not a public utility because Flywheel has conceded as much in prior

9     judicial proceedings.  *See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983,

10    1000 (9th Cir. 2012).  Therefore, the section 17024(1) exception precludes Flywheel from bring a

11    UPA claim against Uber.  Flywheel's UPA claims are dismissed.

12    **IV.    Lanham Act.**

13         Flywheel's Lanham Act allegations concern allegedly false or misleading statements Uber

14    made to drivers or to customers.  Uber argues that Flywheel's allegations concerning these

15    statements lack the requisite specificity, do not concern "material" deception of a "substantial

16    segment" of the public, fail to show the statements were false when made, constitute non-

17    actionable puffery, and/or are time-barred.

18         **A.    Flywheel's Allegations Meet Heightened Pleading Requirement.**

19         Federal Rule of Civil Procedure 9(b) requires, when alleging fraud or mistake, that a party

20    "state with particularity the circumstances constituting fraud or mistake."  The Ninth Circuit has

21    not definitively weighed in on whether Rule 9(b) applies to all Lanham Act claims, but many

22    district courts in the Ninth Circuit have applied heightened pleading standards to Lanham Act

23    claims grounded in misrepresentation.  *See Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-02066

24    SI, 2010 WL 5141843, at *7 (N.D. Cal. Dec. 13, 2010) (collecting cases).  To satisfy this

25    heightened pleading standard, a plaintiff must include "the who, what, when, where, and how" of

26    the misrepresentation.  *TransFresh Corp. v. Ganzerla & Assoc., Inc.*, 862 F. Supp. 2d 1009, 1017

27    (N.D. Cal. 2012) (citation omitted).

28

United States District Court
Northern District of California

1    Flywheel alleges the statements' content[12], that Uber made each of the statements, and

2    when Uber made the statements.  Flywheel further alleges that Uber made each of the statements

3    through its website and explains which statements were directed to taxi drivers and which

4    statements were directed to the public (consumers).  Finally, the Complaint alleges that each of the

5    statements at issue were "in reality" untrue and explains the specific ways in which the statements

6    were false.  *See Newcal*, 513 F.3d at 1053 (court limited to contents of complaint at motion to

7    dismiss because question of statement's falsity is factual).  To the extent a heightened pleading

8    standard is required for Lanham Act claims, these allegations are sufficient to plead "the who,

9    what, when, where, and how" of the misrepresentation.[13]  *See Kilopass*, 2010 WL 5141843, at *7.

10    Flywheel has also sufficiently alleged that the statements deceived their intended audience

11    and that Flywheel was injured: Flywheel alleges that it lost customers and drivers due in part to

12    the fact that customers and drivers relied upon Uber's respective statements directed to each

13    group.  The Court further concludes that the deceptions, which concerned pricing, efficiency,

14    income, and safety were material: representations about each of these topics are likely to influence

15    the purchasing decision of consumers.

16    **B.    Some Allegedly Misleading Statements Regarding Safety Constitute Non-**

17    **Actionable Puffery.**

18    A statement is considered puffery "if the claim is extremely unlikely to induce customer

19    reliance."  *Newcal*, 513 F.3d at 1053.  Ultimately the difference between actionable statements and

20    puffery is specificity, the idea being that general assertions are less likely to induce consumer

21

22    _____

23    [12] Flywheel does not provide direct quotes of the statements in their entirety, but Uber has pointed to no case that stands for the proposition that Flywheel must do so.

24    [13] Flywheel is not required, even under a heightened pleading standard, to present the "context" of the purportedly misleading statements.  The cases Uber cites for its argument are distinguishable.

25    *Southland Sod Farms v. Stover Seed Co.* stands for the proposition that that the context of a statement may transform a statement from true or not "literally false" to false "by necessary

26    implication."  108 F.3d 1134, 1137-39 (9th Cir. 1997).  Meanwhile, *XYZ Two Way Radio Service, Inc. v. Uber Techs., Inc.* suggests that additional contextual information is necessary when such

27    information could redeem the statements in the complaint.  214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016).  It is unclear to the Court, drawing all reasonable inferences in favor of the Complaint, that

28    additional contextual information contained elsewhere on the website would or could redeem the statements featured in the Complaint.

