UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESOTO CAB COMPANY, INC., | Case No. 16-cv-06385-JSW |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| UBER TECHNOLOGIES, INC., et al., | Re: Dkt. No. 89 |
| Defendants. | |

Now before the Court is the motion to dismiss the second amended complaint filed by Defendants Ubesr Technologies, Inc., Uber USA, LLC, RASIER, LLC, and RASIER-CA, LLC (collectively, "Defendants" or "Uber"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the motion suitable for disposition without oral argument. *See* Civil L.R. 7-1(b). For the reasons discussed below, the Court GRANTS Uber's motion to dismiss but will afford DeSoto Cab Company, Inc. ("Flywheel") one final opportunity to amend.

## BACKGROUND

The substantive facts of this case are fully addressed in this Court's Order granting in part and denying in part Uber's motion to dismiss. (Dkt. No. 64.) Most of the procedural history of this case is addressed in this Court's Order granting Flywheel's motion for leave to file a second amended complaint. (Dkt. No. 85.) Pursuant to this Court's Order, Flywheel filed its second amended complaint ("SAC") on August 19, 2019. (Dkt. No. 86.) The SAC brings twelve causes of action: (i) monopolization and (ii) attempted monopolization in violation of the Sherman Antitrust Act, 15 U.S.C. § 2, (iii) violation of the Lanham Act, 15 U.S.C. § 1125(a), (iv) intentional interference with prospective economic relations, (v) failure to charge just and

1 reasonable rates, in violation of California Public Utilities Code ("PUC") section 451, (vi)

2 providing free or reduced rate transportation, in violation of PUC section 522, (vii) charging

3 different rates for multiple and single passengers, in violation of PUC section 532, (viii) failure to

4 file rate schedules, in violation of PUC section 486, (ix) transporting passengers without filing rate

5 schedules, in violation of PUC section 493, (x) changing rates without notice or approval, in

6 violation of PUC sections 454 and 491, and the California Constitution, (xi) charging rates

7 different than those specified in a schedule, in violation of PUC section 494, and (xii) violating

8 section 17200 of California Business and Professions Code through unfair and illegal practices.

9      The Court will address additional facts as necessary below.  For the purposes of this

10 analysis only, the Court assumes the truth of the allegations in the SAC.

<b>ANALYSIS</b>

**A.    Applicable Legal Standards.**

13      A complaint must contain a "short and plain statement of the claim showing that the

14 pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  "[D]etailed factual allegations are not

15 required" to survive a motion to dismiss if the complaint contains sufficient factual allegations to

16 "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

17 (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Labels and conclusions[] and a

18 formulaic recitation of the elements of a cause of action will not do." *Twombly*, 50 U.S. at 555.

19      When evaluating a Rule 12(b)(6) motion to dismiss, a district court accepts as true all

20 material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff.

21 *Faulkner v. ADT Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).  A district court should grant

22 leave to amend unless the court determines the pleading could not "possibly be cured by the

23 allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

**B.    Request for Judicial Notice.**

25      Uber and Flywheel have each asked the Court to take judicial notice of several documents.

26 (Dkt. Nos. 90, 93, 99.)  Neither party contests the other's request.  Federal Rule of Evidence 201

27 allows a court to take judicial notice of facts that are "not subject to reasonable dispute because

28 [they] (1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1   accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

2   Fed. R. Evid. 201(b).  Although the pending motion is a motion to dismiss, the Court may take

3   judicial notice of matters of public record outside of the complaint without converting the motion

4   into one for summary judgment.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).

5         Judicial notice is appropriate for public records, including transcripts and orders issued by

6   administrative agencies and courts.  *W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1192 n.4

7   (9th Cir. 2008) (taking judicial notice of a CPUC decision).  Accordingly, the Court takes judicial

8   notice of Exhibits A, B, F, G and I through U to the Declaration of Brian C. Rocca ("Rocca

9   Decl."), Exhibits A through E to the Declaration of Joe Bautista, and Exhibit A to Uber's

10   supplemental request for judicial notice.  (Dkt. Nos. 90, 91-1, 93, 93-1 99.)  Each of these

11   documents are rulings, orders, or decisions of the California Public Utilities Commission

12   ("CPUC").

13         Courts may also take judicial notice of documents found on government agency websites.

14   *Paralyzed Veterans of Am. v. McPherson*, No. 06-cv-4670-SBA, 2008 WL 4183981, at *5 (N.D.

15   Cal. Sept. 9, 2008) (taking judicial notice of two documents on Secretary of State's website); *see*

16   *also Goncharov v. Uber Tech., Inc.,* 19 Cal. App. 5th 1157, 1161 n.2 (2018) (granting judicial

17   notice of permit issued by the CPUC).  Accordingly, the Court also takes judicial notice of

18   Exhibits C through E, H, and V to the Rocca Declaration.  (Dkt. No. 91-1.)  Exhibits C through E

19   and V are CPUC-issued "Class P" Transportation Network Company permits[1], and Exhibit H is a

20   term sheet for an agreement between the CPUC and Uber.  Exhibits C through E, H, and V were

21   all obtained from the CPUC's website.

22         All told, in support of their respective briefing on this motion to dismiss alone, the parties

23   have asked this Court to take judicial notice of nearly 1,100 pages.  Notably, the parties have not

24   asked the Court to take judicial notice of particular facts or statements within these documents.

25   Yet, "[j]ust because the document itself is susceptible to judicial notice does not mean that every

26   assertion of fact within that document is judicially noticeable for its truth."  *Khoja v. Orexigen*

27

28         [1] The companies identified in these permits are Silver Ride LLC, Wingz, Inc., Ziro Ride, LLC, and Uber.

