Shannon Seibert (CBN 240317)
seibert@sbm.law
Joe Bautista (CBN 255708)
bautista@sbm.law
Nina Montoya (CBN 237419)
montoya@sbm.law
SEIBERT BAUTISTA MONTOYA
2100 Embarcadero, Suite 203
Oakland, CA  94606
Tel:  510.679.1981
Fax: 510.679.1982
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| DESOTO CAB COMPANY, INC., d/b/a FLYWHEEL TAXI,<br><br>               Plaintiff,<br>    vs.<br><br>UBER TECHNOLOGIES, INC., a Delaware corporation; UBER USA, LLC, a Delaware limited liability company; RASIER, LLC, a Delaware limited liability company; RASIER-CA, LLC, a Delaware limited liability company; and DOES 1 through 100, inclusive,<br><br>               Defendants. | CASE NO.: 4:16-cv-06385<br><br>**THIRD AMENDED COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff DESOTO CAB COMPANY, INC., d/b/a FLYWHEEL TAXI, complains against Defendants, and each of them, demands a trial by jury of all issues and for all causes of action for which it is entitled, and hereby alleges on information and belief as follows.

## INTRODUCTION

1.      This is an action that stems from the anticompetitive and illegal conduct of Uber, which promotes itself as a "disrupter" of the transportation industry through its use of "innovative" practices. In reality, Uber has done little more than implement a business strategy that openly flouts the law, shifts many of the costs and nearly all of the risks of providing ride-hail services from itself to its drivers and passengers, and forces a race to the bottom through predatory pricing tactics – where, propped up by billions of dollars in venture capital funding, Uber will remain until its illegal strategy has forced all other competitors from the market.

## PARTIES

2.      Plaintiff DESOTO CAB COMPANY, INC., d/b/a FLYWHEEL TAXI ("FLYWHEEL TAXI") is a California corporation. FLYWHEEL TAXI is a San Francisco taxicab company that maintains its headquarters and principal place of business in the City and County of San Francisco, California.

3.      Defendant UBER TECHNOLOGIES, INC. is a Delaware corporation. UBER TECHNOLOGIES, INC. maintains its headquarters and principal place of business in the City and County of San Francisco, California.

4.      Defendant UBER USA, LLC is a Delaware limited liability company. UBER USA maintains its headquarters and principal place of business in the City and County of San Francisco, California.

5.      Defendant RASIER, LLC is a Delaware limited liability company. RASIER, LLC maintains its headquarters and principal place of business in the City and County of San Francisco, California.

6.      Defendant RASIER-CA, LLC is a Delaware limited liability company. RASIER-CA, LLC maintains its headquarters and principal place of business in the City and County of San Francisco, California.

7.     Defendants UBER TECHNOLOGIES, INC., UBER USA, LLC, RASIER, LLC, and RASIER-CA, LLC are collectively referred to herein as "UBER" or "Defendants."

8.     FLYWHEEL TAXI is unaware of the identity of those Defendants sued as DOES 1 through 100, inclusive, and they are therefore sued under those fictitious names. FLYWHEEL TAXI is informed and believes, and thereon alleges, that it is entitled to the relief requested in this complaint from these Doe defendants and will seek leave of this Court to amend this complaint to reflect these defendants' true names and identities when ascertained.

9.     FLYWHEEL TAXI is informed and believes and thereon alleges that each of the defendants named herein was the agent, alter ego, employee or representative of each of the remaining defendants and in doing the things mentioned herein, was acting in the course and scope of such relationship. FLYWHEEL TAXI further alleges that in doing the acts or omissions complained of herein, Defendants, and each of them, acted or omitted to act in concert as agents of and/or on behalf of the other defendants named herein.

## VENUE AND JURISDICTION

10.     Jurisdiction is conferred upon this Court by 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331 and 1337.

11.     Supplemental jurisdiction over the California state law claims alleged herein is invoked pursuant to 28 U.S.C. § 1367. The claims that arise under state law are so related to claims within the original jurisdiction of this Court that they form a part of the same case and controversy under Article III of the United States Constitution.

12.     Venue is proper in this district pursuant to 15 U.S.C. §§ 22 and 26 and 28 U.S.C. § 1391 because Defendants transact business and maintain their principal corporate offices in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the violation of the antitrust laws alleged herein was and is carried on within this district, and the acts complained of have had, and will have, substantial anticompetitive effects in this district.

////

////

////

**INCORPORATION OF ALLEGATIONS**

13.     All of the allegations in this Complaint are hereby incorporated into each cause of action to the extent necessary or useful to clarify and complete each stated cause of action, to avoid repetition and redundancy.

**TRADE AND COMMERCE**

14.     Defendants market and sell ride-hail ground transportation services through the internet and smartphone applications within the flow and using means of interstate commerce.

**RELEVANT MARKET**

15.     The product market relevant to the antitrust and unfair competition causes of action is ride-hail ground transportation service provided in private vehicles that are not licensed as "TCP" or "PSC" and that originate in the City and County of San Francisco. The geographic market is the City and County of San Francisco, including San Francisco International Airport. This market is referred to herein as the "San Francisco Ride-Hail Market."

16.     Defendants currently control more than 70 percent of the San Francisco Ride-Hail Market.

**FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION**

**Ground Transportation in San Francisco**

17.     In San Francisco, three types of private for-hire ground transportation existed prior to July 2012: Passenger stage corporations ("PSCs"), which are shuttles driven by commercially licensed drivers; charter-party carriers ("TCPs"), which are limousines and luxury sedans driven by commercially licensed drivers; and taxicabs, which are driven by specially permitted drivers.

18.     PSCs provide shuttle transportation service to the general public on fixed routes or through scheduled service. TCPs are hired on a prearranged basis through a TCP-permitted company for the exclusive use of an individual or group. There is no limit on the number of PSCs or TCPs that may operate in the City of San Francisco, and no limit is set on the fees that PSCs or TCPs may charge to passengers.

19.     Taxicabs are permitted and regulated by the San Francisco Municipal Transportation Agency ("SFMTA"). Working within the confines of the regulations established by the SFMTA and

the San Francisco Transportation Code, the taxicab industry provides ride-hail ground transportation services originating in the City and County of San Francisco through smartphone applications, telephone dispatch, and street hails.

20.     FLYWHEEL TAXI is a taxicab company that has been operating in the San Francisco Ride-Hail Market since the 1930s.

21.     Prior to July 2012, UBER offered transportation services in San Francisco by commercially licensed drivers in TCP-licensed vehicles.

22.     On July 4, 2012, UBER entered the San Francisco Ride-Hail Market with the launch of "UberX," which offered transportation in non-TCP-licensed vehicles. With the launch of UberX, UBER entered into direct competition with taxicab companies, including FLYWHEEL TAXI, for drivers and consumers of ride-hail transportation services in San Francisco.

23.     UBER expanded its presence in the San Francisco Ride-Hail Market on May 12, 2014 with the launch of "UberXL."

24.     From July 2012 through the present date, the taxicab industry has experienced an approximately 70 percent decline in ridership and has lost more than 60 percent of its drivers as a result of UBER's illegal actions as explained below. During this time, FLYWHEEL TAXI lost 65 percent of its drivers and 50 percent of its ridership.

25.     As a result of the decline in ridership and loss of drivers caused by UBER's illegal conduct, FLYWHEEL TAXI has suffered and will continue substantial monetary losses.

**UBER's History in San Francisco**

26.     UBER began operations in San Francisco in approximately June 2010 as "UberCab." UberCab provided ride-hail transportation service in full-size luxury vehicles. The luxury vehicles were TCP-licensed and driven by commercially licensed drivers. UBER conceived of its luxury vehicle service as one that would be used as a status symbol for people who wanted to be "ballers" in San Francisco.

27.     In October 2010, UberCab was ordered to cease and desist operations by local and state agencies due, in part, to the agencies' findings that UBER was using limousines, town cars, and

other luxury vehicles to provide taxi services in violation of San Francisco's Transportation Code and California law.

28.     UBER responded by dropping the name "Cab" from the company name and continuing to provide luxury car services known as "UberBlack." UBER charged a base rate of $8.00 plus $4.90 per mile and $1.25 per idle minute for UberBlack service.

29.     On July 4, 2012, UBER launched "UberX" in San Francisco. UBER promoted its UberX service as its lower cost alternative to UberBlack. UberX prices were initially set higher than those charged by taxicabs but lower than UberBlack.

30.     On July 4, 2012, UBER also launched "UberSUV" in San Francisco as a premium service for larger groups. UberSUV services are provided by commercially licensed drivers in TCP-licensed luxury vehicles. UberSUV rates are higher than those charged for UberBlack due to the additional passenger capacity offered by UberSUV vehicles.

31.     On October 17, 2012, UBER launched UberTaxi, which allows users to request a licensed taxicab through UBER's smartphone application. UBER charged the taximeter rates, plus a $1.00 booking fee and added an automatic 20 percent gratuity to the total fare.

32.     On May 12, 2014, UBER launched "UberXL," which was promoted as its "Low-Cost SUV Option." UberXL drivers are not commercially licensed, and UberXL vehicles are not TCP-licensed. UberXL is approximately 50 percent less expensive than UberSUV.

**UBER's Business Model**

33.     UBER formed in 2009 with seed funding of approximately $200,000. Since then, UBER has raised nearly $25 billion in private funding.

34.     UBER's revenue is generated by taking a percentage of the money paid by passengers for rides booked through the UBER smartphone application. The amount charged to the passenger for each ride is determined by a GPS-based system that, just like a meter in a taxicab, measures the time and distance traveled during each trip.

35.     At the conclusion of each trip, the passenger's credit card is charged by UBER. UBER withholds its percentage as commission and deposits the remainder into each driver's bank account

on a weekly basis. The standard percentage currently taken by UBER is 25 percent of the total amount charged to the passenger, though the amount may vary from 0 percent to 30 percent.

36.     In October 2011, UBER implemented a new policy called "surge pricing," which results in an automatic price increase during times of actual or anticipated increases in demand. Surge pricing has resulted in passengers being charged up to eight (8) times the advertised fare during times of natural and national emergencies.

