<div style="text-align:center">

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

</div>

7 DESOTO CAB COMPANY, INC.,

Plaintiff,

8

9     v.

10 UBER TECHNOLOGIES, INC., et al.,

Defendants.

11

Case No. <u>16-cv-06385-JSW</u>

**ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTION TO DISMISS THIRD AMENDED COMPLAINT AND SETTING CASE MANAGEMENT CONFERENCE**

Re: Dkt. No. 108

12

13     Now before the Court for consideration is the motion to dismiss filed by Defendants Uber

14 Technologies, Inc., Uber USA, LLC, RASIER, LLC, and RASIER-CA, LLC (collectively,

15 "Defendants" or "Uber"). The Court has considered the parties' papers, relevant legal authority,

16 and the record in this case, and for the reasons discussed below, the Court GRANTS, IN PART,

17 AND DENIES, IN PART, Defendants' motion, without further leave to amend.

18 <div style="text-align:center">**BACKGROUND**</div>

19     The substantive facts of this case are fully addressed in this Court's Orders granting, in

20 part, and denying, in part, Uber's motions to dismiss the original and second amended complaints

21 filed by Plaintiff, De Soto Cab Company d/b/a Flywheel Taxi ("Flywheel"). (Dkt. Nos. 64

22 ("9/24/18 Order"), 100 ("3/25/20 Order").) Most of the procedural history of this case is

23 addressed in this Court's Order granting Flywheel's motion for leave to file a second amended

24 complaint. (Dkt. No. 85 ("8/13/19 Order").)

25     Flywheel filed the Third Amended Complaint ("TAC") on August 24, 2020 and asserts ten

26 causes of action against Uber: (1) monopolization and (2) attempted monopolization in violation

27 of the Sherman Antitrust Act, 15 U.S.C. section 2, (3) violation of the Lanham Act, 15 U.S.C.

28 section 1125(a), (4) failure to charge just and reasonable rates, in violation of California Public

<div style="writing-mode:vertical-rl; text-align:center">United States District Court<br>Northern District of California</div>

1  Utilities Code ("PUC") section 451, (5) providing free or reduced rate transportation, in violation

2  of PUC section 522, (6) failure to file rate schedules, in violation of PUC section 486, (7)

3  transporting passengers without filing rate schedules, in violation of PUC section 493, (8)

4  changing rates without notice or approval, in violation of PUC section 454 and 491, and the

5  California Constitution, (9) charging rates different than those specified in a schedule, in violation

6  of PUC section 494, and (10) violating California's Unfair Competition Law ("UCL"), Business

7  and Professions Code sections 17200, *et seq.*

8      Many of Flywheel's allegations remain unchanged, and the Court will additional facts as

9  necessary in its analysis below.  (*Compare* TAC *with* Dkt. No. 117, Redline of TAC.)

**ANALYSIS**

**A.    Applicable Legal Standards.**

12      A complaint must contain a "short and plain statement of the claim showing that the

13  pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[D]etailed factual allegations are not

14  required" to survive a motion to dismiss if the complaint contains sufficient factual allegations to

15  "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

16  (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Labels and conclusions[] and a

17  formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 50 U.S. at 555.

18  When evaluating a Rule 12(b)(6) motion to dismiss, a district court accepts as true all material

19  facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff.

20  *Faulkner v. ADT Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).

21      A district court should grant leave to amend unless the court determines the pleading could

22  not "possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th

23  Cir. 2000).  However, where a plaintiff has previously amended a complaint, a district court has

24  broad discretion to deny further leave to amend.  *Allen v. City of Beverly Hills*, 911 F.2d 367, 373

25  (9th Cir. 1990) (internal quotations and citation omitted).

**B.    Requests for Judicial Notice.**

27      Uber and Flywheel each filed requests for judicial notice.  (Dkt. Nos. 109, 113.)  Neither

28  party objected to the other party's request.  However, the Court did not rely on any of the

United States District Court
Northern District of California

2

1    documents attached to resolve this motion.  Accordingly, it DENIES each party's request as moot.