United States District Court
Northern District of California

reliance.  *Id.*  A general, subjective statement about a product is non-actionable puffing because such a statement would not contain "specific characteristics . . . that could be tested."  *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, No. 08-cv-4397-WHA, 2008 WL 6742224, at *3 (N.D. Cal. Dec. 18, 2008).

In *L.A. Taxi Cooperative, Inc. v. Uber Techs., Inc.*, this Court found that specific statements comparing Uber's safety standards directly to taxi companies and describing its background check process as a "comprehensive and new industry standard" and "industry-leading" were actionable.  114 F. Supp. 3d 852, 861 (N.D. Cal. 2015).  Here, Uber's statement that it conducted "rigorous" background checks that "set a new standard" to ensure passenger safety is nearly identical to the statement deemed actionable in *L.A. Taxi*.

Uber's statement that its drivers "provide[d] the safest ride on the road" and were the "gold standard" of safety practices is a different story.  In *XYZ Two Way Radio Service*, the court observed that similar statements, though they concerned the service's safety, were "vague" and "hyperbolic:" "the challenged statements cannot reasonably be understood as specific representations of objective facts."  214 F. Supp. 3d at 184.  Here, what constitutes a "gold standard" and/or "the safest ride on the road" is in the eye of the beholder.  It is unclear to the Court whether these statements pertain to the quality of background checks alone or whether they pertain, for example, to driver behavior on the road or the safety rating of the type of cars Uber accepts as part of its fleet.  Without more, these statements are not specific enough to create consumer reliance and constitute non-actionable puffery.

**C.**     **Dismissing Lanham Act Claim As Time-Barred Is Premature.**

When a federal statute, such as the Lanham Act, lacks a statute of limitations, courts presume that Congress intended to "borrow" the limitations period from the most "closely analogous" state law action.  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836–37 (9th Cir. 2002) (citation omitted).  Consistently, federal courts import the statute of limitations for a state's fraud action onto Lanham Act claims.  *See, e.g., Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1140 (9th Cir. 2010) (applying three-year statute of limitations for Arizona fraud law to Lanham Act claim).  California's statute of limitations for fraud is three

19

1   years; therefore, the applicable statute of limitations for Flywheel's Lanham Act claims is three

2   years.  *See Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir.

3   2002) (applying three-year statute of limitations to Lanham Act claim) (citations omitted).

4          The clock on the limitations period for a Lanham Act claim begins when the plaintiff knew

5   or should have known of the wrong.  *See General Bedding Corp. v. Echevarria,* 947 F.2d 1395,

6   1397 (9th Cir.1991).  Generally, therefore, whether a claim is barred by the statute of limitations is

7   a factual issue.  *Akkerman v. Mecta Corp.*, 72 F. App'x 652, 654 (9th Cir. 2003); *Ranch Realty,*

8   *Inc. v. DC Ranch Realty, LLC*, 614 F. Supp. 2d 983, 989-90 (D. Ariz. 2007) (". . . [T]he date on

9   which a cause of action accrued is a factual question inappropriate to determine based on the

10  pleadings.").  Where the applicability of a statute of limitations concerns a factual dispute,

11  including the timing of the discovery of the wrong, it is inappropriate to resolve a statute of

12  limitations issue at the motion to dismiss stage.  *Id.*

13         In *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, the court denied a motion to dismiss a

14  Lanham Act claim based on the argument that the claim was time-barred.  871 F. Supp. 2d 905,

15  911 (D. Ariz. 2012).  The court reasoned that, though the plaintiffs alleged the defendant made

16  misrepresentations five years earlier (and therefore outside the three-year statute of limitations),

17  there was nothing in the pleadings to suggest that the plaintiffs discovered the statements were

18  false *at the same time* the statements were made.  *Id.*  "Rather," the court observed, "a plausible

19  inference is that [the plaintiff] did not know of the falsity of [the defendant's] statements until [the