1    *Therapeutics, Inc.*, 899 F.3d 988, 999–1000 (9th Cir. 2018), *cert. denied sub nom. Hagan v.*

2    *Khoja*, 139 S. Ct. 2615 (2019). Moreover, taking judicial notice of these documents in their

3    entirety "could have unforeseen consequences later in the litigation." *Metro. Creditors' Tr. v.*

4    *Pricewaterhousecoopers, LLP*, 463 F. Supp. 2d 1193, 1197 (E.D. Wash. 2006). The Court

5    therefore concludes it is appropriate to take judicial notice only of the facts appearing in the

6    submitted documents that are relevant to the issues presented in the motion to dismiss the SAC—

7    and only the facts from these documents the Court specifically references in its analysis below.

8    Further, the Court takes judicial notice of these facts solely for the purposes of deciding the instant

9    motion.

10   **C.      Sherman Act Claims.**

11        **1.      Redefining Relevant Market.**

12        Uber argues that this Court should reconsider its earlier holding that Flywheel adequately

13   defined a cognizable, relevant market. The market, as pled, excludes charter-party carriers

14   ("TCPs"). (Dkt. No. 86 (SAC) ¶ 15.) Uber points out that the CPUC classifies Uber as a

15   transportation-network carrier ("TNC") and considers TNCs a subset of TCPs. It follows that

16   Uber, by virtue of being a TNC, is also a TCP. Therefore, according to Uber, the market definition

17   is nonsensical because it allows Flywheel to contend that Uber is monopolizing a ride-share

18   market of which Uber is, by definition, excluded. Flywheel correctly points out, however, that,

19   though this argument was available to Uber when it filed its first motion to dismiss, Uber

20   neglected to pose it.

21        Under Federal Rule of Civil Procedure 12(g), parties are prohibited from bringing

22   successive motions to dismiss that raise arguments that could have been made in a prior motion.

23   Yet, courts have discretion to consider a successive motion under Rule 12(g) if to do so would

24   facilitate judicial economy and efficiency. *In re Apple Iphone Antitrust Litig.*, 846 F.3d 313, 319

25   (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019); *Amaretto Ranch*

26   *Breedables, LLC v. Ozimals, Inc.*, No. 10-cv-05696-CRB, 2011 WL 2690437, at *2 n.1 (N.D. Cal.

27   July 8, 2011) (considering successive Rule 12(b)(6) motion in interest of judicial economy).

28        The Court declines to consider Uber's "successive" argument. This is not a circumstance

where a defendant's successive motion draws the Court's attention to a heretofore-unaddressed topic. Instead, Uber tasks the Court to revisit a position the Court has affirmatively developed: this is patently *in*efficient. Moreover, Uber has not offered any explanation as to why it failed to raise this argument in its first motion to dismiss. *See Mario v. v. Armenta*, No. 18-cv-00041-BLF, 2019 WL 8137140, at *2 (N.D. Cal. Apr. 17, 2019) (declining to consider successive motion where defendant had not explained prior omission).

Further, the complaint defines TCPs as "limousines and luxury sedans driven by commercially-licensed drivers." (SAC ¶ 17.) While it would have been perhaps more convenient and clear to define TCPs in the complaint using the exact contours of the CPUC definition, there is no rule requiring Flywheel to do so. A plaintiff, in a complaint, is permitted to create shorthand and define terms within a complaint. Doing so is common practice, and that appears to be what Flywheel has done here. For these reasons, the Court declines to consider Uber's successive argument.

### 2.   Market Barriers and Danger of Recoupment.

Uber next argues that Flywheel's allegations concerning market barriers and danger of recoupment remain deficient. The Court agrees: Flywheel has failed to correct the deficiencies the Court identified in its prior Order.

"In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share." *United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990) (emphasis in original). Accordingly, to allege sufficient market barriers, Flywheel must show that new competitors are barred from entering the market and existing competitors cannot "expand their output" to challenge Uber's pricing. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995). In other words, a plaintiff must show barriers to entry and barriers to expansion. *Id.* A barrier to entry is either an "additional" long-run cost that incumbent firms did not incur that "must" be incurred by new entrants or a factor or factors in the market that deter entry "while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993) (citation omitted). Barriers to entry may include: (i) legal license requirements, (ii) control of an essential or superior resource, (iii) entrenched buyer

5

1    preferences for established brands, (iv) capital market evaluations imposing higher capital costs on

2    new entrants, and, occasionally, (v) economies of scale.  *Rebel Oil*, 51 F.3d at 1439.

3            Flywheel's augmented allegations do not resolve the concerns the Court identified in its

4    previous Order.  For instance, Flywheel alleges that new market entrants must comply with

5    regulations that were not in place at the time Uber entered the market.  (SAC ¶¶ 86-88.)  Yet,

6    crucially, Flywheel does not allege that new market entrants are incapable of complying with

7    those regulations or that the regulations are prohibitively cumbersome.  *Med Vets Inc. v. VIP*

8    *Petcare Holdings, Inc.*, No. 18-cv-02054-MMC, 2019 WL 1767335, at *7 (N.D. Cal. Apr. 22,

9    2019) (holding regulatory authorization requirements insufficient to establish barrier to entry

10   where no allegations concerning the difficulty of compliance).  It is not enough to call a market

11   feature an impediment; factual allegations must substantiate the difficulty the impediment

12   imposes.

13           Flywheel also alleges that the capital outlays for new taxicab companies and new TNC

14   companies are prohibitive.  (SAC ¶¶ 89-91.)  For traditional taxicab companies, Flywheel alleges

15   that the costs of securing land and vehicles are excessively expensive and that the longstanding

16   financier for the San Francisco Ride-Hail Market (as defined in the SAC) will no longer lend

17   money to taxicab companies.  Flywheel explains that this lender's new reluctance is due to the

18   collapse of companies attempting to compete in the San Francisco Ride-Hail Market.