37.     From the time of its founding until July 2012, UBER's service was promoted as a luxury service, and its business model was centered on the premise that passengers were willing to pay more for an Uber than for a taxi because UBER offered higher quality transportation services.

38.     Beginning in July 2012, UBER shifted its focus from providing luxury TCP-licensed transportation service and entered the San Francisco Ride-Hail Market with UberX.

39.     Between July 2012 and September 2013, UBER operated UberX free from any local, state, or federal regulation.

40.     In September 2013, the Public Utilities Commission exercised jurisdiction over UBER as a Transportation Network Company ("TNC").

41.     From September 2013 through April 2016, UBER operated subject to only minimal regulations that required vehicles to be insured, background checks to be performed on drivers, the company to institute a zero-tolerance policy for drug and alcohol use, safety inspections to be performed on vehicles, drivers to complete an online driver-training program, and the company to submit annual reports regarding drivers' completion of the driver-training program.

42.     From April 2016 through the present date, TNCs have been subjected to increasingly stringent and costly regulations including stricter requirements for vehicle inspections, driver background checks, driver training, and vehicle insurance, requiring the availability of accessible vehicles to transport disabled individuals, and the imposition of substantial regulatory penalties for failure to comply with the regulatory requirements.

43.     To drive for UBER, drivers must provide their own personal vehicles and proof of personal liability insurance. UBER requires that driver applicants submit a picture of their vehicle – which must be an UBER-approved make and model, must carry at least four passengers, must not be

more than 10 to 15 years old, and must not have any scratches or dents in the body – as well as proof of personal insurance on the vehicle at the time of application.

44.     Though UBER has been required to provide liability insurance of $1 million per vehicle since September 23, 2013, it did not begin doing so until approximately July 1, 2015 due to lax regulatory oversight during that time.

45.     From September 2013 through July 2015, UBER avoided the cost of insuring tens of thousands of vehicles in the San Francisco Ride-Hail Market while increasing its market share. At a conservative estimated annual cost of $2,500 per vehicle and 20,000 UberX vehicles providing ride-hail services in San Francisco during that time, UBER avoided paying more than $100 million in costs necessary to comply with state insurance requirements.

46.     From July 2015 through the present date, UBER has provided vehicle insurance while drivers are looking for, picking up, or transporting a passenger. Drivers are required to insure the vehicle through their personal insurance at all other times.

47.     By requiring drivers to maintain personal insurance, UBER pushes many of the liability risks inherent in providing ride-hail transportation to UBER drivers. The risk is also transferred to UBER passengers and third parties such as pedestrians, who may be left without any or sufficient recourse if they are injured as a result of an UBER driver's actions due to the absence of an adequate insurance policy to provide coverage.

48.     Additional costs associated with driving a vehicle include maintenance, cleaning, and depreciation of the vehicle. Depending on the amount of time and number of miles driven, the cost of maintenance, cleaning, and service of the vehicle can range from $500 per month to more than $1,500 per month.

49.     Additional costs include data usage rates for streaming music UBER offers to passengers through the driver's personal cell phone, $10 a week for use of UBER's iPhone containing the UBER application, toll charges incurred when transporting UBER passengers, and tickets and citations issued for operating UBER as an unauthorized taxi service.

50.     Beginning in November 2013, UBER implemented a plan to push additional costs to drivers while ensuring drivers would be unable to stop driving for UBER through the "Vehicle

Solutions Program." Through the program, UBER "connects drivers with any kind of credit history to the best financing options available" from subprime lenders in order to purchase an UBER-approved vehicle. At least one of UBER's "partner" lenders is currently under federal investigation for its auto lending and underwriting practices.

51.     To enroll in the Vehicle Solutions Program, the driver makes an initial cash deposit of approximately $2,000. The driver's car payments are then automatically deducted from his or her weekly earnings before UBER deposits them in the driver's bank account. At interest rates as high as 25 percent, UberX drivers pay between $700 and $1,000.00 per month until the loan is paid in full, resulting in drivers often paying nearly double the sticker price of the car. The program works, according to former UBER CEO Travis Kalanick, to ensure that UberX drivers continue driving for UBER.

52.     Beginning in July 2015, UBER added a new program, Xchange Leasing, through which UBER offers subprime automobile leases to UBER drivers with poor credit. UBER markets Xchange Leasing as offering "low" car payments that are deducted from the driver's weekly earnings and a leasing program that is "flexible." In reality, the subprime rates charged to UBER drivers with poor credit are two to three times the amount charged by car dealerships and include hidden fees and cancellation penalties.

53.     Despite a business model that unabashedly shifts the risks of doing business to its drivers and lures drivers to a modern-day form of indentured servitude, UBER has yet to turn a profit. Propped up by billions of dollars in venture capital, UBER has lost and continues to lose hundreds of millions of dollars each year due to its below-cost pricing of its services.

### Beyond "Disruption" – UBER's Anticompetitive Conduct

54.     In 2010 and 2011, UBER advertised the prices for its luxury-vehicle transportation service as the premium charged for a better service than that offered by the taxicab industry. In a lengthy 2011 blog post, UBER explained: "We *do* cost more than a cab. But we *offer* more than a cab: reliability, user support, and of course style and comfort … Uber may cost more, but … Uber's benefits far outweigh the extra costs." (emphasis in original UBER website posting.) At the time,

UBER charged a base rate of $8.00 plus $4.90 per mile and $1.25 per idle minute for UberBlack luxury vehicles.

55.     In July 2012, UBER launched UberX in San Francisco at prices higher than taxicab rates but lower than UberBlack rates. UBER promoted UberX as its lower cost alternative to UberBlack. In July 2012, UberX cost $5.00 for the base rate, $3.25 per mile, and $.75 for each idle minute in San Francisco.

56.     As demand for UberX increased between July 2012 and June 2013, UBER increased the base rate for UberX services in San Francisco to $5.75, the per-mile rate to $3.75, and the per-minute rate to $.85.

57.     In June 2013, UBER drastically lowered the price of its UberX service in San Francisco and incorrectly announced that "effective today, **uberX prices are 10 percent lower than taxi prices**." (emphasis in original UBER website posting.) UBER promoted UberX as the "new UberX" that offered "cheaper-than-taxi pricing."

58.     In reality, the June 2013 price cut brought UberX prices into parity with the taxicab industry's 2013 prices: $3.50 for the base fare, $2.75 for each additional mile, and $.55 for each minute of waiting or traffic delay time.

59.     UBER lost money on each and every UberX ride provided in the San Francisco Ride-Hail Market after reducing prices in June 2013.

60.     Six months later, in January 2014, UBER "temporarily" slashed UberX prices in San Francisco by an additional 20 percent explaining that "we're going all-in on being the cheapest ride in town" and claiming to offer fares 26 percent cheaper than taxicabs.

61.     The new rates charged for UberX after the January 2014 price cuts were $3.00 for the base fare, $1.50 per mile, and $.30 per idle minute.

62.     At the same time it lowered UberX rates in January 2014, UBER reduced its commission on each UberX ride by 75 percent (from 20 percent to 5 percent) to subsidize the income lost by UberX drivers due to the price cuts.

63.     UBER lost money on each and every UberX ride under the pricing structure implemented in January 2014.

64.     In April 2014, UBER restored its commission on UberX rides to 20 percent but did not return UberX prices to pre-January levels, leading the drivers to suffer a 15 percent reduction in income compared to three months earlier. Though it claimed the January 2014 price cuts would be "temporary," UberX prices never returned to pre-January 2014 levels.

65.     In May 2014, UBER launched UberXL, which it advertised as its "low-cost SUV option." UberXL prices were: $5.00 for the base fare, $2.15 per mile, and $.45 per idle minute. UBER lost money on each and every UberXL ride under the pricing structure implemented in May 2014.

66.     In June 2014, UBER further reduced UberX prices by 25 percent. UBER emailed its San Francisco users and advertised through its San Francisco blog: "We just dropped uberX fares by 25 percent, making it 45 percent cheaper than a taxi. In San Francisco … and everywhere else in the Bay Area, uberX is the most affordable ride on the road."

////
////
////
////
////
////
////
////
////
////
////
////
////
////
////

67.     To ensure the public would not miss UBER's drastic, if overrepresented, undercutting of the prices charged by the taxicab industry, UBER included the following graphic:

## HOW THESE PRICES COMPARE







68.     UBER subsidized the June 2014 round of price cuts by paying its drivers more than UBER charged passengers under the new pricing program. Though UberX passengers paid only 75 percent of the January 2014 rates due to the 25 percent price-reduction, UBER continued to pay UberX drivers 80 percent of the January 2014 rates – meaning UBER paid the entire amount collected from the passenger *plus* an additional 5 percent for each UberX ride.

69.     When UBER stopped subsidizing UberX drivers' income in the San Francisco Ride-Hail Market in September 2014, drivers lost an additional 25 percent of their income due to the price cuts.

70.     The June 2014 price cuts lowered UberX prices to $2.20 for the base fare, $1.30 per mile, and $.26 per idle minute. UBER lost money on each and every UberX ride under the pricing structure implemented in June 2014.

71.     UBER further reduced prices of UberX in January 2016 to $2.00 for the base fare, $1.15 per mile, and $.22 per idle minute. UBER has lost money on each and every UberX ride under the pricing structure implemented in January 2016.

72.     In January 2016, UBER reduced UberXL prices to: $3.00 for the base fare, $2.00 per mile, and $.30 per idle minute. UBER has lost money on each and every UberXL ride under the pricing structure implemented in January 2016.

73.     In August 2016, UBER instituted a program called Uber Plus. In San Francisco, Uber Plus passengers pay $30.00 per month in return for 40 UberX rides per month at the flat rate of $8 per ride, resulting in a total fare of $8.75 for each UberX ride provided by UBER.

74.     In September 2017, UBER increased the per-mile price for UberX by 6 cents. From September 2017 through the present date, UberX prices have been: $2.00 for the base fare, $2.06 per mile, and $.22 per idle minute. UBER has experienced and continues to experience a loss on each and every UberX ride under the pricing structure implemented in September 2017.

75.     In September 2017, UBER also increased the per-mile price for UberXL by 6 cents. From September 2017 through the present date, Uber XL prices have been: $3.00 for the base fare, $2.06 per mile, and $.30 per idle minute. UBER has experienced and continues to experience a loss on each and every UberXL ride under the pricing structure implemented in September 2017.