2    **C.**    **The Court Dismisses the Sherman Act Claims.**

3        Uber once again moves to dismiss the Sherman Act claims on the basis that Flywheel's

4    allegations concerning market barriers and danger of recoupment remain deficient.[1]  "In

5    evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market

6    share."  *United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990) (emphasis in

7    original).  When it dismissed these claims from Flywheel's SAC, the Court stated Flywheel must

8    allege facts to show that there are barriers to entry for new competitors and that there are barriers

9    to expansion for existing competitors, most notably Lyft.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51

10    F.3d 1421, 1439 (9th Cir. 1995).

11        Flywheel amended its allegations to assert that, with one short-lived exception, "no new

12    competitors have entered the San Francisco Ride-Hail Market in more than five years[.]"  (TAC ¶

13    104.)  In some instances, however, competition may well result in "the exit" of competitors.  *Syufy*

14    *Enters.*, 903 F.2d at 664.  Therefore, that fact alone is not dispositive.  Flywheel also argues that

15    Wingz, Inc. and SilverRide, LLC, which are other TNCs, only serve "niche" consumers, but it has

16    not disputed those companies fall within the product and geographic markets alleged in the TAC.

17        Flywheel continues to allege that that Uber's brand awareness and customer loyalty

18    continue to present a barrier to entry and a barrier to expansion.  (TAC ¶¶ 111-112.)  For the

19    reasons previously stated, the Court concludes that, standing alone, these allegations are not

20    sufficient to show market power.  (3/25/20 Order at 7:15-20.)  Flywheel also continues to allege

21    that that capital outlays and compliance with CPUC regulations, including outlays for a

22    smartphone application, for new taxicab companies and for new TNCs are prohibitive and that

23    Uber's overhead costs are lower.  (TAC ¶¶ 91-100.)  The Court previously concluded those

24    allegations were not sufficient because Flywheel did not allege it would have been more difficult

25    for a new TNC to raise such capital than it would be for Uber to do so.  (3/25/20 Order at 6:13-

26

27    [1]    A barrier to entry is either an "additional" long-run cost that incumbent firms did not incur that "must" be incurred by new entrants or a factor or factors in the market that deter entry "while

28    permitting incumbent firms to earn monopoly returns."  *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993) (citation omitted).

United States District Court
Northern District of California

7:14.)

Flywheel now alleges that capital markets no longer exist because investors have learned of "the liquidity network effects at play" and alleges that established – and former - competitors, such as Sidecar, have been unable to raise capital because of those network effects.  (TAC ¶ 102.) It also alleges that "no company, including … Lyft, in the San Francisco Ride-Hail market has the ability to respond effectively to Uber's anti-competitive pricing."  (*See* TAC ¶¶ 86-90, 102-108.) "In markets characterized by network effects, one product or standard tends towards dominance, because the utility that a user derives from consumption of the good increases with the number of other agents consuming the good."  *United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) (internal quotations and citation omitted).  As summed up by Flywheel, "[n]etwork effects exist where there is a positive feedback loop created when reaching one group allows one to reach more of the second group thus raising the value of the overall network."  (TAC ¶ 87.)

Flywheel's network effects theory consists of a two-sided platform that is comprised of riders and drivers.  (*Id.*; *see also id.* ¶¶ 24-25 (describing Flywheel's loss of drivers and riders).) The Court must analyze the alleged anti-competitive effects on both sides of that platform; "[e]vidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power."  *Ohio v. Am. Express Co.*, -- U.S. --, 138 S. Ct. 2274, 2287 (2018).  Further, "simply invoking the phrase 'network effects' without pointing to" allegations that demonstrate those effects will not satisfy Flywheel's burden. *Microsoft*, 253 F.3d at 84.