20  defendant's] products began being recalled . . . and [the plaintiff] independently conducted tests of

21  [the products] to determine whether the . . . advertising was false . . . ."  *Id.*

22         Here, even assuming Flywheel discovered the statements the instant Uber posted them on

23  its website, a plausible inference from the Complaint is that Flywheel did not adduce evidence to

24  suggest the statements were untrue until it conducted some investigation.  It is entirely possible

25  that Uber will adduce evidence in discovery that demonstrates Flywheel knew or should have

26  known that Uber's statements were misleading earlier than the Complaint suggests than Flywheel

27  did.  In that event, Uber may move for summary judgment on Flywheel's Lanham Act claim.

28  However, at this juncture, given the allegations and drawing all reasonable inferences in favor of

United States District Court
Northern District of California

20

1    the Complaint, dismissal of the Lanham Act claims as time-barred is premature.  *See Jablon v.*

2    *Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980) ("When a motion to dismiss is based on the

3    running of the statute of limitations, it can be granted only if the assertions of the complaint, read

4    with the required liberality, would not permit the plaintiff to prove that the statute was tolled.").

5          Accordingly, Flywheel's Lanham Act claims is dismissed only to the extent it included

6    non-actionable puffery.

7    **V.     Intentional Interference with Prospective Economic Advantage.**

8          Flywheel's intentional interference claim is premised on Uber's purported disruption of

9    Flywheel's relationships with its drivers.  Uber argues that Flywheel has not alleged independently

10   wrongful acts, actual disruption to driver relationships, or that Uber acted with the requisite intent.

11         To successfully bring a claim for intentional interference with prospective economic

12   advantage under California law, Flywheel must allege: (i) an economic relationship between itself

13   and a third party, with the probability of future economic benefit to Flywheel; (ii) Uber's

14   knowledge of the relationship; (iii) intentional acts by Uber designed to disrupt the relationship;

15   (iv) actual disruption of the relationship; and (v) economic harm to Flywheel proximately caused

16   by Uber's acts.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (Cal. 2003)

17   (citation omitted).  The interfering conduct must be "wrongful by some legal measure other than

18   the fact of the interference itself."  *Id.* (citation omitted).  An act is not independently wrongful

19   merely because a defendant acts with an improper motive; rather, an act is independently wrongful

20   if it is unlawful, "if it is proscribed by some constitutional, statutory, regulatory, common law, or

21   other determinable legal standard."  *Id.* at 1158-59.  Moreover, "[t]he independently wrongful act

22   must *be* the act of interference itself."  *Crown Imports, LLC v. Superior Court*, 223 Cal. App. 4th

23   1395, 1404 (Cal. Ct. App. 2014) (emphasis added); *see Korea Supply*, 29 Cal. 4th at 1159 (illegal

24   acts of bribery and sexual favors interfered with plaintiff's efforts to obtain government contract).

25         To the extent Flywheel's intentional interference claim is based upon the "independently

26   wrongful acts" of its Sherman Act or Unfair Practices Act claims, its claim for intentional

27   interference is dismissed for the reasons discussed above.  (*See* Complaint ¶ 185.)  To the extent

28   Flywheel's intentional interference claim is based upon the "independently wrongful acts"

United States District Court
Northern District of California

1   described in its Lanham Act claims, its interference claim is also dismissed, but only to the extent

2   the claim included non-actionable puffery.  (*See id.* ¶¶ 186, 187.)

3         With respect to the surviving portion of Flywheel's Lanham Act claim[14], the Court holds

4   that Flywheel has sufficiently alleged the nexus between Uber's purported misrepresentations and

5   a disruption in the relationship between Flywheel and its drivers.  Flywheel has alleged that Uber

6   misrepresented to drivers that they would earn more per hour and per year driving for Uber than

7   for taxi companies.  Flywheel further alleged that, "in reliance" upon these representations, taxi

8   drivers opted instead to drive for Uber.  This is sufficient to allege a nexus.