19           Yet, traditional taxicab companies are not Uber's only competitors.  There is at least one

20   other category of potential Uber challengers—other TNCs.  (SAC ¶¶ 92-96.)  Flywheel alleges

21   that barriers to entry for TNCs include the price of developing a smartphone application, which

22   Flywheel estimates as $15 to $20 million dollars.  But Flywheel has not alleged that this is capital

23   a new TNC company would be unable to raise or that it would be more difficult for a new TNC

24   company to raise this capital than it would be for Uber.  *See Los Angeles Land Co.*, 6 F.3d at

25   1427-28 (holding need for financing not barrier to entry because no evidence more difficult for

26   new entrants to obtain financing than market incumbents).  In fact, as the Court observed in its

27   previous Order, "Uber's market success . . . very likely makes it easier, not harder, for newcomers

28   to the relevant product market to procure capital backing."  Indeed, Uber points to the entry to the

1   market of competitors Zipcar, Silver Ride, Wingz, and ZiroRide.  (*See* Dkt. No. 91-1, Exs. C-E

2   (TNC permits for Silver Ride LLC, Wingz, Inc., Ziro Ride, LLC).)  Silver Ride, Wingz, and

3   ZiroRide's permits are dated 2016, 2017, and 2019 respectively.  (*See id.*)  This suggests that the

4   ride-share market is expanding, not contracting.  *See W. Parcel Exp. v. United Parcel Servs. of*

5   *Am., Inc.*, 190 F.3d 974 at 976 (9th Cir. 1999) (finding no significant barriers to entry where

6   market expanded).

7       This group of allegations concerning capital outlay requirements for new taxicab and TNC

8   businesses comes the closest of all of Flywheel's allegations to constituting a barrier to entry.  Yet,

9   Flywheel's allegations demonstrate no more than the evolution of the San Francisco Ride-Hail

10  Market.  Traditional taxicab companies may be experiencing new obstacles to obtaining traditional

11  financing, but competitors setting up business as TNCs are emerging.  A market's shift towards a

12  different model does not suggest that competition is imperiled.  Instead, this suggests that

13  innovation is causing the market to evolve and that competition is working.  *Syufy Enters.*, 903

14  F.2d at 664 (noting that competition may result in "the exit" of some competitors).

15      Finally, Flywheel alleges that brand awareness and customer loyalty to Uber presents a

16  barrier to entry.  (SAC ¶¶ 97, 98.)  Yet, courts routinely hold that "reputation alone does not

17  constitute a sufficient entry barrier."  *E.g.*, *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace*

18  *Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997).  Indeed, "good will

19  achieved through effective service" is not an impediment to competition: it is its "natural result."

20  *Syufy Enters.*, 903 F.2d at 669.  This, too, is not a sufficiently alleged barrier to entry.

21      Even if Flywheel's allegations concerning new market entrants were sufficient—and, as

22  the Court has explained, they are not—Flywheel has not satisfied pleading requirements

23  concerning existing competitors.  The SAC contains no allegations that existing competitors in the

24  market, of which there are several, are unable to expand their output or offerings to challenge

25  Uber's market behavior.  *See Rebel Oil*, 51 F.3d at 1434 (discussing necessity of barriers to

26  expansion as well as barriers to entry).[2]  Accordingly, Flywheel has not alleged sufficient market

27  _____

28  [2] For example, Flywheel ignores the existence of Lyft as an existing, established competitor in the
    San Francisco Ride-Hail Market.  (*See, e.g.*, Dkt. No. 91-1 Ex. H (discussing Lyft and analogizing

United States District Court
Northern District of California

barriers and has therefore not sufficiently alleged market power.  As the Court observed in its prior

Order, the success of predatory pricing allegations depends on the sufficiency of allegations

concerning market barriers.  Therefore, Flywheel has not sufficiently alleged a dangerous

probability that Uber will recoup its losses from below-cost pricing.  *See In re Air Passenger*

*Comput. Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1470 n.20 (C.D. Cal. 1988)

("Predatory pricing can only be effective when there are significant barriers to entry which enable

a monopolist to recoup short term losses through monopoly profits reaped after exclusion of a

competitor from the market.").

The Court therefore dismisses Flywheel's Sherman Act claims.  The Court will give

Flywheel one more opportunity to amend these claims.   If Flywheel is unable to satisfy the

pleading requirements in a third amended complaint, the Court will conclude that opportunity for

further amendment is futile, and the Court will dismiss the Sherman Act claims with prejudice.

**D.     PUC Claims.**

The SAC brings seven new claims for violations of PUC.  Uber argues that adjudication of

these claims would usurp the CPUC's authority under California law.  Flywheel disagrees,

maintaining that (i) Uber is judicially estopped from arguing that it is a public utility and (ii) Uber

has failed to demonstrate that adjudicating Flywheel's PUC claims would interfere with the

CPUC's power.  The Court addresses each argument in turn.

**1.     Judicial Estoppel.**

Flywheel first argues that Uber is judicially estopped from arguing that Uber is a public

utility.  Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage

by asserting one position and then later seeking an advantage by taking a clearly inconsistent

position.  *Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600–01 (9th Cir. 1996).

This doctrine is concerned primarily with avoiding "inconsistent court determinations" and

concomitant "threat[s] to judicial integrity."  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d

778, 782–86 (9th Cir. 2001) (citations omitted).  When determining whether to apply this doctrine,

Lyft to Uber business model).)

United States District Court
Northern District of California

courts consider: (i) whether a party's later position is "clearly inconsistent" with its earlier position; (ii) whether the court adopted that earlier position; and (iii) whether the court's allowing the party to assert an inconsistent position would give that party an unfair advantage or would impose an unfair detriment on the opposing party. *New Hampshire v. Maine,* 532 U.S. 742, 750-51 (2001) (citations omitted). In the Ninth Circuit, judicial estoppel only applies where the court relied on, or "accepted," the party's previous inconsistent position. *Interstate Fire & Casualty Co. v. Underwriters at Lloyd's, London,* 139 F.3d 1234, 1239 (9th Cir. 1998).