76.     UBER subsidizes the difference between the flat rate charged to passengers and the normal rates earned by drivers by paying drivers more than UBER receives from the passengers, resulting in additional losses for UBER for each and every ride taken.

77.     Beginning in at least January 2014 and continuing through the present date, UBER has lost and continues to lose money on each and every UberX and UberXL ride provided under the pricing structures implemented in the San Francisco Ride-Hail Market.

78.     UBER has been able to maintain below-cost pricing for its UberX and UberXL services in the San Francisco Ride-Hail Market due to vast reserves of capital invested with the expectation of reaping extraordinary future returns.

79.     In adopting this approach, UBER has veered from free market principles and artificially deflated fares of UberX and UberXL to prices below cost in an effort to drive competitors of UberX and UberXL from the market with the intention of recouping its losses once UBER's competition has been destroyed.

80.     UBER's intent to monopolize the San Francisco Ride-Hail Market and injure competitors has been made clear through the statements of its former CEO Travis Kalanick and UBER's advertising highlighting its unilateral price war in the San Francisco Ride-Hail Market.

81.     UberX is advertised as "everyday cars for everyday use" that are "better, faster, and cheaper than a taxi," and UBER's San Francisco website advertises that its "fares are usually cheaper than a taxi." UBER's San Francisco webpage links to the SFMTA website, where San Francisco taxicab rates are published so consumers can compare UberX and UberXL prices to San Francisco taxicab prices.

82.     Former UBER CEO Travis Kalanick repeatedly stated in public speeches over the course of more than 5 years that UBER intended to "destroy" all of its competitors and made clear that UBER was doing so through below-cost pricing of UberX and UberXL services.

83.     Propped up by billions of dollars in venture capital that allow it to operate at enormous losses due to below-cost pricing, UBER has captured more than 70 percent of the San Francisco Ride-Hail Market.

**UBER's Likelihood of Success – Barriers to Entry and Probability of Recoupment**

84.     Left unchecked, UBER is likely to succeed in establishing complete domination of the San Francisco Ride-Hail Market by forcing out all competitors through its predatory pricing strategy.

85.     The existence of significant barriers to entry into the San Francisco Ride-Hail Market bar new entrants from entering or remaining in the market.

86.     Since its inception, UBER's stated anti-competitive strategy has been to create high barriers to entry into the San Francisco Ride-Hail Market in order to dominate the San Francisco

Ride-Hail Market. UBER's strategy has been to use what it ultimately termed a liquidity network effect in combination with anti-competitive predatory pricing in the form of below-cost pricing with the intent to first dominate the San Francisco Ride-Hail Market, push out its competitors, and ultimately increasing prices after competitors left the market.

87.    All participants in the San Francisco Ride-Hail Market are trying to connect drivers to passengers. Network effects exist where there is a positive feedback loop created when reaching one group allows one to reach more of the second group thus raising the value of the overall network. In such circumstances, gaining market share leads a company to be able to gain greater market share.

88.    In UBER's S-1 filed in connection with its recent public offering, UBER states that UBER's "strategy is to create the largest network in each market so that we can have the greatest liquidity network effect, which we believe leads to a margin advantage." UBER strategy includes the use of incentives to attract platform users on both sides of our network, which can result in a negative margin until we reach sufficient scale to reduce incentives. These incentives have included promotions to drivers and customers as well as below-cost pricing.

89.    The network effects at play within the San Francisco Ride-Hail Market create a formidable barrier to entry that insulates UBER from new competition or expansion by smaller rivals. A new competitor trying to enter the market or an existing, smaller firm trying to expand will not be able to compete in a timely, likely, or sufficient way with UBER. UBER is well on its way to its goal of the greatest liquidity network effect in the San Francisco Ride-Hail Market, which it was able to achieve in large part to its anticompetitive pricing. In this way, UBER has locked up a large number of drivers and customers such that a smaller rival will not be able to compete with UBER.

90.    UBER's policy is that whenever another rival attempts to mitigate the advantages UBER possesses as a result of its more liquid network, it will match any incentives such as below-cost pricing, even if it results in a negative margin. UBER believes since it has the largest and most liquid network in the San Francisco Ride-Hail Market, it will have a higher margin (i.e., smaller overall costs) than any smaller operator.

91.    The capital requirements to enter the San Francisco Ride-Hail Market act as a further barrier to entry into the market.

92.     The capital requirements to enter the San Francisco Ride-Hail Market as a taxicab company include purchasing or leasing a large plot of land within the City of San Francisco, purchasing a fleet of vehicles, leasing a medallion for each vehicle, insuring the premises and vehicles, equipping the vehicles with required meters and communications equipment, painting and dressing the vehicles, hiring employees to provide telephone and dispatch services to the public and drivers, hiring employees to perform maintenance on the vehicles, and hiring support staff to perform administrative duties and ensure regulatory compliance.

93.     To enter the San Francisco Ride-Hail Market with a fleet of sufficient size to attempt to compete in the market would presently cost in excess of $10 million for a taxicab company. Obtaining the funding necessary to enter the market as a taxicab company today is nearly impossible due to the inordinately high costs required to establish a taxicab company and because investors are unwilling to provide funding to taxicab companies in the San Francisco Ride-Hail Market due to the continuing loss of market share to UBER that has taken place since 2012.

94.     The financier of taxicab companies in the San Francisco Ride-Hail Market has long been the San Francisco Federal Credit Union ("SFFCU"). Since 2017, SFFCU has ceased lending money to taxicab companies due to the financial collapse of numerous companies attempting to compete in the San Francisco Ride-Hail Market and the highly risky nature in lending money in the market due to the near-impossibility of competing in a market dominated by UBER and its predatory pricing tactics.

95.     The capital requirements to enter the San Francisco Ride-Hail Market as a TNC include the development of a technologically sophisticated smartphone application as well as the employees and infrastructure necessary to maintain the application, manage high volumes of customer communications, and ensure compliance with TNC regulations. The Public Utilities Commission requires any new TNC entrant to the San Francisco Ride-Hail Market have an online-enabled smartphone application.

96.     To enter the San Francisco Ride-Hail Market with resources sufficient to compete would presently cost in excess of $40 million for a TNC. Obtaining the funding necessary to enter the market as a TNC is next to impossible due to the inordinate amount of money required to develop

and market the software and services to potential drivers and passengers and to obtain the insurance necessary to operate as a TNC.

97.     UBER's size as the largest participant in the San Francisco Ride Hail Market allow it to effectively pay less for insurance than other companies but using captive insurance companies to manage their own risk, an option not available for most of UBER's competitors.

98.     A new entrant to the market must, prior to entering the market, have a fully developed smartphone application ready for immediate launch to the public if it hopes to compete with UBER and develop market share. Development of the software application required to enter the market would cost approximately $15 to $20 million dollars.

99.     In contrast, UBER developed its current smartphone application over the course of years. UBER was able to launch a comparatively inexpensive "beta" version prior to entering the market and to spread the costs of development of its sophisticated software over multiple years – an option unavailable to a company seeking to enter the market today.

100.     To obtain the necessary capital today would also require that a market entrant pay a higher price – in terms of number of shares of the company or interest rate charged for debt financing – than UBER was required to pay when it entered the market. The higher price that would be charged to new entrants is due to UBER's current dominance of the market and UBER's below-cost prices, which make it impossible for a new entrant to gain market share without also charging below-cost prices.

101.     In an effort to undercut its competitors and create barriers to entry, UBER has raised huge amounts of outside capital, thereby being able to drive UberX and UberXL prices far below the costs of providing the service by using outside capital to subsidize the prices charged for UberX and UberXL services. UBER has priced below the appropriate measure of cost under any relevant legal standard. This includes pricing below total cost, pricing below marginal cost, and pricing below average variable cost in the relevant markets.-

102.     Capital markets no longer exist for potential new entrants to the San Francisco Ride-Hail Market as a TNC because potential investors have learned of the liquidity network effect at play in the San Francisco Ride-Hail Market and that competing in the market would require sustaining

losses of millions of dollars over the course of years. Established competitors in the San Francisco Ride-Hail Market, for example Sidecar, have been unable to raise sufficient capital in the capital markets for similar reasons.

103.    One of the only new entrants to the San Francisco's Ride-Hail Market as a TNC in the last four years has been Ziro Ride, LLC which entered the market in 2019 only to exit the market in 2020 when it was unable to obtain the venture capital necessary to effectively compete. Former TNC competitors of UBER, such as Sidecar, were forced out of the market due to an inability to raise sufficient capital to compete against UBER.

104.    With the exception of Ziro Ride, LLC, which offered services for only six (6) months, no new competitors have entered the San Francisco Ride-Hail Market in more than five (5) years as a result of the significant barriers to entry into the market.

105.    Despite the loss of billions of dollars, UBER continues to engage in below-cost pricing because UBER believes that, once UBER benefits from its market dominance, the long-term financial rewards will be sufficient to cover not only the accumulated losses and will deliver substantial returns. UBER reasonably and confidently believed that its dominance aided by network effects and financial power would ultimately return its losses from ride-hailing and more in the U.S. ride-hailing market.

106.    Based on press reports, UBER has privately advised current and potential investors that driver subsidies are responsible for the large losses it has historically recorded on its books. As reported in UBER's S-1 connected with its recent public offering, UBER has lost more than $9 billion dollars.

107.    At the time UberX and UberXL entered the market in 2012, there existed 36 transportation companies providing ride-hail ground transportation services in San Francisco: 33 taxicab companies and three TNCs. Since July 2012, more than half of these companies (17 taxicab companies and one TNC) have been forced to shut down due to their inability to compete with UBER's prices and their loss of market share due to UBER's below-cost pricing.

108.    No company, including FLYWHEEL TAXI or Lyft, in the San Francisco Ride-Hail Market has the ability to respond effectively to UBER's anticompetitive pricing, or for that matter to

increase its own share as a restraint to UBER's anticompetitive pricing. UBER's control of 70 percent of the market share in the San Francisco Ride-Hail Market acts as an effective barrier to any attempt to do so. A new entrant or fringe competitor in the San Francisco Ride-Hail Market cannot similarly leverage an existing customer base to effectively compete with Uber's scale.