Citing to *SC Innovations v. Uber Technologies, Inc.*, Flywheel argues it has included allegations that are sufficient to show Uber's market power.  No. 18-cv-07440-JCS, 2020 WL 2097611 (N.D. Cal. May 1, 2020).  In *SC Innovations*, Sidecar argued that network effects acted as barriers to entry and to expansion and alleged Uber engaged in predatory pricing on both "sides" of the ride-hailing market by "offering above-market incentive payments to drivers, and offering below-market fares to riders."  *Id.*, at *2-*3.  In particular, Sidecar alleged that Uber submitted "fraudulent requests for rides on competitors' platforms" and cancelled before the drivers arrived.  According to Sidecar that conduct "increased wait times for both drivers and

passengers to obtain legitimate rides, causing them to become frustrated with Sidecar." *Id.* at, *3. The "reduced number of passengers and drivers created a vicious cycle of declining usage." *Id.* There are no similar allegations in this case.

In addition, Sidecar alleged that Lyft was unable to effectively respond to Uber because its "current status as a public company requires it to recoup its own massive losses through higher prices." *SC Innovations*, 2020 WL 2097611, at *3. Thus, unlike Flywheel's allegations here, Sidecar included some facts about why Lyft was unable to act as a check on Uber's alleged anti-competitive activity, especially in geographic markets where the gap in market share between Uber and Lyft was larger.[2] *Id.*, at *8-*9.

Flywheel also alleges Uber created programs that allow drivers to buy or lease vehicles at a low cost. According to Flywheel the vehicle rental and lease programs are a means to "lure drivers to a modern-day form of indentured servitude" with Uber and prevent drivers from returning to work as taxicab drivers. However, there no allegations that Uber restricts its drivers from contracting with other TNCs, such as Lyft. (*See* TAC ¶¶ 13 (incorporating by reference all allegations into all causes of action as necessary) 50-53, 137-156 (alleged false statements regarding, *inter alia*, driver income).)

Flywheel does allege Uber provides "incentives" to drivers and to riders. However, Flywheel provides little to no facts about the nature of those incentives, other than that that as Uber dropped prices for passengers it either reduced commissions for drivers or paid drivers more than it charged passengers. (TAC ¶¶ 62, 68, 76.) Flywheel also alleges that even when Uber has stopped subsidizing drivers' income, Uber loses money on every ride. When the Court dismissed these claims from the original complaint, it found those allegations were sufficient to allege below cost pricing. (9/24/18 Order at 15:13-16:5.) However, it concluded that Flywheel's claims failed it had "not sufficiently alleged a dangerous probability of recoupment because … it ha[d] not sufficiently alleged that barriers to entry will prevent competitors from entering the market." (*Id.* at 16:6-8.) That is still true, and the Court GRANTS Uber's motion to dismiss the Sherman Act

---

[2]     The court noted that the gap in market share was smaller in San Francisco, the relevant geographic market in this case. *See SC Innovations*, 2020 WL 2097611, at *9.

United States District Court
Northern District of California

claims.

Flywheel asks for leave to amend but does not explain what additional facts it could add to a fourth amended complaint. When the Court granted Uber's motion to dismiss the SAC, it expressly advised Flywheel that the TAC would be the final opportunity to amend the Sherman Act claims. (3/25/20 Order at 8:9-12.) Accordingly, the Court DISMISSES the claims with prejudice.

**D.      The Court Dismisses the PUC Claims, Without Further Leave to Amend.**

Flywheel reasserts six of its PUC claims and now alleges that unless the CPUC has issued a "Ruling" or a "Scoping Memo" on a particular issue, the CPUC "has not and does not intend to exercise its regulatory authority" over that issue. Flywheel also alleges that "[t]he only issues relevant to the claims at issue through this Complaint that the [CPUC] has exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on are those identified in the Scoping Memos, Rulings, and Decisions described" in paragraphs 120 through 131. (TAC ¶ 118, 132.) In each of its PUC claims, Flywheel alleges that the CPUC "has not exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on the rates charged by TNCs," including rate issues covered by each claim. (*Id.* ¶¶ 221, 230, 238, 257, 265; *see also id.* ¶¶ 238, 247 (alleging CPUC has not "exerted its authority or exercised jurisdiction over, regulated, addressed, or ruled on TNC rate schedules").