9         Flywheel also alleges a rather lengthy list of wrongful and unlawful conduct under federal,

10  California, and municipal laws.  (See *id.* ¶¶ 110-124.)  Yet, Flywheel does not allege, beyond

11  conclusory statements, how these myriad federal, state, and municipal infractions worked to

12  disrupt the relationship between it and its drivers.  As a matter of common sense, it is unclear to

13  the Court how some of these violations *could* lure drivers away from Flywheel or otherwise

14  meaningfully disrupt the relationship.[15]  Therefore, Flywheel has failed to sufficiently allege the

15  nexus between these independently wrongful acts and disruption in the relationship between

16  Flywheel and its drivers.

17        The Court next considers, with respect to the wrongful acts for which Flywheel sufficiently

18  alleged a nexus, whether Flywheel sufficiently alleged actual disruption in the relationships

19  between Flywheel and drivers.  For disruption to occur, the "relationship" that forms the basis of

20  an intentional interference claim must have existed at the time of the allegedly tortious conduct.

21  *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 997–98 (N.D. Cal. 2014) (collecting California

22

23  _____

    [14] At this juncture, the Court declines to address whether Flywheel has sufficiently alleged a nexus
24  between the wrongful conduct alleged in the Sherman Act or UPA claims as each have been
    substantively dismissed.

25  [15] In its opposition, Flywheel argues that each of these transgressions results in a "less regulated"
26  driver experience, which makes Uber more attractive than Flywheel to drivers.  This allegation,
    however, does not appear in the Complaint, and the Court is unable to infer as much from the
27  allegations themselves.  Further, many of the unlawful activities of which Uber stands accused,
    seem demonstrably unattractive to drivers: forcing them to carry their own insurance and refusing
28  to allow drivers to register their vehicles as commercial vehicles, to name but two examples.

1    state cases); *see Westside Ctr. Assocs v. Safeway Stores 23, Inc.,* 42 Cal.App.4th 507, 524 (1996)

2    (intentional interference with economic advantage tort protects "the expectation that the

3    relationship will yield the desired benefit, not necessarily the more speculative expectation that a

4    potentially beneficial relationship will eventually arise.")  To the extent, then, that Flywheel

5    alleges that Uber's actions lured away drivers that were already driving for Flywheel, Flywheel

6    has sufficiently alleged a disruption.  *See Silicon Labs Integration, Inc. v. Melman,* No. 08–cv–

7    04030–RMW, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010) (previous, discrete transaction

8    sufficient to establish "existing" relationship; ongoing transaction not necessary).[16]  To the extent,

9    however, Flywheel alleges that Uber's actions prevented it from recruiting new drivers,

10   Flywheel's intentional interference claim fails.  (*See, e.g.,* Complaint ¶ 80: "In reliance on Uber's

11   misrepresentations, thousands of *former and potential* San Francisco taxicab drivers have quit or

12   foregone driving taxicabs . . . ." (emphasis added).)

13        Finally, Flywheel pleads only conclusory allegations that Uber intended to disrupt

14   Flywheel's economic relationships with its drivers.  *See Korea Supply*, 29 Cal. 4th at 1154–57.

15   Flywheel suggests in its opposition brief that it is "aware" of numerous instances where Uber

16   deliberately targeted Flywheel drivers, but that specificity does not appear in the Complaint.

17   Accordingly, Flywheel did not sufficiently plead intent.

18        For the foregoing reasons, Flywheel's intentional interference claim is dismissed.

19   **VI.    Unfair Competition.**

20        Uber next argues that Flywheel's Unfair Competition Law ("UCL") claim should be

21   dismissed solely because it is wholly derivative of Flywheel's Sherman Act, UPA, and Lanham

22   Act claims.  To the extent Flywheel's UCL claim is based upon Flywheel's Sherman Act, UPA

23   claim, and non-actionable puffery, its UCL claim is dismissed for the reasons described above.  To

24   the extent Flywheel bases its UCL claim on the surviving portions of the Lanham Act claim or the

25   allegations in Paragraphs 110-124, however, the UCL claim survives.