Here, Flywheel argues Uber is judicially estopped from arguing it is a utility. Flywheel points out that Uber insisted, in two separate submissions to CPUC, it was not a utility and that the CPUC did not have the power to regulate it. (*See* Dkt. No. 93-1, Ex. A (Uber Appeal of CPUC Decision) p. 32-33 and Ex. B (Uber Application for Re-hearing of CPUC Decision) p. 43-44.) This, Flywheel insists, precludes Uber from arguing now that it is a utility and using its status as such to protect it from suit under PUC. The Court disagrees.

First and foremost, the CPUC rejected Uber's position and concluded that Uber *was* a public utility. (Dkt. No. 91-1, Ex. G (CPUC Decision) and Ex. M (CPUC decision) p. 4.) Because the CPUC did not accept Uber's argument, judicial estoppel does not apply. *See Yanez v. United States*, 989 F.3d 323, 326 (9th Cir. 1993) (noting judicial estoppel "inapplicable" unless inconsistent statement "actually adopted" by court in earlier litigation).

Second, underscoring the obvious, Flywheel's new claims under PUC and its arguments in opposition to the motion to dismiss rely on Uber's status as a public utility. (*See, e.g.*, SAC ¶¶ 101-13 (describing Uber's obligations as public utility).) It would be a strange ruling indeed that prevented Uber from developing defenses available to public utilities, while allowing Flywheel to use Uber's status as a public utility as a cudgel. Surely such a result would not protect the integrity of the judicial process. *See Hamilton*, 270 F.3d at 782–86. It is one thing to wield inconsistent statements strategically in order to play "fast and loose" with the courts; it is another to make an argument, lose, and then adapt the subsequent approach. Uber has done the latter.[3]

---

[3] Interestingly, this Court has ruled that Flywheel is judicially estopped from arguing that Uber is *not* a public utility. (Dkt. No. 64 p. 17.)

United States District Court
Northern District of California

**2.      Prongs 1 and 2 of *Covalt* Test.**

Uber argues that Flywheel's claims under PUC should be dismissed because this Court lacks jurisdiction.  Flywheel's new allegations, in Uber's view, interfere with the CPUC's jurisdiction because they require this Court to decide issues (or matters implicated by issues) currently under review at the CPUC.

PUC section 1759(a) states that no trial court will have jurisdiction to "review, reverse, correct, or annul any order or decision of the [CPUC] . . . or delay the execution or operation . . . [of] the [CPUC] in the performance of its official duties, as provided by law and the rules of court."  Yet, while the CPUC is "an expert administrative body" with "wide regulatory power" that courts generally may not abrogate, its jurisdiction is not exclusive over "any and all matters having any reference to the regulation and supervision of public utilities."  *Masonite Corp. v. Pac. Gas & Elec. Co.*, 65 Cal. App. 3d 1, 8-9 (1976).  PUC section 2106 allows trial courts to award "persons or corporations affected . . . for all loss, damages, or injury" caused by a public utility.[4]  Under section 2106, "any court of competent jurisdiction" may adjudicate such an action.

In *San Diego Gas & Elec. Co. v. Superior Ct.*, 13 Cal. 4th 893, 916-18 (1996) ("*Covalt*"), the California Supreme Court addressed the tensions between sections 1759 and 2106 and developed a three-part test to determine whether section 1759 precludes adjudication of an issue by a trial court.  Under the *Covalt* test, a court asks: (i) whether [a regulatory commission] has the authority to adopt a policy; (ii) whether the commission has exercised that authority, and (iii) whether the court action at issue would hinder that policy.  *Id.* at 923, 926, 935.  If the answers to

---

[4] Section 2106 states in full:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom.  If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage or injury may be brought in any court of competent jurisdiction by any corporation or person.

United States District Court
Northern District of California

1    all three questions are affirmative, a trial court may not adjudicate an issue.  *See id.*

2          In its Order granting Flywheel leave to file a second amended complaint, this Court

3    concluded that the first two factors of the *Covalt* test were met.  (*See* Dkt. No. 85 p. 5.)  The Court

4    sees no reason to depart from that conclusion.  The Court has already explained why Uber is not

5    judicially estopped from arguing it is a public utility.  Further, as Uber correctly points out, the

6    allegations in the SAC themselves demonstrate that the first two *Covalt* factors are satisfied.  *See*

7    *A White & Yellow Cab, Inc. v. Uber Techs., Inc.,* No. 15-cv-05163-JSW, 2017 WL 1208384, at *6

8    (N.D. Cal. Mar. 31, 2017) (holding first two factors of *Covalt* test satisfied based on allegations in

9    complaint).  For instance, Flywheel alleges that the CPUC has authority to issue regulations

10   concerning the contested issues:

> *Among the obligations created for utilities* by the Public Utilities Act
> *are the requirements* that utilities charge just and reasonable rates,
> refrain from providing free or reduced-rate transportation without
> approval, refrain from charging different amounts when service is
> combined, file rate schedules with the Commission, refrain from
> transporting passengers before filing a rate schedule with the
> Commission, refrain from changing rates without providing notice
> and obtaining Commission approval, and refrain from charging rates
> different than those specified in the schedules on file with the
> Commission.

(SAC ¶ 112 (emphasis added).)  This laundry list of "obligations created for utilities" maps

precisely onto the seven causes of action Flywheel brings under PUC.  (*See* SAC ¶¶ 186-237.)

Moreover, the language "created for utilities" suggests both that the CPUC has the authority to

exercise and has exercised that authority to regulate the particular issues itemized.