109.    UBER did not acquire and maintain its monopoly by offering a better product or competing on the merits. Instead, UBER directed a series of anticompetitive tactics that were specifically designed to thwart true competition and allow UBER to institute anticompetitive pricing strategies in the long run.

110.    Through its anticompetitive actions UBER has marginalized its competitors, raised barriers to entry, and insulated itself from meaningful competition.

111.    UBER dominates San Francisco's Ride-Hail Market not only in market share but in name recognition. UBER has an extraordinary level of brand awareness among consumers and a high level of customer loyalty to the brand such that the very word "Uber" has become synonymous with use of ride-hail transportation within the San Francisco's Ride-Hail Market in a manner similar to Xerox being equated with a copy machine.

112.    UBER's high brand awareness and customer loyalty have created an entrenched preference for UBER over would-be competitors and present significant obstacles to entrance into the San Francisco Ride-Hail Market.

113.    UBER fully intends to recoup its predatory losses by raising prices to supra-competitive levels in the long run. UBER's own strategy and actions provide the evidence of its ability and intentions. Unless UBER knew that it was capable of recouping its losses, UBER's stated strategy of pricing below marginal cost to later achieve increased margins could not have been profitable and would not have been undertaken.

114.    The primary way that UBER intends to charge supra-competitive profits is through its ongoing below-cost pricing.

115.    UBER's monopoly power in the ride-hailing market is demonstrated not only by its dominant market share in an industry with significant barriers to entry, but also by its ability to

control prices, through unilateral price increases and below-cost pricing, and the ability to exclude and weaken competition through the undercutting of competitors including FLYWHEEL TAXI.

116.    If permitted to continue without restraint, UBER's predatory pricing will push out the remaining competitors in the San Francisco Ride-Hail Market. Once its competitors have been removed, UBER, free from the constraints of competition, will be free to implement unfettered price increases for its services, and consumers will be left with no choice but to pay the prices – however exorbitant – demanded by UBER.

### UBER as a Public Utility

#### *Exercise of Jurisdiction by the Public Utilities Commission*

117.    In December 2012, the Public Utilities Commission ("Commission"), through an Order Instituting Rulemaking ("OIR"), exercised jurisdiction over UBER as a public utility. The Commission stated that it was doing so for the purpose of protecting public safety and encouraging innovation to improve the lives of Californians.

118.    The Commission exercises its regulatory authority over an issue through issuing a Scoping Memo and Ruling ("Scoping Memo") or a Ruling that amends a Scoping Memo ("Ruling"). The Commission identifies each and every issue over which it intends to exercise its regulatory authority in Scoping Memos and Rulings. If an issue is not identified through a Scoping Memo or Ruling, the Commission has not exercised and does not intend to exercise its regulatory authority over that issue.

119.    The Commission creates new rules, regulations, and requirements through issuing a Decision adopting the rule, regulation, or requirement.

120.    In April 2013, the Commission issued a Scoping Memo that identified six (6) issues: 1) how TNCs and their services should be described, 2) the legal basis for and extent of the Commission's jurisdiction, 3) public safety, 4) insurance and background checks, 5) accessibility to TNCs, and 6) public access to roadways.

121.    In September 2013, the Commission issued a Decision, amended in November 2014, that designated a new category of companies providing ride-hail services and called them Transportation Network Companies ("TNCs"). The Commission also adopted safety regulations

requiring TNCs to carry sufficient liability insurance on each vehicle, to conduct criminal background and DMV driving record checks on all drivers, to institute a zero-tolerance drug and alcohol policy, to institute a driver-training program, to submit annual reports regarding drivers' completion of the driver-training program, and to require vehicle safety inspections.

122. In November 2014, the Commission issued a Scoping Memo that identified additional issues the Commission would consider during Phase II. Phase II issues were amended through a second Scoping Memo issued in April 2015 and a Ruling issued in August 2015. Through the Scoping Memos and Ruling, the Commission identified twelve (12) issues it intended to consider during Phase II: 1) the frequency with which vehicles should be inspected, 2) who should be allowed to conduct vehicle inspections, 3) which vehicles would be subject to inspection, 4) the collection and reporting of driver and vehicle information, 5) whether information on driver suspensions was required, 6) the design of driver-training programs, 7) requirements for transportation of minors, 8) insurance requirements, 9) maximum penalties that may be issued, 10) the application process, 11) trade dress rules, and 12) the applicability of Public Utilities Code section 5401 to ridesharing services offered by TNCs.

123. In April 2016, the Commission issued a Decision adopting rules and regulations regarding TNC inspections, background check and insurance filing requirements, trade dress on vehicles, the definition of a personal vehicle, safety certifications, the applicability of Public Utilities Code section 5401, and reporting requirements.

124. In October 2016, the Commission issued a Scoping Memo that identified the issues the Commission would consider during Phase III, which it divided into Phase III.A. and Phase III.B. The issue identified for consideration during Phase III.A. was an amended definition of a personal vehicle.

125. In December 2016, the Commission issued a Decision through which it adopted an expanded definition of a personal vehicle.

126. In April 2017, the Commission issued a Scoping Memo that identified the issues the Commission would consider during Phase III.B. Phase III.B. issues were amended through a subsequent Scoping Memo issued in June 2017. Through these Scoping Memos, the Commission

identified eight (8) issues for Phase III.B.: 1) criminal background checks for drivers, 2) the regulatory status of Uber Technologies, Inc., 3) the sharing of TNC data, 4) whether Uber Technologies, Inc. is a TNC, 5) accessibility requirements, 6) the transportation of minors, 7) additional regulations to protect public safety, and 8) autonomous vehicles.

127.     In November 2017, the Commission issued a Decision in which it adopted regulations requiring expanded criminal background checks.

128.     In April 2018, the Commission issued a Decision in which it found that Uber Technologies, Inc. was a TNC.

129.     In April 2018, the Commission issued a Scoping Memo that identified the issues it would consider during what was designated as Phase III.C. Phase III.C. issues were amended through two subsequent Scoping Memos issued in October 2019 and June 2020. Through these Scoping Memos, the Commission identified eight (8) issues for Phase III.C.: 1) sexual assault and sexual harassment protections, 2) the classification of TNC drivers, 3) accessibility of TNC services, 4) the sharing of TNC data, 5) the transportation of minors, 6) safety requirements, 7) autonomous vehicles, and 8) vehicle emissions reductions.

130.     In May 2018, the Commission issued a Decision through which it authorized a pilot test program for TNCs to operate autonomous vehicles.

131.     In March 2020, the Commission issued a Decision through which it established guidelines for when TNC annual reports must be shared or may be kept confidential.

132.     The only issues relevant to the claims at issue through this Complaint that the Commission has exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on are those identified in the Scoping Memos, Rulings, and Decisions described above.

### *Uber's Obligations as a Public Utility*

133.     UBER is a common carrier and a public utility.

134.     As a public utility, UBER is required to comply with the provisions of the Public Utilities Act (Cal. Pub. Util. Code § 201, *et seq.*) as well as the regulations issued and interpreted by the Commission.

////

135.    Among the obligations created for public utilities by the Public Utilities Act are the requirements that utilities charge just and reasonable rates, refrain from providing free or reduced-rate transportation without approval, file rate schedules with the Commission, refrain from transporting passengers before filing a rate schedule with the Commission, refrain from changing rates without providing notice and obtaining Commission approval, and refrain from charging rates different than those specified in the schedules on file with the Commission.

136.    UBER has failed to comply with these requirements by charging unreasonably low rates during times of normal demand and exorbitantly high rates during times of high demand, by providing free and reduced rate transportation to passengers through coupons, discounts, and promotions without approval, by failing and refusing to file rate schedules with the Commission, by transporting passengers despite having never filed rate schedules with the Commission, by raising and lowering rates without providing notice to or receiving approval from the Commission, and, by virtue of never filing schedules with the Commission, necessarily charging rates different than those specified in schedules on file with the Commission.

### **UBER's False Statements of Fact**

#### ***UBER's Misrepresentations to Drivers***

##### *<u>False Statements about Uber Drivers' Hourly Income</u>*

137.    In June 2013, UBER represented to current and prospective UberX drivers that they would earn more money per hour as a result of UBER's June 2013 price reduction for UberX services.

138.    In January 2014, UBER represented to current and prospective UberX drivers that they would earn more money per hour as a result of UBER's January 2014 price reduction for UberX services.

139.    In June 2014, UBER represented to current and prospective UberX drivers that they would earn more money per hour as a result of UBER's June 2014 price reduction for UberX services.

140.    Beginning in 2013 and continuing through 2015, UBER represented to FLYWHEEL TAXI drivers that drivers would earn more money per hour working for UBER than for FLYWHEEL

TAXI, including claims that hourly income would increase as a result of UBER's price reductions in 2013 and 2014.

141.   In reality, UberX drivers earned less money on a per-hour basis despite performing more work after each of UBER's price cuts than they earned before each of UBER's price cuts.

142.   In reliance on UBER's misrepresentations, thousands of San Francisco taxicab drivers have quit driving taxicabs and assumed monthly car payments with the expectation of earning increased amounts of income on a per-hour basis.

143.   In reliance on UBER's misrepresentations, more than one thousand (1,000) FLYWHEEL TAXI drivers have quit driving taxicabs and assumed monthly car payments with the expectation of earning increased amounts of income on a per-hour basis.

144.   Having incurred the costs and long-term financial commitments required to become an UberX driver, the drivers are left with no choice but to continue driving for UBER despite a decreasing rate of return and cannot return to work as a taxicab driver.

*False Statements about Uber Drivers' Annual Income*

145.   Beginning in May 2014 and continuing until at least 2017, UBER represented to current and potential UberX drivers that half of UberX drivers in the San Francisco Ride-Hail Market earned more than $74,000 per year driving for UBER.

146.   Beginning in 2013 and continuing through 2015, UBER represented to FLYWHEEL TAXI drivers that drivers earned more than $74,000 per year driving for UBER and that drivers' annual income would be greater driving for UBER than for FLYWHEEL TAXI.

147.   In reality, more than half of full-time UberX drivers in the San Francisco Ride-Hail Market make less than approximately $35,000 in gross earnings per year and incur costs exceeding $15,000 per year.