Uber renews its argument that adjudication of each of the PUC claims would usurp the CPUC's authority under California law. Section 1759(a) of the PUC states that no trial court will have jurisdiction to "review, reverse, correct, or annul any order or decision of the [CPUC] . . . or delay the execution or operation . . . [of] the [CPUC] in the performance of its official duties, as provided by law and the rules of court."[3] The CPUC is "an expert administrative body" with "wide regulatory power with respect to public utilities which the courts generally may not abrogate." *Masonite Corp. v. Pac. Gas & Elec. Co.*, 65 Cal. App. 3d 1, 7 (1976). However, its jurisdiction is not exclusive "over any and all matters having any reference to the regulation and

United States District Court
Northern District of California

---

[3]      All statutory references in this section of the Order are to the Public Utilities Code.

supervision of public utilities." *Id.*  Indeed, Section 2106 allows trial courts to award "persons or corporations affected . . . for all loss, damages, or injury" caused by a public utility.  *Id.* (emphasis omitted).

The Court uses a three-part test to determine whether Section 1759 deprives the Court of jurisdiction over these claims.  *See San Diego Gas & Electric Co. v. Superior Court*, 13 Cal. 4th 893, 916-18 (1996) ("*Covalt*").  Under the *Covalt* test, a court asks: (i) whether [a regulatory commission] has the authority to adopt a policy; (ii) whether the commission has exercised that authority, and (iii) whether the court action at issue would hinder that policy.  *Id.* at 923, 926, 935.  If the answers to all three questions are affirmative, a trial court may not adjudicate an issue.  *See id.*

The Court previously concluded that the first *Covalt* factor was satisfied.  The allegations in the TAC provide no basis for the Court to revisit that decision.  (*See* 8/13/19 Order at 5:16-17; 3/25/20 Order at 8:2-20; *see also, e.g.,* TAC ¶ 135.)[4]  Flywheel renews its argument that the second prong is not met because the CPUC has not spoken affirmatively on the issues addressed in its claims.  Again, the Court does not disagree that the analysis must center upon whether the CPUC has exercised its regulatory authority over an issue rather than over any particular utility. *See Lefebvre v. S. Cal. Edison*, 244 Cal. App. 4th 143, 154 (2016) (describing the first two prongs of the *Covalt* test as depending upon "the issue in question"); *see also Kairy v. SuperShuttle Int'l*, 660 F.3d 1146, 1150 (9th Cir. 2011) (analyzing *Covalt* by referencing "subject matter of the litigation").  Courts have found this prong of *Covalt* satisfied where the "issue in question" is, broadly, "transportation companies."  *See Goncharov*, 19 Cal. App. at 1170 (agreeing with parties that first two *Covalt* factors satisfied where CPUC had exercised authority to regulate "transportation companies"); *Rosen v. Uber Techs., Inc.*, 164 F. Supp. 3d 1165 (N.D. Cal. 2016).

In support of this argument, Flywheel relies on a case decided days before the Court granted Uber's motion to dismiss the SAC: *Uber Technologies Pricing Cases*, 46 Cal. App. 5th

---

[4]     *See also A White & Yellow Cab, Inc. v. Uber Techs., Inc.,* No. 15-cv-05163-JSW, 2017 WL 1208384, at *6 (N.D. Cal. Mar. 31, 2017) (holding first two factors of *Covalt* test satisfied based on allegations in complaint).

United States District Court
Northern District of California

United States District Court
Northern District of California

963 (2020), *review denied* (July 29, 2020) ("*Uber Pricing Cases*").  In that case, the issue presented was whether Uber was exempted from liability for alleged violations of California's Unfair Practices Act, and the parties' primary dispute was whether the CPUC had to have set rates for the exemption to apply.  *Id.* at 986.  On appeal, Uber argued for the first time that the trial court lacked jurisdiction under Section 1759, but the Court of Appeal rejected that argument.  *Id.* at 970.