26   

_____

27   [16] The cases Uber cites do not stand for the proposition that Flywheel is required to allege the
     specific identities of individual drivers.  Indeed, based on the Complaint, listing each individual

28   driver of the "thousands" who departed Flywheel for Uber would be prohibitive.  (*See, e.g.*,
     Complaint ¶ 80.)

While it is indeed puzzling to the Court that Flywheel does not explicitly reference the litany of Uber's alleged violations of federal, state, and municipal law in its UCL claim, Paragraph 13 of the Complaint incorporates "into each clause of action" "[a]ll of the allegations in this Complaint" "to the extent necessary or useful to clarify and complete each stated cause of action." This is sufficient to "state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678.

The Court declines to address Uber's standing argument, because it was raised for the first time in Uber's reply brief. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (court need not consider arguments raised for the first time in reply brief) (citations omitted); *MJG Enters., Inc. v. Cloyd*, No. 10-cv-0086-PHX-MHM, 2010 WL 3842222, at *6 n.1 (D. Ariz. Sept. 27, 2010) (declining to consider standing argument when raised for first time in reply brief).

Flywheel's UCL claim, therefore, partially survives Uber's motion to dismiss.

## VII.   Collective Allegations.

Finally, Uber argues that Flywheel's allegations against the four Uber-related entities are deficient because the Complaint refers to these entities collectively as "Uber" and does not allege facts specific to any of the distinct entities.

To satisfy Federal Rule of Civil Procedure 8(a), a complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted). A complaint may fail to provide such "fair notice," however, where it does not differentiate between defendants. *See Corazon v. Aurora Loan Servs., LLC*, No. 11-cv-00542-SC, 2011 WL 1740099, at *4 (N.D. Cal. May 5, 2011) ("In the few allegations where [plaintiff] alleges misconduct by a singular defendant, [plaintiff] fails to specify which one." (citations omitted)). Yet, so-called "group pleading" is not fatal as long as the complaint gives defendants fair notice of the claims against them. *See Frazier v. U.S. Bank Nat'l Ass'n*, No. 11-cv-8775, 2013 WL 1337263 at *2–3 (N.D. Ill. Mar. 29, 2013) (holding group pleading did not render complaint infirm where complaint provided fair notice of claims); *see also Sprint Sols., Inc. v. Fils-Amie*, No. 14-cv-60224, 2014 WL 4494146, at *2 (S.D. Fla. Sept. 12, 2014) (rejecting defendants' contention that Sprint's use of the term "Defendants" in the amended complaint requires dismissal).

United States District Court
Northern District of California

Flywheel refers collectively to the four target entities as Uber.  (Complaint ¶ 7.)  Flywheel alleges that the four entities acted in concert with and on behalf of each other.  (*Id.* ¶ 9.)  Flywheel also brings all of its causes of action against each of the four Uber-related entities.  These facts are almost identical to those in *Tivoli LLC v. Sankey*, No. 14-cv-1285-DOC-JCG, 2015 WL 12683801, at *3–4 (C.D. Cal. Feb. 3, 2015).

In *Tivoli*, the complaint referred collectively to four "target entities" and accused each of the four defendants of participating in the alleged wrongful conduct.  *Id.*  The plaintiff further alleged that the entities were corporate affiliates and agents/employees of each other.  *Id.*  The court deemed the complaint sufficient, observing that while "collective references" could cause confusion when a "large and diverse" group of defendants was at issue and "obscure[] which defendant is alleged to have committed which act," a small number of defendants presented no such risk.  *Id.*  Here, as in *Tivoli*, the Complaint fairly claims that each of the four Uber-related entities participated in the alleged wrongful conduct, even if the allegations are accomplished through group pleading.

## CONCLUSION

For the foregoing reasons, and as described above, Uber's motion to dismiss is GRANED in part and DENIED in part, but Flywheel shall have leave to amend the deficient portions of the Complaint.  The only portion of the Complaint dismissed without leave to amend are Flywheel's UPA claims.  Flywheel shall file an amended complaint, if it chooses to do so, by November 21, 2018.

**IT IS SO ORDERED.**

Dated: September 24, 2018

_____

JEFFREY S. WHITE
United States District Judge