      With respect to the second prong of the *Covalt* test specifically, the Court does not

disagree with Flywheel that the analysis must center upon whether the CPUC has exercised its

regulatory authority over an issue rather than over any particular utility.  *See Lefebvre v. S. Cal.*

*Edison,* 244 Cal. App. 4th 143, 154 (2016) (describing the first two prongs of the *Covalt* test as

depending upon "the issue in question"); *see also Kairy v. SuperShuttle Int'l,* 660 F.3d 1146, 1150

(9th Cir. 2011) (analyzing *Covalt* by referencing "subject matter of the litigation").  Even so, other

courts have concluded that the second prong of *Covalt* is satisfied where the "issue in question" is,

broadly, "transportation companies."  *See Goncharov,* 19 Cal. App. at 1170 (agreeing with parties

that first two *Covalt* factors satisfied where CPUC had exercised authority to regulate "transportation companies").  Here, the CPUC has exercised its authority to regulate transportation companies, and the second *Covalt* prong is satisfied.  *See Rosen v. Uber Techs., Inc.*, 164 F. Supp. 3d 1165 (N.D. Cal. 2016).

### 3.      Prong 3 of *Covalt* Test.

The Court next considers whether adjudicating Flywheel's PUC claims would interfere with the CPUC's regulatory authority.  It does not appear the CPUC has completed constructing regulatory framework for TNCs, including regulations for rate-related concerns.  Because rulemaking is ongoing, the Court concludes that adjudicating Flywheel's PUC claims would hinder the CPUC's exercise of authority.  *See Overton v. Uber Techs., Inc.*, 333 F. Supp. 3d 927, 949 (N.D. Cal. 2018) (CPUC rulemaking ongoing), *aff'd*, No. 18-16610, 2020 WL 1159269 (9th Cir. Mar. 10, 2020); *City & Cty. of San Francisco v. Uber Techs., Inc.*, 36 Cal. App. 5th 66, 76–77 (2019) (same), *review denied* (Sept. 11, 2019).  There is no small amount of gray area in the determinations the CPUC has made concerning TNCs like Uber: adjudicating some of Flywheel's claims very clearly would derogate from CPUC authority, while other claims present a closer question.  In the Court's view, ambiguity in such a circumstance is dispositive.  *Goncharov*, 19 Cal. App. 5th at 1161–74 (noting court intervention is impermissible if adjudication requires court to determine whether ambiguous rule applies or how it applies).  Given the primacy this Court is obligated to give section 1759, it is prudent for the Court to decline to adjudicate Flywheel's PUC claims.  The Court addresses each PUC claim in turn.

Claim Four alleges a violation of PUC section 451, which requires public utilities to charge "just and reasonable" rates.  As rulemaking remains open, including rulemaking related to rates, the Court does not have a framework that would enable it to determine whether a rate is "just" or "reasonable."  Accordingly, adjudicating this claim would hinder the CPUC's exercise of authority.  (*See* Dkt. No. 91-1, Ex. A p. 38 ("Rulemaking 12-12-011 remains open.") and Ex. B p. 120 ("The [CPUC] . . . is still gathering information regarding fares in order to gauge their reasonableness, especially in view of sporadic complaints that some TNCs have engaged in surge pricing.").)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    For Claims Five, Seven[5], Eight, and Ten to survive, Uber must be a common carrier.  *See*

2    Cal. Pub. Util. Code §§ 486, 493, 494, 522 (each provision dependent upon term "common

3    carrier").   The term "common carrier" is defined by statute to mean "every person and

4    corporation providing transportation for compensation to or for the public or any portion thereof

5    . . . ."  § 211.  Insofar as the term "common carrier" is concerned, applying these statutory

6    provisions would seem to require no more than interpretation of the text.  However, the scope of

7    the CPUC's consideration and regulation of TNCs has been far-reaching.  In fact, in permits

8    issued to TNCs as recently as 2019 (Dkt. No. 91-1, Exs. E and V), the CPUC has explicitly

9    reserved the right to update the requirements of a TNC permit "pending determinations the

10   [CPUC] may make in Rulemaking 12-12-011 or a successor proceeding."  *See Goncharov*, 19 Cal.

11   App. at 1173–74 (language of permit indicates ongoing regulatory inquiry).  Given the open-ended

12   and ongoing nature of rule-making for TNCs, the Court concludes that adjudicating whether Uber

13   is a common carrier and subject to regulations governing common carriers would interfere with

14   the CPUC's authority.[6]  *See Rosen*, 164 F. Supp. 3d at 1175 (finding third *Covalt* factor satisfied

15   where CPUC regulation of TNCs ongoing and complaint concerned which regulations Uber

16   required to follow).  Claims Five, Seven, Eight, and Ten are dismissed.

17   Claim Six alleges a cause of action under PUC section 532, which mandates, in pertinent

18   part, that no public utility shall charge an amount for the "collective . . . rendition" of two or more

19   services that is different from the "aggregate of the . . . charges specified in its schedules" on file

20

21   [5] Uber argues that another reason Claim Seven should fail is that the CPUC has not concluded
     PUC section 486 applies to TNCs.  Section 486 reads in part: "Every common carrier shall file
22   with the [CPUC] . . . schedules showing the rates, fares, charges, and classifications for the
     transportation between termini . . . of persons and property from each point upon its route to all
23   other points thereon . . . ."  In addition to noting that no adjudicative bodies have appeared to
     apply section 486 to TNCs, Uber points out that this Court has already observed that Uber's
24   business model uses "customizable pick up and drop off points."  Further, the SAC does not allege
     that Uber runs on a "termini" or fixed route model.  (*See* SAC ¶¶ 17, 18 (contrasting "fixed route"
25   model of passenger stage corporations to TNCs).)  Therefore, even absent the required *Covalt*
     analysis, it is not clear Claim Seven would be viable.
26

27   [6] The Court agrees with Uber that the issue of whether Uber was a common carrier was not
     decided in *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1085 n.3 (N.D. Cal.
28   2019).  In that case, the court noted that all common carriers are public utilities.  The court did not
     conclude that every public utility is a common carrier.