148.   In reliance on UBER's representations, thousands of San Francisco taxicab drivers have quit driving taxicabs and assumed monthly car payments with the expectation of earning approximately $74,000 per year driving an UberX vehicle.

////

////

149.     In reliance on UBER's representations, more than one thousand (1,000) FLYWHEEL TAXI drivers have quit driving taxicabs and assumed monthly car payments with the expectation of earning approximately $74,000 per year driving an UberX vehicle.

150.     Having incurred the costs and long-term financial commitments required to become an UberX driver, drivers are left with no choice but to continue driving for UBER despite the paltry annual income actually earned and cannot return to work as a taxicab driver.

<u>*False Statements about Uber Drivers' Proportional Income*</u>

151.     Beginning in June 2013 and continuing through the present date, UBER has represented to current and potential UberX and UberXL drivers in San Francisco that they would earn 80 percent of all fares collected from their passengers and that UBER would provide free smartphones to them.

152.     Beginning in 2013 and continuing through 2015, UBER represented to FLYWHEEL TAXI drivers that they would earn 80 percent of all fares collected from their passengers, that UBER would provide free smartphones to the drivers, and that, as a result, drivers would earn more driving for UBER than for FLYWHEEL TAXI.

153.     In reality, UBER began deducting $10.00 per week from drivers' earnings in September 2014 for the use of its smartphone and began confiscating a $1.00 "safe rides" fee that was previously paid to UberX and UberXL drivers. As a result, UberX and UberXL drivers receive far less than 80 percent of the total fares collected from their passengers.

154.     In reliance on UBER's misrepresentations, thousands of San Francisco taxicab drivers have quit driving taxicabs and assumed monthly car payments with the expectation of earning 80 percent of all fares collected from their passengers.

155.     In reliance on UBER's misrepresentations, more than one thousand (1,000) FLYWHEEL TAXI drivers, have quit driving taxicabs and assumed monthly car payments with the expectation of earning 80 percent of all fares collected from their passengers.

156.     Having incurred the costs and long-term financial commitments required to become an UberX or UberXL driver, drivers are left with no choice but to continue driving for UBER despite the reduced proportional income actually earned and cannot return to work as a taxicab driver.

**UBER's Misrepresentations to the Public**

*False Statements about UberX Prices Relative to Taxi Prices*

157.    In June 2013, UBER falsely stated to the public that UberX prices were "10 percent lower than taxi prices." In reality, UberX prices were not lower than taxicab vehicle prices but were exactly equal to taxicab prices in the San Francisco Ride-Hail Market after UBER's June 2013 price cuts.

158.    In January 2014, UBER falsely stated to the public that UberX prices were 26 percent lower than taxi prices. In reality, UberX prices were 15 percent lower than taxicab prices in the San Francisco Ride-Hail Market after UBER's January 2014 price cuts.

159.    In June 2014, UBER falsely stated to the public that it dropped UberX prices by 25 percent and that the price reduction made UberX prices 45 percent lower than taxi prices. In reality, UberX prices were decreased by 18 percent, making them 38 percent lower than taxicab prices in the San Francisco Ride-Hail Market after UBER's June 2014 price cuts.

160.    Throughout this time and continuing through the present date, purchasers of ride-hail services in San Francisco have relied on and have been deceived by UBER's representations regarding UberX prices relative to San Francisco taxicab prices when selecting UberX instead of UBER's taxicab competitors.

*False Statements about Surge Pricing*

161.    Beginning in June 2013 and continuing through December 2013, UBER advertised UberX prices in San Francisco as $3.50 for the base fare, $2.75 per additional mile, and $.55 per idle minute.

162.    Beginning in January 2014 and continuing through June 2014, UBER advertised UberX prices in San Francisco as $3.00 for the base fare, $1.50 per additional mile, and $.30 per idle minute.

163.    Beginning in July 2014 and continuing through December 2015, UBER advertised UberX prices in San Francisco as $2.20 for the base fare, $1.30 per additional mile, and $.26 per idle minute.

////

164.     Beginning in January 2016 and continuing through the present date, UBER advertised UberX prices in San Francisco as $2.00 for the base fare, $1.15 per additional mile, and $.22 per idle minute.

165.     In reality, beginning in June 2013 and continuing through the present date, UBER has charged UberX customers "surge" rates at amounts not included in the advertised rates. UBER's "surge" pricing results in passengers being charged more than the rates advertised by UBER.

166.     Beginning in June 2013 and continuing through the present date, purchasers of ride-hail services in San Francisco have relied on and have been deceived by the advertised rates when selecting UberX instead of UBER's competitors.

*False Statements about Tipping and Total Fares Charged to Passengers*

167.     Beginning in at least November 2011 and continuing through April 2016, UBER consistently and repeatedly falsely stated that the fare charged to the customer through the UBER smartphone application for UberX and UberXL services "includes the tip."

168.     In reality, the fare charged to passengers never included a tip and UBER did not provide the driver with a tip despite the fact that tipping is a common and expected practice in the San Francisco ride-hail industry.

169.     Continuing through at least June 2016, purchasers of ride-hail services have relied on and have been deceived by UBER's misrepresentations when comparing the prices of UberX and UberXL to those of UBER's taxicab competitors.

*False Statements about Vehicle Locations and Response Times*

170.     Through its smartphone application, UBER provides a visual depiction of nearby UberX and UberXL vehicles currently available to accept requests from passengers. The application also provides an estimate of the time it will take for a driver to reach the passenger when the passenger requests a ride. From June 2012 and continuing through the present date, UBER advertised this function as real-time tracking of UberX vehicles available for hire. From May 2014 and continuing through the present date, UBER advertised this function as real-time tracking of UberXL vehicles available for hire.

////

171.    In reality, the UBER application did not and does not accurately represent the UberX and UberXL vehicles available to pick up passengers. The application overstates the number and understates the proximity of available vehicles. When an order is placed through the application, the application significantly underestimates the time it will take for an UberX or UberXL driver to reach the passenger, leading to longer wait times than represented.

172.    Throughout this time and continuing through the present date, purchasers of ride-hail services in San Francisco have relied on and have been deceived by UBER's false statements regarding the number and proximity of available vehicles and estimated wait times when selecting an UberX or UberXL vehicle over those of UBER's taxicab competitors.

*False Statements about Safety*

173.    Beginning in at least June 2013 and continuing through April 2016, UBER falsely stated that it conducted "rigorous" background checks on UBER drivers that "set a new standard" to ensure the safety of passengers.  UBER falsely stated that its drivers were "thoroughly screened through a process that includes court, federal, and multi-state criminal background checks" and that UBER's "background checking process and standards are…more rigorous that what is required to become a taxi driver."

174.    In reality, UBER's background checks were and are inferior to those conducted for taxicab drivers, who are required to submit to fingerprinting and LiveScan through the California Department of Justice, which searches a national database of criminal records including databases maintained by state and federal law enforcement agencies.

175.    UBER's deficient background check process did not include a comprehensive search of potential drivers' criminal records and has allowed people with convictions for murder, sex offenses, kidnapping, assault, robbery, burglary, fraud, driving under the influence, and reckless driving to drive for UBER.

176.    Throughout this time and continuing through the present date, purchasers of ride-hail services in San Francisco have been deceived by and have relied on UBER's misrepresentations regarding safety when choosing UberX and UberXL services over those of UBER's taxicab competitors.

### UBER's Wrongful, Illegal and Unfair Practices

#### *UBER's Violations of Federal Law*

177.     The Americans with Disabilities Act prohibits private for-hire transportation companies from discriminating against any individual with a disability and requires that private for-hire transportation companies provide readily accessible vehicles for individuals with disabilities, train personnel to provide proficient service to disabled individuals, assist with the stowing of mobility devices, and allow service animals to accompany people with disabilities. In contravention of federal law and continuing from UBER's inception through the present date, UBER has discriminated against individuals with disabilities by providing services only through smart-phone applications that require credit card payment, thereby excluding from UBER services all disabled individuals of limited financial means, and has further refused to provide readily accessible vehicles for disabled individuals, refused to train personnel to provide proficient service to disabled individuals, refused to assist with the stowing of mobility devices, and, until April 2016, refused to allow service animals to accompany disabled individuals.

#### *UBER's Violations of California Law*

178.     Beginning on or before September 23, 2013 and continuing through the present date, UBER was and is required under California law and regulations to provide vehicle insurance that provides at least $1 million per incident in liability coverage. From September 23, 2013 through approximately July 1, 2015, UBER failed and refused to provide the liability insurance required by state regulation and law.

#### *UBER's Violations of San Francisco Law*

179.     San Francisco municipal law requires that private vehicles providing ride-hail services in the City and County of San Francisco must comply with the SFMTA's rules regarding taxicab vehicles contained in sections 300 and 1100 of the San Francisco Transportation Code. From November 2, 2012 through September 23, 2013, UBER failed and refused to abide by San Francisco municipal law regulating taxicab vehicles.

180.     San Francisco municipal law requires that private vehicles providing ride-hail services in the City and County of San Francisco must comply with the regulations adopted by San Francisco

International Airport. San Francisco International Airport requires all vehicles providing ride-hail services to register with and be permitted by the airport. From November 2, 2012 through approximately September 23, 2013, UBER failed and refused to register its vehicles or apply for permits with the San Francisco International Airport.

181.    San Francisco's Transportation Code requires private vehicles providing ride-hail services in the City and County of San Francisco to provide liability insurance of no less than $1 million per incident that covers property damage as well as personal injury for the driver, passengers, and third parties caused any time the vehicle is in use. From November 2, 2012 through September 23, 2013, UBER failed and refused to provide liability insurance of at least $1 million per incident to protect drivers, passengers, and third parties from injuries caused while the vehicle is in use.

182.    San Francisco's Transportation Code requires private vehicles providing ride-hail services in the City and County of San Francisco to participate in the city's Paratransit program and remain in compliance with the regulations of the SFMTA's Paratransit program. From November 2, 2012 through September 23, 2013, UBER failed and refused to refuse to participate in the Paratransit program and was not in compliance with the regulations of the Paratransit program.