Applying the *Covalt* test, the court recognized the CPUC had the authority to regulate rates.  However, it stated that although "extensive rulemaking was ongoing, nothing indicates the CPUC is contemplating imminent exercise of tis authority to set rates for [TNCs] and charter-party carriers such as Uber."  *Id.* at 970.  The court distinguished *Goncharov* on the basis that the plaintiff had alleged Uber was acting as an unlicensed charter-party carrier in violation of CPUC regulations.  Thus, the "express focus of the CPUC's formal Rulemaking" was Uber's status and "any determination regarding [its] status would strike at the heart" of those proceedings.  *Id.* at 972 (quoting *Goncharov*, 19 Cal. App. 5th at 1171).  In the court's view, that concern was not present because there was "no evidence that in the seven years the rulemaking proceeding involving Uber has been ongoing the commission has set its sights on setting Uber's fares.  It may do so in the future, but that is not sufficient to divest the jurisdiction of the courts."  *Id.*  The court then went on to consider the merits of whether the exemption applied, and found that it did because the CPUC would have the jurisdiction to set Uber's rates, even though it had not yet done so.  *Id.* at 973-79.

Uber argues that Flywheel's reliance on *Uber Pricing Cases* is inapt because the issue was limited to whether Uber was subject to the exemption rather than what rules should be applicable to Uber in the first instance.  Thus, it argues that the claims here are analogous to the claims at issue in *Goncharov* and *Rosen*.  The Court agrees.  The *Uber Pricing Cases* did not require the court to consider whether or not the fares charged by Uber, or other TNCs, were reasonable.  That is not the case here, and the parties' recent status report shows that the CPUC continues to collect information about TNCs fares, including information about how Uber calculates its fares.  (Dkt. No. 118, Joint Status Report at 2:4-26.)

United States District Court
Northern District of California

1    Accordingly, the Court reaffirms its previous conclusion that the second *Covalt* factor is

2    satisfied, and it turns to the third factor.

3    "When the bar raised against a private damages action has been a ruling of the commission

4    on a single matter such as its approval of a tariff or a merger, the courts have tended to hold that

5    the action would not 'hinder' a 'policy' of the commission … and hence may proceed.  But when

6    the relief sought would have interfered with a broad and continuing supervisory or regulatory

7    program of the commission, the courts have found such a hindrance and barred the action under

8    section 1759." *Covalt,* 13 Cal. 4th at 918-19.  Flywheel argues that the gravamen of its claims is

9    simply the enforcement of CPUC rules.  Even when that is the case, an "action is impermissible if

10   its adjudication requires courts to determine how, or even whether, an ambiguous CPUC rule

11   applies, because this type of determination is policy making that would hinder or interfere with the

12   CPUC's exercise of its jurisdiction." *Goncharov*, 19 Cal. App. 5th at 1172 (internal quotations

13   and citations omitted).  In contrast, if the action simply seeks "to enforce a rule that clearly sets out

14   the nature of the obligation imposed," a ruling on whether a defendant's actions "did or did not

15   violate that standard" would not run afoul of the CPUC's exercise of jurisdiction.  *Id.* (internal

16   quotations and citations omitted).

17   Because the CPUC has not completed constructing a regulatory framework for TNCs,

18   including regulations for rate-related concerns, for the reasons set forth in its Order dismissing

19   these claims from the SAC, the Court once again concludes that adjudicating Flywheel's PUC

20   claims would hinder the CPUC's exercise of authority.  (3/25/20 Order at 12:6-15:1.)  The Court

21   also advised Flywheel it would have one opportunity to amend these claims.  (*Id.* at 20:21-24.)

22   Accordingly, the Court GRANTS Uber's motion and DISMISSES the PUC claims,

23   without further leave to amend.

24   **D.     The Court Dismisses, in Part, the UCL Claim.**

25   Finally, Uber argues Flywheel's UCL claim must be dismissed.  Flywheel bases the UCL

26   Claim on the alleged violations of the Sherman Act, the PUC claims, the Lanham Act claim, and

27   alleged violations of the Americans with Disabilities Act ("ADA"), non-compliance with

28   insurance requirements, and failure to comply with certain San Francisco regulations.

1       Because the Court concludes Flywheel has not alleged a violation of the Sherman Act and

2   cannot state its PUC claims, the Court GRANTS Uber's motion to dismiss the UCL claim to the

3   extent it is premised on those claims, for the reasons set forth above.  *See Eastman v. Quest*

4   *Diagnostics, Inc.*, 108 F. Supp. 3d 827, 838 (N.D. Cal. 2015) (dismissing unfair competition

5   claims because "derivative" of other dismissed claims).