1    with the CPUC, where the charges on file are "applicable to each . . . service when separately . . .

2    rendered."  The SAC alleges that Uber's UberPool service violates this provision because

3    UberPool charges passengers "lower amounts" for riding together than passengers would have

4    been charged had they engaged the service separately.  (SAC ¶¶ 104, 113, 204.)

5         The CPUC has concluded that Uber may engage in fare-splitting services consistent with

6    PUC section 5401, which allows computation of charges based on "vehicle mileage or time of use

7    . . . or on a combination thereof."  (*See* Dkt. No. 91-1, Ex. M p. 55.)  When determining that fare-

8    splitting was permissible under section 5401, the CPUC acknowledged that the statute was unclear

9    and "would benefit from modernization" but concluded that "the facts of how the fare-splitting

10   services operate . . . lead[] us to affirm the validity of these operations. . . ."  (*Id.* p. 45.)  The

11   CPUC also telegraphed that it would continue to deliberate about fare-splitting operations.  (*Id.* p.

12   48 ("…the [CPUC] has not had sufficient time, nor seen enough data, to determine if there are any

13   advantages to allowing the fare-splitting operations to continue.").)  This, and other similar

14   statements, coupled with the ongoing and rather open-ended rulemaking regarding TNCs, is

15   sufficient to convince the Court that determining whether Uber's actions violate section 532

16   would, at this time, detract from the CPUC's authority.  Claim Six is also dismissed.

17        Finally, Claim Nine alleges that Uber has "regularly and customarily changed rates . . .

18   without receiving approval" from the CPUC in violation of PUC sections 454 and 491.  (SAC ¶

19   227.)  Adjudicating Claim Nine would require the Court to determine whether TNCs are required

20   to comply with this provision.  Because the CPUC has not indicated it has concluded its evaluation

21   of fares and fare structures, applying this provision to Uber would usurp the CPUC's authority.

22   For this reason, Claim Nine is also dismissed.

23        Based on the materials before the Court, it is not clear that the CPUC has closed the book

24   on issues of rate-based rulemaking.  Given that the pertinent rulemaking proceeding (12-12-011)

25   encompasses a multitude of issues and remains open, noting in particular the CPUC's recent

26   reservation of rights to update requirements imposed on TNCs (*e.g.*, Dkt. No. 91-1, Exs. E and V),

27   and contemplating the "primacy" this Court must afford the CPUC's authority under section 1759,

28   the Court concludes that Uber has satisfied all three factors of the *Covalt* test for each of

United States District Court
Northern District of California

14

1    Flywheel's PUC claims.  The  PUC claims are dismissed.

2    **E.      Intentional Interference with Prospective Economic Advantage.**

3          To state a claim for intentional interference with prospective economic advantage,

4    Flywheel must allege (i) an economic relationship between it and some third party with the

5    probability of future economic benefit; (ii) Uber's knowledge of the relationship; (iii) intentional

6    acts by Uber designed to disrupt the relationship; (iv) disruption, and (v) economic harm to

7    Flywheel proximately caused by those acts.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.

8    4th 1134, 1153 (2003).  Flywheel must also plead that Uber's conduct was wrongful by some legal

9    measure other than the fact of the interference itself.  *Id.* (internal citations omitted).  An act is not

10   independently wrongful merely because a defendant acts with an improper motive; rather, an act is

11   independently wrongful if it is unlawful, "if it is proscribed by some constitutional, statutory,

12   regulatory, common law, or other determinable legal standard."  *Id.* at 1158-59.  Moreover, "[t]he

13   independently wrongful act must *be* the act of interference itself."  *Crown Imports, LLC v.*

14   *Superior Court*, 223 Cal. App. 4th 1395, 1404 (2014) (emphasis added); *see Korea Supply*, 29 Cal.

15   4th at 1159 (illegal acts of bribery and sexual favors interfered with plaintiff's efforts to obtain

16   government contract).

17         As the Court observed in its Order dismissing the original complaint, Flywheel's

18   intentional interference claim is premised on Uber's purported disruption of Flywheel's

19   relationship with its drivers.  (Dkt. No. 64 p. 21.)  The Court previously held that Flywheel

20   sufficiently alleged a nexus between Uber's purported misrepresentations and a disruption in the

21   relationship between Flywheel and its drivers.  (*Id.* p. 21-23.)  The Court also ruled that Flywheel

22   had sufficiently alleged a disruption in its relationships with drivers already driving for Flywheel

23   but had not sufficiently alleged a disruption in Flywheel's ability to recruit new drivers.  (*Id.*)  The

24   Court further concluded that Flywheel had not sufficiently alleged that Uber intended to disrupt

25   Flywheel's economic relationships with its drivers.  (*Id.* p. 23.)

26         Flywheel's amended intentional interference claim again relies solely on Uber's purported

27

28

United States District Court
Northern District of California

misrepresentations to Flywheel drivers.  (SAC ¶¶ 114-24, 242, 244.)[7]  Nonetheless, the SAC still fails to plead facts regarding Uber's intent to disrupt those relationships.  The SAC alleges only that "Uber made the misrepresentations . . . for the purpose and with the intention of luring drivers" from Flywheel, that Uber "acted with malice, oppression, and fraud," and that the interference was "intentional, willful, and calculated to cause damage" to Flywheel.  (SAC ¶¶ 244, 248.)  These allegations are conclusory.  *See Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1032 (N.D. Cal. 2011) (dismissing intentional interference claim because allegations conclusory).  Further, as Uber notes, the statements themselves appear designed to compete for drivers generally, not to disrupt Flywheel's relationships with its drivers or to recruit drivers directly from Flywheel.  (*See id.* ¶¶ 114-16, 119, 122.)  Flywheel's claim for intentional interference is dismissed.