183.    San Francisco's Transportation Code requires all private vehicles providing ride-hail services in the City and County of San Francisco to be associated with a medallion issued by the SFMTA. From November 2, 2012 through September 23, 2013, UBER failed and refused to associate any of its UberX or UberXL vehicles with a city-issued medallion.

184.    San Francisco's Transportation Code requires all private vehicles providing ride-hail services in the City and County of San Francisco to be equipped with a two-way communication device, paratransit debit card processing system, high speed printer, decals indicating the taxicab company name, and a light attached to the vehicle indicating the vehicle is a taxicab. From November 2, 2012 through September 23, 2013, UBER failed and refused to fail to equip its vehicles with a two-way communication device, paratransit debit card processing system, high speed printer, decals indicating UBER's company name, or light indicating each vehicle was a taxicab.

185.    San Francisco's Transportation Code requires ride-hail companies to provide a telephone dispatch service and advertise a phone number that can be called by passengers to request

transportation. From November 2, 2012 through September 23, 2013, UBER failed and refused to provide a telephone dispatch service or advertise a phone number that could be called by passengers to request transportation.

186.    UBER employed each of these unfair and illegal methods to obtain an unfair advantage over FLYWHEEL TAXI and the ride-hail industry as a whole, leaving FLYWHEEL TAXI and the ride-hail industry unable to fairly compete for drivers and customers in the San Francisco market.

## FIRST CAUSE OF ACTION
### MONOPOLIZATION
### (SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)
### (Against all Defendants)

187.    The purpose of this country's antitrust laws is to preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

188.    The Sherman Antitrust Act prohibits the acquisition or maintenance of monopoly power within any part of interstate or foreign trade or commerce where such power harms competition and injures consumers.

189.    The San Francisco Ride-Hail Market is a valid antitrust market.

190.    Through the actions described in paragraphs 54 through 116, UBER has willfully acquired and maintained monopoly power in the San Francisco Ride-Hail Market. UBER's anticompetitive conduct has harmed competition in the San Francisco Ride-Hail Market and has caused and will cause injury to consumers in the San Francisco Ride-Hail Market by allowing UBER to charge supracompetitive prices for ride-hail services after its competition is eliminated.

191.    Significant barriers to entry into the San Francisco Ride-Hail Market exist as described in paragraphs 84 through 116.

192.    UBER's anticompetitive conduct is in violation of the Sherman Antitrust Act, and the injuries caused by UBER's anticompetitive conduct are the type intended to be prevented by the Act.

193.     There is no appropriate or legitimate business justification for UBER's anticompetitive conduct.

194.     As a direct and proximate result of UBER's anticompetitive conduct, FLYWHEEL TAXI has suffered and continues to suffer damages in an amount to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

**SECOND CAUSE OF ACTION**
**ATTEMPTED MONOPOLIZATION**
**(SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)**
**(Against all Defendants)**

195.     The purpose of this country's antitrust laws is to preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

196.     The Sherman Antitrust Act prohibits anticompetitive conduct carried out for the purpose of achieving monopoly power in any part of interstate or foreign trade or commerce.

197.     The San Francisco Ride-Hail Market is a valid antitrust market.

198.     Through the actions described in paragraphs 54 through 116, UBER has engaged in exclusionary conduct through below-cost pricing carried out with the specific intent of achieving monopoly power in the San Francisco Ride-Hail Market and of obstructing, restraining and excluding competition.

199.     Significant barriers to entry into the San Francisco Ride-Hail Market exist as described in paragraphs 84 through 116.

200.     There is a dangerous probability that UBER will achieve its goal of obtaining monopoly power in the San Francisco Ride-Hail Market if it continues to engage in the conduct described herein because UBER has sufficient market power to and actually does exclude its competitors through the use of below-cost pricing.

201.     There is a dangerous probability that UBER will recoup the losses it has incurred due to below-cost pricing by charging supracompetitive prices once it has achieved its goal of excluding

and driving out competitors from the San Francisco Ride-Hail Market because significant barriers to entry into the Ride-Hail Market exist.

202.   There is no appropriate or legitimate business justification for UBER's anticompetitive conduct.

203.   The anticompetitive conduct described herein is in violation of the Sherman Antitrust Act, and the injuries caused by UBER's anticompetitive conduct are the type intended to be prevented by the Sherman Antitrust Act.

204.   As a direct and proximate result of UBER's attempt to achieve monopoly power through anticompetitive conduct, FLYWHEEL TAXI has suffered and continues to suffer damages in an amount to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

**THIRD CAUSE OF ACTION**
**LANHAM ACT**
**(15 U.S.C. § 1125(a))**
**(Against all Defendants)**

205.   Pursuant to the Lanham Act, it is illegal to make false statements of fact in a commercial advertisement about one's own or a competitor's products or services.

206.   UBER is in commercial competition with FLYWHEEL TAXI.

207.   UBER made false statements of fact regarding UberX drivers' income as described in paragraphs 137 through 156.

208.   UBER made false statements of fact regarding UberX prices relative to taxi prices as described in paragraphs 157 through 160.

209.   UBER made false statements of fact regarding UberX prices as described in paragraphs 161 through 169.

210.   UBER made false statements of fact regarding UberX vehicle locations and passenger wait times as described in paragraphs 170 through 172.

211.   UBER made false statements of fact regarding passenger safety as described in paragraphs 173 through 176.

////

212.    UBER's false statements had and have the tendency to deceive a substantial segment of UBER's audience, which is composed of consumers of ride-hail services in San Francisco and drivers providing ride-hail services in San Francisco.

213.    UBER's false statements actually deceived and continue to deceive a substantial segment of UBER's audience, which is composed of consumers of ride-hail ground transportation services in San Francisco and drivers providing ride-hail services in San Francisco.

214.    The deception caused by each of UBER's false statements is likely to influence and has influenced the purchasing decisions of consumers of ride-hail services in San Francisco and drivers providing ride-hail services in San Francisco.

215.    UBER made each of the false statements of fact over the internet through its websites (e.g., newsroom.uber.com, www.uber.com/cities/san-francisco), which affect and are a part of interstate commerce.

216.    Each and every one of UBER's false statements of fact is commercial speech, was made for the purpose of influencing customers to purchase UBER's services, and was disseminated sufficiently to consumers of ride-hail services in San Francisco to constitute advertising or promotion.

217.    As a result of UBER's false statements of fact as described herein, FLYWHEEL TAXI has been and is likely to be injured through diversion of sales to UBER and by a lessening of goodwill in amounts to be proven at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

**FOURTH CAUSE OF ACTION**
**FAILURE TO CHARGE JUST AND REASONABLE RATES**
**(Cal. Pub. Utilities Code §§ 451, 2106)**
**(Against all Defendants)**

218.    Pursuant to California Public Utilities Code section 451, all charges demanded or received by a public utility for service rendered to the public must be just and reasonable.

219.    Pursuant to California Public Utilities Code section 2106, any public utility which acts in a manner prohibited or declared unlawful by the Constitution, any law of this state, or any order or decision of the Public Utilities Commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused by such unlawful acts.

220.     Pursuant to California Public Utilities Code section 2106, a public utility may be held liable for exemplary damages, in addition to actual damages, if the public utility's conduct was wilful.

221.     The Commission has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on the rates charged by TNCs for services rendered to the public.

222.     Beginning on or before November 2, 2014 and continuing through the present date, UBER has charged unjust and unreasonable rates for services rendered to the public in the form of below-cost and below-market pricing for UBER's services.

223.     Beginning on or before November 2, 2014 and continuing through the present date, UBER has charged unjust and unreasonable rates for services rendered to the public in the form of surge pricing during times of high demand.

224.     UBER engaged and continues to engage in this activity for the express purpose of injuring competitors and destroying competition.

225.     As a direct and proximate result of UBER's intentional and wrongful acts and omissions as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages as a result of market and customer loss to UBER in an amount to be proven at trial.

226.     Because UBER's acts and omissions as described herein were wilful, FLYWHEEL TAXI is entitled to and will seek exemplary damages in an amount to be determined at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

### FIFTH CAUSE OF ACTION
### PROVIDING FREE OR REDUCED RATE TRANSPORTATION
### (Cal. Pub. Utilities Code §§ 522, 2106)
### (Against all Defendants)

227.     Pursuant to California Public Utilities Code section 522, a common carrier may not directly or indirectly, issue, give, or tender any free ticket, free pass, or free or reduced rate transportation for passengers traveling within California.

228.     Pursuant to California Public Utilities Code section 2106, any public utility which acts in a manner prohibited or declared unlawful by the Constitution, any law of this state, or any order or

decision of the Public Utilities Commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused by such unlawful acts.

229. Pursuant to California Public Utilities Code section 2106, a public utility may be held liable for exemplary damages, in addition to actual damages, if the public utility's conduct was wilful.

230. The Commission has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on the rates charged by TNCs, including the offering of free or reduced rate transportation in the form of rebates, coupons, and promotions provided to passengers.

231. Beginning on or before November 2, 2014 and continuing through the present date, UBER has regularly and customarily offered free or reduced rate transportation in the form of rebates, coupons, and promotions provided to UBER passengers.

232. UBER engaged and continues to engage in this activity for the express purpose of injuring competitors and destroying competition.

233. As a direct and proximate result of UBER's intentional and wrongful acts and omissions as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages as a result of market and customer loss to UBER in an amount to be proven at trial.

234. Because UBER's acts and omissions as described herein were wilful, FLYWHEEL TAXI is entitled to and will seek exemplary damages in an amount to be determined at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

### SIXTH CAUSE OF ACTION
### FAILURE TO FILE RATE SCHEDULES
### (Cal. Pub. Utilities Code §§ 486, 2106)
### (Against all Defendants)

235. Pursuant to California Public Utilities Code section 486, every common carrier must file with the Commission and keep open for public inspection schedules showing all rates, fares, charges, and classifications for the transportation of persons between locations in California.

236. Pursuant to California Public Utilities Code section 2106, any public utility which acts in a manner prohibited or declared unlawful by the Constitution, any law of this state, or any order or

decision of the Public Utilities Commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused by such unlawful acts.

237.    Pursuant to California Public Utilities Code section 2106, a public utility may be held liable for exemplary damages, in addition to actual damages, if the public utility's conduct was wilful.