6       **1.**       **Statutory Standing.**

7       Uber argues that Flywheel lacks statutory standing to pursue this claim based on the

8   alleged violations of the ADA, including the requirement to provide accessible vehicles, the

9   alleged failure to carry insurance required by California law, and the alleged failure to comply

10  with other regulations.  (TAC ¶¶ 275-286.)  To show standing under the UCL, Flywheel must

11  allege facts to show it "suffered [1] injury in fact and [2] has lost money or property [3] as a result

12  of the unfair competition."  Cal. Bus. & Prof. Code § 17204.

13      In many cases, "proof of injury in fact will … overlap with proof" of the requirement that a

14  plaintiff have "lost money or property."  *Kwikset Corp. v. Sup. Ct.*, 51 Cal. 4th 310, 322 (2011).

15  In general, the phrase "injury in fact" has the same meaning as it does under Article III of the

16  United States Constitution.  *Id.* at 322-23.  However, because Section 17204 requires a plaintiff to

17  show they have lost money or property, the UCL limits injury in fact to economic injury.  *Id.* at

18  324.  A plaintiff may show it "lost money or property" by showing it "(1) surrender[ed] in a

19  transaction more, or acquire[d] in a transaction less, than [it] otherwise would have; (2) ha[d] a

20  present or future property interest diminished; (3) was deprived of money or property to which [it]

21  had] a cognizable claim; or (4) [was] required to enter into a transaction, costing money or

22  property, that would otherwise have been unnecessary."  *Kwikset*, 51 Cal. 4th at 323.  "The phrase

23  'as a result of' in its plain and ordinary sense means 'caused by'."  *Id.* at 326 (quoting *Troyk v.*

24  *Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1349 (2009)).  If "a complaining party would suffer

25  the same harm whether or not a defendant complied with the law," the requisite causal connection

26  is broken.  *Daro v. Sup. Ct.*, 151 Cal. App. 4th 1079, 1099 (2007).

27      Flywheel now alleges it:

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  has lost more than one thousand (1,000) drivers as a result of Uber's
2  [unlawful conduct].  At the time each driver stopped leasing taxicabs
   from Flywheel and left to drive for Uber, Flywheel had a contract
3  with the driver through which the parties agreed that the driver
   would pay between $65.00 and $130.00 in daily lease fees to lease a
4  taxicab from Flywheel.  Each contract contained a provision that the
   driver would provide at least 30 days' [sic] notice before terminating
5  the contract.  Most or all of the drivers that stopped leasing taxicabs
   from Flywheel in order to drive for Uber did not give notice before
6  terminating the contract and did not pay leasing fees to after leaving
   to drive for Uber.

7  (TAC ¶¶ 277, 280.)

8       Flywheel also alleges that it "was required to and did spend, out of the leasing fees it

9  received, approximately $250.00 per vehicle per month to comply with" the ADA, while at the

10 same time "Uber enjoyed increased revenues of approximately $250 per vehicle per month due to

11 its failure to comply with" the ADA.  (*Id.* ¶ 282; *see also id.* ¶¶ 284, 286 (alleging Flywheel spent

12 $600 per vehicle per month out of leasing fees to comply with cost of liability insurance and

13 $2000 per vehicle per month out of leasing fees to comply with San Francisco's regulatory

14 requirements, a cost Uber did not incur).)  Finally, Flywheel alleges that it has suffered injury

15 because Uber's conduct caused it to lose drivers "and the consequent loss of lease payments to

16 which it was entitled and the loss of profits that were used to comply with the laws and regulations

17 with which Uber refused to comply."  (*Id.* ¶ 287.)