## F.      Unfair Competition Claim.

Finally, Uber argues that Flywheel's unfair competition claim under California Business and Professions Code section 17200 must be dismissed because: (i) it is derivative of claims that should be dismissed; (ii) Flywheel lacks standing to allege unfair competition claims based o certain predicate unlawful acts; and (iii) Flywheel seeks a remedy that California law does not allow.  First, to the extent the unfair competition claim is based upon the SAC's Sherman Act or PUC claims, the unfair competition claim fails for the reasons explained above.  *See Eastman v. Quest Diagnostics, Inc.*, 108 F. Supp. 3d 827, 838 (N.D. Cal. 2015) (dismissing unfair competition claims because "derivative" of other dismissed claims).

The Court next addresses Uber's argument that Flywheel has not sufficiently alleged standing with respect to certain predicate claims.  Flywheel contends that the Court should decline to entertain this argument because Uber failed to raise it in Uber's earlier motion to dismiss.  *See* Fed. R. Civ. P. 12(g).  The Court disagrees.  Uber did raise this standing argument in briefing in

---

[7] To the extent Flywheel's intentional interference claim is based on other wrongful acts, Flywheel has not alleged a connection between Uber's allegedly predatory pricing practices or violations of federal, local, and state law and a disruption in Flywheel's relationship with its drivers. (*See* SAC ¶ 248.)  Further, for the reasons discussed above, Flywheel's intentional interference claim fails to the extent it is based on Flywheel's Sherman Act or Public Utility Code claims.

United States District Court
Northern District of California

1    support of its earlier motion to dismiss, but the Court declined to consider the argument because

2    Uber raised it for the first time on reply.  The logic in declining to entertain an argument raised in

3    a reply is that to do so deprives the non-moving party of an opportunity to respond.  Had the Court

4    entertained Uber's standing argument when it was first presented, the Court would have denied

5    Flywheel the benefits of the adversarial process.  With respect to Uber's standing arguments as

6    presented in the motion to dismiss now before the Court, Flywheel has had an opportunity to

7    respond.

8        Even if the prohibition against "successive motions" is implicated here, the Court exercises

9    its discretion to evaluate the argument.  As discussed above, district courts in the Ninth Circuit

10   have the discretion to entertain or to decline to entertain "successive motion" arguments.

11   Discretion exists because, under Rule 12(g)(2), a party who has foregone the earliest opportunity

12   to make an available Rule 12 argument has multiple occasions later in the case to pose that

13   argument.  A party may raise a neglected Rule 12 argument in its answer, on a motion for

14   judgment on the pleadings, or at trial.  Fed. R. Civ. P. 12(g)(2), (h)(2).  Accordingly, courts in the

15   Ninth Circuit typically exercise their discretion to consider previously-available-but-unaddressed

16   arguments on a motion to dismiss where declining to do so would "substantially delay[]"

17   resolution of the issue.  *E.g.*, *Harrell v. City of Gilroy*, No. 17-cv-05204-LHK, 2019 WL 452039,

18   at *8 (N.D. Cal. Feb. 5, 2019) (discussing *Apple*, 846 F.3d at 320).

19        Here, if the Court were to decline to consider Uber's standing argument, Uber would

20   have the opportunity to raise the argument in its answer, in a motion for judgment on the

21   pleadings, or at trial.  Uber should have raised its standing argument in its *opening* brief in support

22   of its first motion to dismiss.  Yet, it does not appear that Uber brings this argument now "merely

23   for delay," and, further, the Court's analysis of standing will resolve an issue likely to arise at a

24   later time.  *See All. Labs, LLC v. Stratus Pharm., Inc.,* No. 2:12-cv-00927-WS, 2013 WL 273309,

25   at *3 (D. Ariz. Jan. 24, 2013).

26        To have standing to assert a claim for unfair competition, Flywheel "must have personally

27   suffered an invasion or injury to a legally protected interest," and there must be a causal

28   connection between the harm suffered and the unlawful business activity.  *Troyk v. Farmers Grp.,*

17

United States District Court
Northern District of California

1    *Inc.*, 171 Cal. App. 4th 1305, 1346, 1348-49 (2009).  Uber contends that Flywheel has not alleged

2    facts explaining how this alleged unlawful behavior violations caused Flywheel injury in fact.  The

3    Court agrees.  Flywheel's allegations concerning these predicate offenses allege that Uber failed

4    (i) to comply with the ADA's requirements, including the requirement to provide accessible

5    vehicles, (ii) to carry insurance required by California law, and (iii) to follow San Francisco

6    regulations for taxicabs.  (SAC ¶¶ 145-53.)  The SAC's only allegations concerning causal

7    connection between these violations and harm suffered by Flywheel are conclusory.  For example,

8    the SAC alleges that Flywheel has lost passengers and drivers to Uber, has incurred increased

9    overhead costs, and is at a competitive disadvantage because it is complying with the regulations

10   Uber flouts.  (*Id.* ¶ 258.)  These allegations describe some of the harm Flywheel suffered, but they

11   do not sufficiently connect, through factual allegations, Flywheel's harm with Uber's purported

12   rule- and law-breaking behavior.  To the extent the unfair competition claim is predicated on

13   purported violations of the Americans with Disabilities Act ("ADA"), Uber's alleged failure to

14   comply with insurance requirements under PUC, and Uber's purported failure to comply with San

15   Francisco regulations, the unfair competition claim fails because Flywheel has not sufficiently

16   alleged standing.[8]

17            Finally, Uber argues that Flywheel's unfair competition claim should be dismissed because

18   it impermissibly seeks nonrestitutionary disgorgement of Uber's profits.  In unfair competition

19   cases, courts may award a prevailing plaintiff injunctive relief and restitution.  *Cel-Tech*

20   *Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 179 (1999) (citations omitted).