238.    The Commission has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on the rates charged by TNCs, including the offering of free or reduced rate transportation in the form of rebates, coupons, and promotions provided to passengers.

239.    The Commission has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on TNC rate schedules, including the filing or making open for public inspection of rate schedules.

240.    Beginning on or before November 2, 2014 and continuing through the present date, UBER refused and continues to refuse to file or make open for public inspection schedules showing all of UBER's rates, fares, charges, and classifications for the transportation of persons between locations in California.

241.    UBER engaged and continues to engage in this activity for the express purpose of injuring competitors and destroying competition.

242.    UBER's failure to file with the Commission and keep open to the public all rates, fares, charges, and classification for the transportation of persons between locations in California was and is intentional, wilful, and malicious because UBER knew of its obligation as a public utility to comply with the requirements of the Public Utilities Act but refused to do so.

243.    As a direct and proximate result of UBER's intentional and wrongful acts and omissions as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages as a result of market and customer loss to UBER in an amount to be proven at trial.

244.    Because UBER's acts and omissions as described herein were wilful, FLYWHEEL TAXI is entitled to and will seek exemplary damages in an amount to be determined at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

////

### SEVENTH CAUSE OF ACTION
### TRANSPORTING PASSENGERS WITHOUT FILING RATE SCHEDULES
#### (Cal. Pub. Utilities Code §§ 493, 2106)
#### (Against all Defendants)

245.     Pursuant to California Public Utilities Code section 493, a common carrier may not engage or participate in the transportation of persons between locations in California before the common carrier's schedules of rates, fares, charges, and classifications are filed with the Commission and made open to public inspection.

246.     Pursuant to California Public Utilities Code section 2106, any public utility which acts in a manner prohibited or declared unlawful by the Constitution, any law of this state, or any order or decision of the Public Utilities Commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused by such unlawful acts.

247.     Pursuant to California Public Utilities Code section 2106, a public utility may be held liable for exemplary damages, in addition to actual damages, if the public utility's conduct was wilful.

248.     The Commission has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on TNC rate schedules or the transportation of passengers by TNCs without filing rate schedules.

249.     Beginning on or before November 2, 2014 and continuing through the present date, UBER has regularly and customarily transported persons within California despite having failed and refused to file schedules of rates, fares, charges, and classifications with the Commission or making all such schedules open to public inspection.

250.     UBER engaged and continues to engage in this activity for the express purpose of injuring competitors and destroying competition.

251.     As a direct and proximate result of UBER's intentional and wrongful acts and omissions as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages as a result of market and customer loss to UBER in an amount to be proven at trial.

////

////

---

252.    Because UBER's acts and omissions as described herein were intentional and wilful, FLYWHEEL TAXI is entitled to and will seek exemplary damages in an amount to be determined at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

**EIGHTH CAUSE OF ACTION**
**CHANGING RATES WITHOUT NOTICE OR APPROVAL**
**(Cal. Pub. Utilities Code §§ 454, 491, 2106; Cal. Const. Art. XII § 4)**
**(Against all Defendants)**

253.    Pursuant to California Public Utilities Code section 491, a public utility may not change any rate without providing 30 days' notice to the Commission and to the public.

254.    Pursuant to California Public Utilities Code section 454, a public utility may not change any rate without making a showing before the Commission and receiving a finding from the Commission that the new rate is justified.

255.    Pursuant to California Public Utilities Code section 2106, any public utility which acts in a manner prohibited or declared unlawful by the Constitution, any law of this state, or any order or decision of the Public Utilities Commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused by such unlawful acts.

256.    Pursuant to California Public Utilities Code section 2106, a public utility may be held liable for exemplary damages, in addition to actual damages, if the public utility's conduct was wilful.

257.    The Commission has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on TNC rates, including the changing of rates by TNCs without providing notice to the Commission or the public and without receiving approval from the Commission.

258.    Beginning on or before November 2, 2014 and continuing through the present date, UBER has regularly and customarily changed rates by increasing and decreasing the amounts charged for its services and increasing and decreasing service and booking fees without providing notice to the Commission or the public and without receiving approval from the Commission.

259.    UBER engaged and continues to engage in this activity for the express purpose of injuring competitors and destroying competition.

260.     As a direct and proximate result of UBER's intentional and wrongful acts and omissions as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages as a result of market and customer loss to UBER in an amount to be proven at trial.

261.     Because UBER's acts and omissions as described herein were intentional and wilful, FLYWHEEL TAXI is entitled to and will seek exemplary damages in an amount to be determined at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

### NINTH CAUSE OF ACTION
### CHARGING RATES DIFFERENT THAN THOSE SPECIFIED IN SCHEDULE
### (Cal. Pub. Utilities Code §§ 494, 2106)
### (Against all Defendants)

262.     Pursuant to California Public Utilities Code section 494, a common carrier may not charge or receive a different amount for the transportation of persons, or for any service in connection therewith, than the applicable rates, fares, and charges specified in its schedules on file with the Commission at the time the service is provided.

263.     Pursuant to California Public Utilities Code section 2106, any public utility which acts in a manner prohibited or declared unlawful by the Constitution, any law of this state, or any order or decision of the Public Utilities Commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused by such unlawful acts.

264.     Pursuant to California Public Utilities Code section 2106, a public utility may be held liable for exemplary damages, in addition to actual damages, if the public utility's conduct was wilful.

265.     The Commission has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on the rates charged by TNCs, including the charging of different rates by TNCs than those specified in schedules on file with the Commission.

266.     Beginning on or before November 2, 2013 and continuing through the present date, UBER regularly and customarily charged and received, and continues to charge and receive, a different amount for the transportation of persons, and for services provided in connection to the transportation of person, than those specified in schedules on file with the Commission by failing to

file schedules with the Commission while continuing to charge and receive sums rates, fares, and charges for services.

267.    UBER engaged and continues to engage in this activity for the express purpose of injuring competitors and destroying competition.

268.    As a direct and proximate result of UBER's intentional and wrongful acts and omissions as described herein, FLYWHEEL TAXI has suffered and continues to suffer damages as a result of market and customer loss to UBER in an amount to be proven at trial.

269.    Because UBER's acts and omissions as described herein were intentional and wilful, FLYWHEEL TAXI is entitled to and will seek exemplary damages in an amount to be determined at trial.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

### TENTH CAUSE OF ACTION
### UNFAIR COMPETITION LAW – ILLEGAL AND UNFAIR PRACTICES
### (Bus. & Prof. Code § 17200, *et seq.*)
### (Against all Defendants)

270.    Pursuant to the Unfair Competition Law (Bus. & Prof. Code § 17200 *et seq.*), it is unlawful for an entity to engage in unfair or illegal business activities.

271.    Beginning in June 2013 and continuing through the present date, UBER has committed acts of unfair competition, as defined by section 17200, *et seq.* of the California Business and Professions Code.

272.    As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described in paragraphs 54 through 116, has committed and continues to commit acts of unfair competition by engaging in the regular and customary practice of below-cost pricing of UberX and UberXL services in violation of the Sherman Antitrust Act (15 U.S.C. § 2).

273.    UBER's conduct caused and continues to cause taxicab customers to stop using taxicabs and instead use UberX and UberXL as a result of the below-cost pricing of UberX and UberXL services. As a result, taxicab drivers stopped and continue to stop leasing and driving taxicabs and instead drive for UBER because of the loss of their customer base to UBER.

274.     FLYWHEEL TAXI has lost more than one thousand (1,000) drivers as a result of UBER's below-cost pricing of UberX and UberXL services. At the time each driver stopped leasing taxicabs from FLYWHEEL TAXI and left to drive for UBER, FLYWHEEL TAXI had a contract with the driver through which the parties agreed that the driver would pay between $65.00 and $130.00 in daily lease fees to lease a taxicab from FLYWHEEL TAXI. Each contract contained a provision that the driver would provide at least 30 days' notice before terminating the contract. Most or all of the drivers that stopped leasing taxicabs from FLYWHEEL TAXI in order to drive for UBER did not give notice before terminating the contract and did not pay leasing fees to FLYWHEEL TAXI after leaving to drive for UBER.

275.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described in paragraphs 157 through 160, has committed and continues to commit acts of unfair competition by engaging in the regular and customary practice of falsely advertising the price of UberX and UberXL services relative to those of the taxicab industry in violation of the Lanham Act (15 U.S.C. § 1125).

276.     UBER's conduct caused and continues to cause taxicab customers to stop using taxicabs and instead use UberX and UberXL as a result of the falsely advertised prices of UberX and UberXL services. As a result, taxicab drivers stopped and continue to stop leasing and driving taxicabs and instead drive for UBER because of the loss of their customer base to UBER.

277.     FLYWHEEL TAXI has lost more than one thousand (1,000) drivers as a result of UBER's false advertisement of the prices of UberX and UberXL services. At the time each driver stopped leasing taxicabs from FLYWHEEL TAXI and left to drive for UBER, FLYWHEEL TAXI had a contract with the driver through which the parties agreed that the driver would pay between $65.00 and $130.00 in daily lease fees to lease a taxicab from FLYWHEEL TAXI. Each contract contained a provision that the driver would provide at least 30 days' notice before terminating the contract. Most or all of the drivers that stopped leasing taxicabs from FLYWHEEL TAXI in order to drive for UBER did not give notice before terminating the contract and did not pay leasing fees to FLYWHEEL TAXI after leaving to drive for UBER.

////

278.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described in paragraphs 161 through 169, has committed and continues to commit acts of unfair competition by engaging in the regular and customary practice of charging "surge" prices while advertising rates that do not include the "surge" multiplier or amount in violation of the Lanham Act (15 U.S.C. § 1125).

279.     UBER's conduct caused and continues to cause taxicab customers to stop using taxicabs and instead use UberX and UberXL as a result of the falsely advertised prices of UberX and UberXL services. As a result, taxicab drivers stopped and continue to stop leasing and driving taxicabs and instead drive for UBER because of the loss of their customer base to UBER.