18      Uber contends Flywheel still has not shown those monetary losses were "as a result of"

19 Uber's alleged conduct.  In *Daro*, *supra*, the plaintiffs were a group of tenants who alleged their

20 landlords, the defendants, engaged in unlawful practices related to their evictions under the Ellis

21 Act.  In particular, the plaintiffs alleged that when the defendants purchased the property at issue,

22 they structured the transaction in such a way that it violated California's Subdivided Lands Act

23 ("SLA").  *Id.* at 1086-89.  The trial court concluded the defendants had violated the SLA and

24 required the defendants to comply with that act before selling their interests in the property or

25 before exercising their rights under the Ellis Act.  *Id.* at 1086.  The Court of Appeal reversed that

26 order on the basis that the plaintiffs lacked standing under the UCL.  *Id.*

27      The court noted that the plaintiffs did not contend the Ellis Act evictions were unlawful,

28 and the plaintiffs were not "among the class of persons the [SLA] was intended to protect[.]"  *Id.*

at 1098-99.  The court reasoned the plaintiffs failed to show a causal connection between their harm and the defendant's conduct, which was "illustrated by the fact that the tenants would suffer the same injury regardless of whether the [defendants] complied with or violated the [SLA]. Indeed, even if the [defendants] fully complied with the trial court's injunction, the [plaintiffs] would still face eviction."  *Id.* at 1099; *see also Medina v. Safe-Guard Prods., Int'l, Inc.*, 164 Cal. App. 4th 105, 109, 114-15 (2008) (concluding insurance policy sold by unlicensed insurer is enforceable by the insured and concluding that plaintiff lacked standing under the UCL on the basis that he did not show he suffered a loss because of the insurer's lack of license).

Flywheel relies on *Law Offices of Mathew Higbee v. Expungement Assistance Services*, 214 Cal. App. 4th 544 (2013).  In that case, the plaintiff was an attorney who alleged the defendant engaged in the unauthorized practice of law, which forced him, "in order to compete, to lower his prices and to expend more money on advertising[.]"  *Id.* at 556.  The plaintiff also alleged he lost clients and revenue and alleged his law firm's value diminished because of the defendant's conduct.  *Id.* at 556.  The court determined those allegations were sufficient to show both "injury in fact" and the requisite causal connection to the defendant's allegedly unfair business practices. *Id.* at 559-561, 564; *cf. Allergan, Inc. v. Athena Cosmetics, Inc.*, 640 F.3d 1377, 1382 (Fed. Cir. 2011) (concluding plaintiff alleged standing under UCL when it alleged it had lost sales, revenue, market share, and asset value" because of the defendant's conduct marketing products that did not comply with, *inter alia*, federal and state labeling requirements).

Flywheel argues that Uber's failures to comply with the ADA and San Francisco's regulatory requirements and its failure to obtain liability insurance gave it an "unfair advantage" and increased its revenues, which then enabled Uber to unfairly compete for market share. Although Flywheel claims it suffered harm "in the form of increased costs," (Opp. Br. at 14:16-15:11), Flywheel neither alleges nor argues that it would not have been required to expend those sums if Uber had complied with those laws and regulations.  Flywheel also argues that it has lost market share and has lost 65% of its drivers and 50% of its riders.  (TAC ¶ 24.)  However, Flywheel has not alleged facts to show that its costs to comply with these various laws and regulations increased as a result of Uber's actions or that it was required to lower its prices in

1    order to compete, as the plaintiff in *Higbee* alleged.  Flywheel also has not alleged facts that

2    connect the alleged loss of drivers and riders to Uber's purported violations of the ADA and

3    Uber's alleged failure to comply with insurance or regulatory requirements.

4        Accordingly, the Court concludes Flywheel has not sufficiently alleged statutory standing

5    to pursue this aspect of its UCL claim, and it GRANTS, IN PART, Uber's motion to dismiss the

6    UCL claim.  Flywheel's UCL claim shall be limited to the alleged violations of the Lanham Act.

7        **2.    Restitution.**

8        Uber also renews its argument that the Court should dismiss Flywheel's request for

9    restitution because Flywheel actually seeks non-restitutionary disgorgement of Uber's profits,

10   which is not a permissible remedy under the UCL.  *See Chowning v. Kohl's Dep't Stores, Inc.*,

11   733 F. App'x 404, 406 (9th Cir. 2018); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

12   1134, 1144-45 (2003).