21   Unfair competition plaintiffs may not receive awards of damages.  *Id.* (citations omitted).  An

22   order for restitution compels a defendant to return property it obtained through an unfair business

23   practice (i) to the party from whom the property was taken or (ii) to the party who had an

24   ownership interest in the property.  *Korea Supply*, 29 Cal. 4th at 1144-45 (citation omitted).  The

25   _____

26   [8] Uber does not argue that Flywheel lacks standing to bring its Lanham Act claim.  To the extent
     the unfair competition claim is based on the current iteration of Flywheel's Lanham Act claim

27   (and to the extent the unfair competition claim does not depend on statements this Court
     previously ruled were non-actionable puffery), the claim survives.  (*Id.* ¶¶ 253, 254.)

28

1    aim of restitution is to "restore the status quo." *Id.* at 1149.

2         As a remedy, disgorgement is broader.  Some disgorgement may be restitutionary because

3    it results in the repatriation of money or property to the wronged party.  *A White & Yellow Cab*,

4    2017 WL 1208384, at *10 (citations omitted).  In other words, restitutionary disgorgement focuses

5    on the plaintiff's loss.  Other disgorgement is not restitutionary because it results in the

6    defendant's surrender of profits regardless of whether such profits represent money taken *directly*

7    *from victims of an unfair practice*.  *Id.* (citations omitted).  Put another way, nonrestitutionary

8    disgorgement focuses on the defendant's gain.  Nonrestitutionary disgorgement is not permitted

9    for unfair competition claims under California law.  *Chowning v. Kohl's Dep't Stores, Inc.*, 733 F.

10   App'x 404, 406 (9th Cir. 2018).

11        Uber argues both (i) that Flywheel impermissibly seeks disgorgement of Uber's profits

12   rather than restitution for money Flywheel lost and (ii) that Flywheel has not alleged it has a

13   vested interest in Uber's profits.  Uber further argues that Flywheel's theory of disgorgement,

14   predicated on its loss of drivers to Uber, is too speculative.  The Court agrees.

15        Flywheel alleges that it has suffered injury due to the loss of "passengers[9] and drivers" and

16   seeks "disgorgement of profits illegally obtained [by Uber] through the wrongful acts" alleged in

17   the SAC.  (SAC ¶ 258 and Twelfth Cause of Action Prayer for Relief ¶ 1.)  This requested relief is

18   impermissibly focused on Uber's profits rather than Flywheel's losses.  Moreover, the supporting

19   factual allegations to which Flywheel draws the Court's attention lament the *taxicab industry's*

20   loss of drivers to Uber, not just Flywheel's own loss.  (*E.g.*, SAC ¶ 24 (". . . the taxicab industry

21   has experienced an approximately 70 percent decline in ridership and has lost more than 50

22   percent of its drivers as a result of Uber's illegal actions . . ."), ¶ 114 (alleging Uber's

23   misrepresentations directed to "current and prospective" Uber drivers and not to Flywheel

24   drivers).)  These allegations underscore Uber's gain at the expense of the taxicab industry's loss,

United States District Court
Northern District of California

25   _____

26   [9] In the SAC, Flywheel premises its request for restitution on the loss of "*passengers and* drivers"
     to Uber.  (SAC ¶ 258 (emphasis added).)  As Flywheel did not address Uber's argument
27   concerning restitution for lost passengers, Flywheel has conceded the merit of Uber's argument.
     *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) (failure to defend
28   point made in opposition is concession).  To the extent Flywheel's prayer for restitution is
     predicated on passenger loss, Flywheel's unfair competition claim is dismissed.

rather than demonstrating that Uber's gain was Flywheel's loss.  As such, Flywheel's prayer for relief for its unfair competition claim is dismissed to the extent it seeks nonrestitutionary relief.

The Court is also not satisfied that Flywheel has pled a vested interest in Uber's profits as generated through rides provided by former taxicab drivers.  Typically, restitution is permissible in two circumstances: (i) where the plaintiff is seeking the return of money or property that was once in its possession and (ii) where the plaintiff may recover property in which it has a vested interest. *Korea Supply*, 29 Cal. 4th at 1149.  A vested interest exists, for example, in money earned but not yet remitted.  *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1124 (N.D. Cal. 2012) ("For example, a plaintiff has a vested interest in unpaid wages and therefore may state a restitution claim . . . to recover such lost money or property.").  At most, Flywheel has alleged an expectancy in the profits that it would have been able to generate through the expected, but not yet completed, labor of drivers.  Flywheel's contingent interest in the profits it could have earned from the unrealized labor of its drivers is too attenuated to constitute a vested interest.

Flywheel's unfair competition claim is dismissed to the extent it is predicated on claims the Court has dismissed, to the extent that Flywheel has not sufficiently alleged it has standing, and to the extent Flywheel seeks nonrestitutionary disgorgement.

**CONCLUSION**

The First, Second, and Fourth through Twelfth claims are dismissed to the degrees explained above.  Due to the difficulties of correctly pleading Sherman Act claims, the Court will afford Flywheel one additional chance to amend its allegations in support of Claims One and Two. The Court will afford Flywheel one opportunity to amend Claims Four through Ten, but only to the extent Flywheel can allege facts "that would not hinder ongoing CPUC supervision and regulation."  *See A White & Yellow Cab, Inc.*, 2017 WL 1208384, at *7 (affording leave to amend for same reason).  Claim Eleven, Flywheel's intentional interference claim, is dismissed with prejudice: Flywheel has demonstrated it cannot plead facts to support Uber's acting intentionally to disrupt Flywheel's relationships with its drivers, and leave to amend this particular claim would be futile.  The Court will afford Flywheel one opportunity to amend its unfair competition claim.

//

United States District Court
Northern District of California

1        An amended complaint, if Flywheel chooses to file one, is due no later than April 24,

2   2020.

3        **IT IS SO ORDERED.**

4   Dated: March 25, 2020

5   _____

6   JEFFREY S. WHITE
   United States District Judge

United States District Court
Northern District of California

21