280.     FLYWHEEL TAXI has lost more than one thousand (1,000) drivers as a result of UBER's false advertisement of the prices of UberX and UberXL services. At the time each driver stopped leasing taxicabs from FLYWHEEL TAXI and left to drive for UBER, FLYWHEEL TAXI had a contract with the driver through which the parties agreed that the driver would pay between $65.00 and $130.00 in daily lease fees to lease a taxicab from FLYWHEEL TAXI. Each contract contained a provision that the driver would provide at least 30 days' notice before terminating the contract. Most or all of the drivers that stopped leasing taxicabs from FLYWHEEL TAXI in order to drive for UBER did not give notice before terminating the contract and did not pay leasing fees to FLYWHEEL TAXI after leaving to drive for UBER.

281.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described in paragraph 177, committed acts of unfair competition by failing to comply with the provisions of the Americans with Disabilities Act (42 U.S.C. § 12101, *et seq.*).

282.     Between November 1, 2012 and April 2016, FLYWHEEL TAXI was required to and did spend, out of the leasing fees it received, approximately $250 per vehicle per month to comply with the Americans with Disabilities Act. During that time, UBER enjoyed increased revenues of approximately $250 per vehicle per month due to its failure to comply with the Americans with Disabilities Act.

////

283.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described in paragraph 178 committed acts of unfair competition by failing and refusing to provide at least $1 million in insurance while each vehicle is in use in violation of California state law (Pub. Util. Code §§ 702, 5432).

284.     Between September 23, 2013 and July 1, 2015, FLYWHEEL TAXI was required and did spend, out of the leasing fees it received, approximately $600 per vehicle per month to comply with California's requirement that each vehicle carry liability insurance of no less than $1 million per incident for each vehicle. During that time, UBER enjoyed increased revenues of approximately $600 per vehicle per month due to its failure to provide liability insurance of no less than $1 million per incident for each vehicle.

285.     As alleged herein and in violation of Business and Professions Code section 17200, UBER, through its policies and practices described in paragraphs 179 through 186, committed acts of unfair competition by failing and refusing to comply with regulatory requirements imposed on all ride-hail services in San Francisco in violation of local law (S.F. Trans. Code §§ 300 – 1100).

286.     Between November 1, 2012 and September 23, 2013, FLYWHEEL TAXI was required and did spend, out of the leasing fees it received, approximately $2,000 per vehicle per month to comply with San Francisco regulatory requirements imposed on ride-hail services in San Francisco. During that time, UBER enjoyed increased revenues of approximately $2,000 per vehicle per month due to its failure to comply with San Francisco regulatory requirements imposed on ride-hail services in San Francisco.

287.     FLYWHEEL TAXI has suffered injury in fact and will continue to suffer injury as a result of Defendants' unfair acts of competition due to the loss of drivers to UBER and the consequent loss of lease payments to which it was entitled and the loss of profits that were used to comply with laws and regulations with which UBER refused to comply. UBER directly and unfairly benefits

288.     The unlawful conduct described herein is continuing and will continue unless and until UBER is enjoined from engaging in such unfair and illegal conduct.

289.    FLYWHEEL is entitled to injunctive relief enjoining Defendants from engaging in conduct that constitutes unfair or illegal conduct in violation of California's Business and Professions Code.

WHEREFORE, FLYWHEEL TAXI prays for relief as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, FLYWHEEL TAXI prays for judgment on all causes of action against all Defendants as follows:

**AS TO THE FIRST CAUSE OF ACTION**

1.    For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from four years before the filing of the complaint to the date of trial, pursuant to 15 U.S.C. § 15;

2.    For additional damages in an amount equal to three times Plaintiff's compensatory damages pursuant to 15 U.S.C. § 15;

3.    For immediate and permanent injunctive relief pursuant to 15 U.S.C. § 26 requiring Defendants to cease all predatory practices including offering for sale and selling UberX and UberXL services at below-cost prices; and

4.    For attorneys' fees and costs of suit pursuant to 15 U.S.C. § 15.

**AS TO THE SECOND CAUSE OF ACTION**

1.    For compensatory damages in an amount according to proof at the time of trial for all harm suffered by Plaintiff from four years before the filing of the complaint to the date of trial pursuant to 15 U.S.C. § 15;

2.    For additional damages in an amount equal to three times Plaintiff's compensatory damages pursuant to 15 U.S.C. § 15;

3.    For immediate and permanent injunctive relief pursuant to 15 U.S.C. § 26 requiring Defendants to cease all predatory practices including offering for sale and selling UberX and UberXL services at below-cost prices; and

4.    For attorneys' fees and costs of suit pursuant to 15 U.S.C. § 15.

////

**AS TO THE THIRD CAUSE OF ACTION**

1.      For compensatory damages in an amount according to proof at the time of trial for all damages suffered by Plaintiff, pursuant to 15 U.S.C. § 1117;

2.      For additional damages in an amount equal to three times Plaintiff's compensatory damages, pursuant to 15 U.S.C. § 1117;

3.      For equitable relief in the form of disgorgement of profits and any additional amounts the Court finds to be just, pursuant to 15 U.S.C. § 1117;

4.      For an accounting of profits Defendants have made as a result of their false and misleading statements as alleged herein, pursuant to 15 U.S.C. § 1117;

5.      For immediate and permanent injunctive relief, pursuant to 15 U.S.C. § 1116, enjoining Defendants from making false statements of fact regarding UberX prices, UberX prices relative to taxi prices, and passenger safety;

6.      For immediate and permanent injunctive relief, pursuant to 15 U.S.C. § 1116, enjoining Defendants from making false statements of fact regarding UberX and UberXL drivers' annual, hourly, and proportional income and from falsely advertising the income earned and expenses incurred by San Francisco taxicab drivers; and

7.      For attorneys' fees and costs of suit due to the exceptional nature of this case pursuant to 15 U.S.C. § 1117.

**AS TO THE FOURTH CAUSE OF ACTION**

1.      For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from November 2, 2014 through the date of trial pursuant to Cal. Pub. Utilities Code § 2106;

2.      For exemplary damages in an amount according to proof and the Court's determination pursuant to California Public Utilities Code § 2106; and

3.      For immediate and permanent injunctive relief enjoining Defendants from engaging in below-cost, below-market, and surge pricing practices in violation of California Public Utilities Code §451.

////

**AS TO THE FIFTH CAUSE OF ACTION**

      1.      For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from November 2, 2014 through the date of trial pursuant to Cal. Pub. Utilities Code § 2106;

      2.      For exemplary damages in an amount according to proof and the Court's determination pursuant to California Public Utilities Code § 2106; and

      3.      For immediate and permanent injunctive relief enjoining Defendants from providing free or reduce rate transportation in violation of California Public Utilities Code § 522.

**AS TO THE SIXTH CAUSE OF ACTION**

      1.      For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from November 2, 2014 through the date of trial pursuant to California Public Utilities Code § 2106;

      2.      For exemplary damages in an amount according to proof and the Court's determination pursuant to Cal. Pub. Utilities Code § 2106; and

      3.      For immediate and permanent injunctive relief requiring Defendants to file rate schedules with the Public Utilities Code in compliance with California Public Utilities Code § 486.

**AS TO THE SEVENTH CAUSE OF ACTION**

      1.      For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from November 2, 2014 through the date of trial pursuant to California Public Utilities Code § 2106;

      2.      For exemplary damages in an amount according to proof and the Court's determination pursuant to Cal. Pub. Utilities Code § 2106; and

      3.      For immediate and permanent injunctive relief enjoining Defendants from transporting passengers without filing rate schedules in violation of California Public Utilities Code § 493.

**AS TO THE EIGHTH CAUSE OF ACTION**

      1.      For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from November 2, 2014 through the date of trial pursuant to California Public Utilities Code § 2106;

2.      For exemplary damages in an amount according to proof and the Court's determination pursuant to Cal. Pub. Utilities Code § 2106.

**AS TO THE NINTH CAUSE OF ACTION**

1.      For compensatory damages in amounts according to proof at the time of trial for all harm suffered by Plaintiff from November 2, 2013 through the date of trial pursuant to California Public Utilities Code § 2106;

2.      For exemplary damages in an amount according to proof and the Court's determination pursuant to Cal. Pub. Utilities Code § 2106; and

3.      For immediate and permanent injunctive relief enjoining Defendants from changing rates without providing notice to the public or receiving approval from the Public Utilities Commission in violation of California Public Utilities Code §§ 454 and 491, and Article XII, section 4 of the California Constitution.

**AS TO THE TENTH CAUSE OF ACTION**

1.      For disgorgement of all profits and money in which Plaintiff had a vested interest that was illegally obtained or diverted by Defendants through the wrongful acts described above;

2.      For permanent injunctive relief pursuant to Business & Professions Code § 17203 enjoining Defendants from selling UberX and UberXL services below-cost; and

3.      For permanent injunctive relief pursuant to Business & Professions Code § 17203 enjoining Defendants from advertising lower rates than actually charged for UberX and UberX services.

////

////

////

////

////

////

////

////

**AS TO ALL CAUSES OF ACTION**

1.      For all additional forms of relief to which Plaintiff is entitled pursuant to statute or that justice and equity demand be awarded;

2.      For pre- and post-judgment interest at the maximum legal rate pursuant to statute;

3.      For costs of suit incurred herein; and

4.      For such other and further relief as this Court may deem fair and just.

Dated: August 14, 2020                        SEIBERT • BAUTISTA • MONTOYA


                                              _____*/s/ Joe Bautista*_____
                                              Shannon Seibert
                                              Joe Bautista
                                              Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a jury trial on all issues so triable.

Dated: August 14, 2020                        SEIBERT • BAUTISTA • MONTOYA


                                              _____*/s/ Joe Bautista*_____
                                              Shannon Seibert
                                              Joe Bautista
                                              Attorneys for Plaintiff

### CERTIFICATE OF SERVICE

I, Shannon Seibert, declare:

I am over the age of eighteen, not a party to the within cause and am employed in the County of Alameda. My business address is 2100 Embarcadero, Suite 203, Oakland, California 94606.

On August 14, 2020, I served the following documents:

### THIRD AMENDED COMPLAINT

by causing the document(s) to be electronically filed with the Clerk of the Court through the CM/ECF online system, which will send notification of the filing(s) to all registered counsel of record.

I declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Dated: August 24, 2020


_____ /s/ *Shannon Seibert* _____
Shannon Seibert