13       Flywheel amended its prayer for relief to state it seeks "disgorgement of all profits and

14   money in which [it] had a *vested interest* that was illegally obtained or diverted by" Uber.  (TAC

15   at 48:14-15 (emphasis added).)[5]  The claim for profits or money in which it has a vested interest is

16   a legal conclusion and standing alone is not sufficient to establish Flywheel's request for

17   disgorgement is restitutionary.  A "vested interest is one that is unconditional, absolute, and not

18   contingent."  *Pegasus Satellite Television, Inc. v. DirectTV, Inc.*, 318 F. Supp. 2d 968, 979 (C.D.

19   Cal. 2004) (internal quotations and citations omitted); *see also Black's Law Dictionary* at 1794

20   (10th ed. 2014).  For example: money earned but not yet remitted.  *Cortez v. Purolator Air*

21   *Filtration Products Co.,* 23 Cal. 4th 163, 178 (2000); *see also In re High-Tech Emp. Antitrust*

22   *Litig.*, 856 F. Supp. 2d 1103, 1124 (N.D. Cal. 2012).  However, "compensation for expected but

23   unearned future income to which the plaintiff has no legal entitlement is not recoverable as

24   restitution under the UCL, regardless whether it is characterized as lost market share."  *Lee v.*

25   *Luxottica Retail N. Am., Inc.*, 65 Cal. App. 5th 793, 797 (2021).

26       For example, in *Korea Supply,* the California Supreme Court held the plaintiff failed to

27

28   _____
     [5]    Flywheel does not argue that Uber has taken money directly from Flywheel.  *See Korea*
     *Supply*, 29 Cal. 4th at 1149.

United States District Court
Northern District of California

1  demonstrate it had a vested interest in the money it sought to recover from the defendant.  There,

2  the plaintiff alleged the defendant violated the UCL by using bribes and other favors to cause a

3  company that the plaintiff represented to lose a contract with the Republic of Korea and sought to

4  recover the profits the defendant gained from that contract.  *Id.* at 1140.  The Supreme Court

5  reasoned that the commission did not "not represent a quantifiable sum owed by defendants to

6  plaintiff.  Instead, it is a contingent expectancy of payment from a third party."  *Id.* at 1150.

7       Here, Flywheel alleges that its drivers agreed to pay daily lease fees and to provide notice

8  30 days before terminating a contract.  Most drivers did not provide the requisite notice and did

9  not pay leasing fees after they left.  (*See, e.g.,* TAC ¶ 274.)  Flywheel argues the lease payments

10  are akin to income earned but not yet been remitted.  The Court is not persuaded because, without

11  more, the facts alleged do not support a reasonable inference that Flywheel's interest in its lease

12  payments were vested, rather than "a contingent expectancy of payment from a third party."

13  *Korea Supply*, 29 Cal. 4th at 1150.[6]  Nor are the facts alleged sufficient to draw a reasonable

14  inference that funds in Uber's possession could be traceable to those leases.

15       Accordingly, the Court concludes Flywheel fails to allege facts to show it would be

16  entitled to restitution on its UCL claim, and it GRANTS, IN PART, the motion to dismiss.

17  However, because Uber has not challenged Flywheel's allegations regarding injunctive relief, the

18  Court DENIES the motion to dismiss the claim in its entirety.

19                              **CONCLUSION**

20        For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART,

21  Uber's motion to dismiss, without further leave to amend.  Defendants shall file an answer by no

22  later than December 3, 2021, and the parties shall appear on January 14, 2022 at 11:00 a.m. for a

23  case management conference.  The parties' joint case management conference statement shall be

---

[6]     The Court's conclusion is further supported by the fact that Flywheel's claims for intentional interference, now dismissed, were based on *prospective* economic relations rather than for intentional interference with contractual relations.  In addition, To the extent this Court found otherwise in *Luxpro Corp., v. Apple, Inc.*, it declines to follow that reasoning here. No. 10-cv-3058-JSW, 2011 WL 3566616, at *8 (N.D. Cal. Aug. 12, 2011).

United States District Court
Northern District of California

due by no later than January 7, 2022.

     **IT IS SO ORDERED.**

Dated: November 18, 2021

_____
JEFFREY S. WHITE
United States District Judge